GIANSANTE & ASSOC., LLC
BY: LOUIS GIANSANTE, ESQUIRE
63 EAST MAIN STREET
MOORESTOWN, NEW JERSEY 08057
(856) 273-8866
(856) 273-8988 (FAX)
ATTORNEY FOR THE MOVANTS, RICHARD AND SHERRY MAROLDA,
MAROLDA FARMS, INC., AND RIGI HOLDINGS, LLC.

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plainitff,<br><br>　　v.<br><br>SOUTH JERSEY CLOTHING COMPANY, | Civil No. 96-3166 (JBS)<br>(Hon. Jerome Simandle) |
| SOUTH JERSEY CLOTHING COMPANY,<br>INC.,<br><br>　　　　Third-Party Plaintiff,<br><br>　　v.<br><br>GARDEN STATE CLEANERS, INC.,<br>ET AL,<br><br>　　　　Third-Party Defendants, | |
| NEW JERSEY DEPARTMENT OF<br>ENVIRONMENTAL PROTECTION, ET AL.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>SOUTH JERSEY CLOTHING COMPANY,<br>ET AL.,<br><br>　　　　Defendants | Civil No. 01-04379 (JBS)<br>(Hon. Jerome B. Simandle) |

**AFFIDAVIT OF LOUIS GIANSANTE, ESQUIRE
IN SUPPORT OF THE MOTION BY RICHARD AND SHERRY MAROLDA,
MAROLDA FARMS, INC., AND RIGI HOLDINGS, LLC.
FOR FED. R. CIV. P. 60(B)(4) AND (5)RELIEF.**

BURLINGTON COUNTY  :

                               :  **ss:**

STATE OF NEW JERSEY :

I, Louis Giansante, Esquire, of full age do hereby depose as follows:

1.    The Movants, Richard and Sherry Marolda, are farmers. They own farmland at 3024 Vine Road (hereinafter the "Farm"), Buena, New Jersey.  They also own a separate parcel of farmland (hereinafter identified as the "Horse Farm"), located at 2960 Vine Road. Jointly, the two properties comprise the bulk of the 500 acres farmed annually by the Moraldas.  See New Jersey Superior Court Law Division Complaint in *Moralda Farms v. Maryland Casualty Insurance Co., et al*, Docket No. L-861-11 attached to the Affidavit of Louis Giansante, Esq. (Hereinafter referred to as "Counsel's Affidavit") as Exhibit "A".

2.    The Movants, husband and wife, conduct their farming operations under the corporate name of Marolda Farms, Inc. and Rigi Holdings, LLC.  Counsel's Affidavit, Exhibit "A" at ¶ 2.

3.    Groundwater in the vicinity of the Marolda's farm has been contaminated by chlorinated solvents originating from the the South Jersey Clothing Company, the South Jersey Clothing Company, Inc., (hereinafter collectively referred to as "SJCC")

and Garden State Cleaners (hereinafter "GSC") superfund sites, which are located directly up-gradient of the Moraldas' farming operations.  *Id.* at ¶ 3.

4.   The Moraldas' operations are entirely dependent upon adequate supplies of ground water for irrigation.  To that end, over the 35 years it took them to build their farm, the Moraldas have developed sufficient water supplies, built extraction wells and secured an allocation permitting the extraction of sufficient water supplies to irrigate their entire operation.

5.   As the result of the groundwater contamination from the SJCC/GSC Superfund sites, two major irrigation wells, critical to the Maroldas' farming operations, have been either closed down or their allocation severely curtailed.

6.   The well on the horse farm property (well "HF1") has been completely shut down.  HF1 is located within the plume of contaminants from the SJCC/GSC sites.  See Figure 50 from the May, 2006 EPA Groundwater Report attached to Counsel's Affidavit as Exhibit "B".[1]

7.   The Moraldas' other irrigation production well (well "RN3") is located side gradient to the plume emanating from the SJCC/GSC site.  *Ibid.*  That well has had its allocation severely

---

[1]Figure 50 locates well HF1 and RN3 within the intermediate capture zones for two contaminants: PCE and TCE, both of which are the primary contaminants at the SJCC and GSC sites.  *See* Counsel's Affidavit, Exhibit "B".

curtailed by the NJDEP, who have concluded that RN3's traditional pumping rate is influencing the contaminant plume from the SJCC/GSC sites, drawing the contaminated groundwater eastward, into clean groundwater supplies. To prevent further migration of the contaminant plume, the NJDEP has reduced the Moraldas allocation for RN3.

8.   On March 14, 2011, in conjunction with the DEP, well RN3 was relocated to within 50 feet of the Moraldas' eastern property line and, for the moment, has had its allocation restored to original levels.  HF1, however, is still shut down and has not yet been replaced, although the Moraldas have been working with the Army Corps of Engineers to find a suitable location for the new well.

9.   The insurance carriers have been on notice since 1986 that contamination from the SJCC and GSC sites was impacting local potable water supplies.  *See* pages 4-5 of a December 22, 1986 Transcript discussing the impact of contamination on local groundwater supplies attached to Counsel's Affidavit as Exhibit "C".  Municipal water was supplied to all homeowners and commercial businesses in Buena Borough.  The Moraldas' production well HF1 is less than 700' directly down gradient from the area that received the replacement water supply.  Yet, the Moraldas were never offered alternate water supplies nor notified that their water supply sources were in jeopardy.

-4-

10.  By July, 1993, the groundwater contamination plume had reached the vicinity of HF1.  See Figure 55 from the EPA's May 2006 Groundwater Study attached to Counsel's Affidavit as Exhibit "D".  Thus, the contamination had impacted HF1 and encroached upon the capture zone of RN3 long before the Consent Decree was entered and the settlements were reached with SJCC/GSC and their insurance carriers.

11.  As the result of the loss of groundwater supplies due to the SJCC/GSC contamination, the Moraldas have suffered damages, including ongoing crop losses and property value diminution.  Counsel's Affidavit Exhibit "A" at ¶ 4.

12.  The Moraldas' damages were the subject of litigation between the plaintiffs, SJCC and GSC captioned *Marolda Farms Inc., et al. v. South Jersey Clothing Company, et al.*, Docket No. L-3440-06.  That litigation resulted in the entry of a judgment No. 134921-08, dated May 9, 2008, entered against the SJCC and GSC parties, jointly and severally in the amount of $9,170,600. See Final Judgment attached to Counsel's Affidavit as Exhibit "E".  After securing judgment against SJCC/GSC, attempting to execute upon the assets of SJCC/GSC, having their writ of execution returned unsatisfied, the Moraldas filed a post-judgment action to reach the proceeds from policies issued to SJCC and GSC by various insurance carriers.  Counsel's Affidavit, Exhibit "A".

13.   Defendant, Maryland Casualty Insurance Co., (hereinafter "Maryland Casualty") issued primary liability insurance policies to SJCC.  *Id.* at ¶ 4.  Those policies included Policies Nos. GL 28265007, GL 37392843, GL58307997 and GL47434501.

14.   Defendant, The Insurance Company of the State of Pennsylvania (hereinafter "ICSPA") issued insurance policies to SJCC during its operating period.  *Id.* at ¶ 5.  Those policies included Policies Nos. MP168-5985 and MP168-8449.

15.   Defendant, Zurich American Insurance Co., (hereinafter "Zurich") issued policies to SJCC during its operating period, including the period between 1970-1974, as well as issuing Policies Nos. 86-57-197 and 87-29-137.  *Id.* at ¶ 6.

16.   Defendant, North River Insurance Company (hereinafter "North River") issued both primary and umbrella liability policies to SJCC during its operating period.  *Id*. at ¶ 7.  Those policies included Policies Nos. 540-208704-6, 540-384652-8, 523-030503-6, 523-062995-4, 523-131051-6 and 520-165357-2.

17.   Defendant Continental Insurance Co., (hereinafter "CNA") issued liability policies to GSC during its operating period. *Id.* at ¶ 8. Those policies included Policies Nos. SMP6087524, SMP2418055, SMP2676123 and SMP3326423.

18.   SJCC engaged in the manufacture of uniforms.  As part of the manufacturing process the company utilized chlorinated

solvents including Trichloethylene (TCE) and tetrachloroethylene (PCE). Chlorinated solvents were discharged at the SJCC site and contaminating the local groundwater. *Id.* at ¶ 8.

19. GSC utilized PCE and TCE in its operations, which were discharged from the GSC site, contaminating the local groundwater. That TCE impacted soils and the local groundwater. *Id.* at ¶ 9.

20. In 1988 the United States Department of Environmental Protection (hereinafter referred to as "USEPA") sent a special notice letter to both SJCC and GSC notifying of its intent to place both the SJCC and GSC sites on the USEPA's National Priorities List ("NPL") under the federal Superfund Program.

21. Studies conducted by the USEPA concluded that the operations of SJCC and GSC have contaminated the groundwater in the vicinity of those sites. See Exhibits "B" & "D".

22. On September 22, 2002, this Court entered a Consent Decree between the defendants, SJCC, GSC, the United States and the State of New Jersey in the matter entitled *United States of America v. South Jersey Clothing Company*, Civil Action No. 01-04379 consolidated with Civil Action No. 96-3166(hereinafter the "Consent Decree"). See Consent Decree attached to Counsel's Affidavit as Exhibit "F".

23. Attached to the Consent Decree were certain settlement agreements entered into between SJCC, GSC and their respective

insurers.  See Counsel's Affidavit, Exhibit "F", Appendix A-D. According to the carriers, these agreements not only resolved the EPA's enforcement action but constituted a, so called, "site release" releasing them from any other potential liabilities associated with the SJCC/GSC sites.

24.  There is no dispute that the alleged "site release" between SJCC, GSC and their insurance carriers, if it was given at all, was provided in exchange for far less than the coverage limits of SJCC/GSC's insurance coverage.  The, so called, "site release" is clearly a windfall to the insurance carriers.

25.  The Consent Decree also memorialized representations made by SJCC and GSC to the USEPA to the effect that the clean-up liabilities at their respective sites greatly exceeded the assets of the companies and the individuals who owned them.  See Counsel's Affidavit, Exhibit "F" ¶ 42.  As such, at the time of the execution of the Consent Decree, SJCC and GSC were insolvent; their environmental liabilities greatly exceeding their assets.

26.  On May 12, 2006, the Plaintiffs filed suit against the South Jersey Clothing Company (hereinafter the "SJCC")and Garden State Cleaners (hereinafter "GSC").  The suit sought compensation for damages to the Marolda's farming operations from the contaminant plume emanating from both the GSC and the SJCC Superfund sites.

27.  Judgment was entered in that matter by Judge Perskie on

May 9, 2008. See Counsel's Affidavit, Exhibit "E". After significant efforts to execute on their judgment, On December 3, 2010, the Court entered an Order confirming that the Plaintiffs' Writ of Execution had been Returned Unsatisfied. See Court's Order attached to Counsel's Affidavit as Exhibit "G".

28.   This matter was filed against the insurance carriers of SJCC and GSC on February 7, 2011, seeking to enforce the plaintiffs' judgment against the proceeds of SJCC and GSC's insurance policies. Counsel's Affidavit, Exhibit "A". Motions to Dismiss were filed by the Defendants in the Superior Court. The arguments, among others, included the argument that the plaintiff's claims against the SJCC/GSC insurance policies were prohibited by this Court's September 22, 2002 Consent Decree. Oral argument was held on August 18, 2011. See Transcript of Oral Argument Attached to Counsel's Affidavit as Exhibit "H".

29.   On October 26, 2011, Judge Kane issued an Order granting the defendants' Motions to Dismiss without prejudice, ruling that he lacked jurisdiction to hear the claims asserted in the plaintiffs complaint and that the plaintiffs must take their arguments to the Federal Court. The Order was accompanied by a written opinion explaining the dismissal as follows:

> ... Defendant insurers, SJCC and GSC entered into a settlement agreement and release. The settlement agreement and release was incorporated into a consent decree which was approved by a District Court Judge and filed in the U.S. District Court.

* * *

> Plaintiffs are asking this Court to make a
> determination that the agreement and release is void
> against public policy when this issue was already ruled
> upon by the District Court.

* * *

> No special justifications are present here, and if
> Plaintiffs seek a reconsideration of the District
> Court's finding that the agreement does not violate
> public policy, the proper motion must be made to the
> appropriate court.  Defendants' motions to dismiss and
> Plaintiffs opposition are intertwined, and for those
> reasons, this matter is dismissed without prejudice, in
> its entirety, to be litigated in the proper forum.

See Judge Kane's October 25, 2011 Opinion attached to Counsel's

Affidavit as Exhibit "I" at 7.  An appeal followed.

    30.  On November 29, 2012, the Appellate Division clarified

the issue of the Superior Court's jurisdiction, ruling that the

Superior Court certainly had jurisdiction to hear the plaintiff's

claims but, given that this District Court retained jurisdiction

to enforce the terms of the consent decree,[2] Comity dictated that

the issue be presented first to the Federal District Court in

case your honor wished to exercise jurisdiction over the dispute

between the plaintiffs and SJCC/GSC's insurance carriers

regarding the efficacy of the releases executed between them.

See Opinion in A-1299-11 attached to Counsel's Affidavit as

Exhibit "J".  On that issue, the Court ruled as follows:

---

    [2]See § XVI of the Consent Decree (Retention of
Jurisdiction).

Here, the terms of the releases were incorporated into the consent decree.  The consent decree, as noted, expressly provided that the United States District Court 'shall retain jurisdiction of this matter for the purpose of enforcing the terms of this consent decree.' It is therefor evident, not only by the court's language in the decree expressly reserving to itself continuing jurisdiction to enforce the terms of the decree, but also by the extent of the terms of the settlement incorporated into the decree, that the court intended to retain jurisdiction to enforce the decree.

While plaintiff were not parties to the action, the issues they raised in their complaint in the Law Division explicitly challenged the lawfulness of the terms embodied in the consent decree.  Consequently, even assuming the United States district Court decree was not intended to bind plaintiffs, we adopt the approach encouraged by our Court in Thompson that, "out of an abundance of caution and as a matter of comity, the better course was for the Superior Court to decline to hear the matter until the plaintiffs first exhausted their potential federal remedies.

Counsel's Affidavit, Exhibit "J" at 14-15.

31.  All of the documents attached hereto as Exhibits A-L are true and correct copies of the documents as described in paragraphs 1-28 above.

_____
**Louis Giansante, Esquire**

**Sworn and Subscribed
before me this 4th day
of January, 2013**

**Maritza Gonzalez**
A Notary in the
State of New Jersey

My Commission Expires
September 13, 2017

-11-

# EXHIBIT A

EXHIBIT "A"

**GIANSANTE & COBB, LLC**
By: Louis Giansante, Esquire
63 East Main Street
Moorestown, New Jersey 08057
(856) 273-8866
Attorney for the Plaintiffs

RECEIVED and FILED

FEB - 7 2011

ATLANTIC COUNTY
LAW DIVISION

|  |  |
|---|---|
| MAROLDA FARMS, INC., RIGI HOLDINGS, LLC, : SHERRY MAROLDA and RICHARD MAROLDA, Sr., : | SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY |

MAROLDA FARMS, INC., RIGI HOLDINGS, LLC, : SUPERIOR COURT OF NEW JERSEY
SHERRY MAROLDA and RICHARD MAROLDA, Sr., : ATLANTIC COUNTY
                                          : LAW DIVISION - CIVIL ACTION
            Plaintiffs,                   :
                                          : Docket No. L 861/11
      vs.                                 :
                                          :
MARYLAND  CASUALTY  INSURANCE  CO., :
INSURANCE  COMPANY  OF  THE  STATE  OF :
PENNSYLVANIA,  ZURICH  AMERICAN :
INSURANCE  CO., NORTH RIVER INSURANCE :
CO.,  CONTINENTAL  INSURANCE  CO.,  ABC : **COMPLAINT WITH JURY DEMAND**
COMPANIES 1-100, JOHN AND JANE DOE 1-100, :
                                          :
            Defendants.                   :
                                          :
                                          :

Plaintiffs by way of Complaint against the Defendants, state:

## THE PARTIES

1.      The plaintiffs are farmers and the owners of property located at 3024 Vine Road, a stable and

horse farm located at 2960 Vine Road and property located at 2960 Vine Road (hereinafter collectively

referred to as the "Farm") all of which is owned and operated by the plaintiffs.

2.      Plaintiffs Richard Marolda, Sr. and Sherry Marolda are husband and wife who own and

operate the Farm under the corporate name of Marolda Farms, Inc. and own property in their individual

capacity or as the owners of Rigi Holdings, LLC.

3.      Groundwater in the vicinity of the Marolda's operations and holdings has been contaminated by certain chlorinated solvents which originated from the dry cleaning operations of the South Jersey Clothing Company and the South Jersey Clothing Company, Inc., (hereinafter collectively referred to as "SJCC") as well as Garden State Cleaners (hereinafter "GSC").

4.      As the result of the groundwater contamination emanating from the SJCC and GSC sites, the plaintiffs have suffered damages. These damages were the subject of litigation between the plaintiffs, SJCC and GSC captioned *Marolda Farms Inc., et al. v. South Jersey Clothing Company, et al.*, Docket No. L-3440-06. That litigation resulted in the entry of a judgment No. 134921-08, entered against the SJCC and GSC parties, jointly and severally, in the amount of $9,170,600.00. A copy of the judgment is attached hereto as Exhibit "A". This post-judgment enforcement and garnishment proceeding is directed at the assets of SJCC and GSC's insurance carriers.

4.      Defendant, Maryland Casualty Insurance Co., (hereinafter "Maryland Casualty") issued primary liability insurance policies to SJCC. Those policies included Policies Nos. GL 28265007, GL 37392843, GL58307997 and GL47434501.

5.      Defendant, The Insurance Company of the State of Pennsylvania (hereinafter "ICSPA") issued insurance policies to SJCC during its operating period. Those policies included Policies Nos. MP168-5985 and MP168-8449.

6.      Defendant, Zurich American Insurance Co., (hereinafter "Zurich") issued policies to SJCC during its operating period, including the period between 1970-1974, as well as issuing Policies Nos. 86-57-197 and 87-29-137.

GIANSANTE & COBB, LLC
63 EAST MAIN STREET

7.     Defendant, North River Insurance Company (hereinafter "North River") issued both primary and umbrella liability policies to SJCC during its operating period. Those policies included Policies Nos. 540-208704-6, 540-384652-8, 523-030503-6, 523-062995-4, 523-13105 1-6 and 520-165357-2.

8.     Defendant Continental Insurance Co., (hereinafter "CNA") issued liability policies to GSC during its operating period. Those policies included Policies Nos. SMP6087524, SMP2418055, SMP2676123 and SMP3326423.

9.     Defendants, ABC Companies (1-100) are partnerships, limited liability corporations and/or corporations who have issued insurance policies to SJCC or GSC during their operating periods.

10.     John and Jane Doe, (1-100) are individuals who have either issued insurance on behalf of SJCC or GSC or were involved in the claims process, litigation or settlement leading to the policy buy backs which are at the center of this action.

## BACKGROUND

8.     SJCC engaged in the manufacture of uniforms. As part of the manufacturing process the company utilized chlorinated solvents including Trichloethylene (TCE) and tetrachloroethylene (PCE). Chlorinated solvents were discharged at the SJCC site and contaminate the local groundwater.

9.     In 1979 an accident resulting from a fire released an estimated 275 gallons of TCE from a storage tank located on the site. That TCE impacted soils and the local groundwater.

10.     In 1984 SJCC entered into an Administrative Order on Consent with the NJDEP.

11.     Wastes, containing PCE, were discharged at the GSC site, impacting the soils and local groundwater.

12.     In 1988 the United States Department of Environmental Protection (hereinafter referred to as "USEPA") sent a special notice letter to both SJCC and GSC notifying of its intent to place both the SJCC and GSC sites on the USEPA's National Priorities List ("NPL") under the federal Superfund Program.

13.     Studies were conducted by the USEPA in the vicinity of the SJCC and GSC sites which concluded that the operations of SJCC and GSC have contaminated the groundwater in the vicinity of those sites.

14.     The plaintiffs depend on access to groundwater supplies for irrigation of their crops. Contamination from the SJCC and GSC sites has impacted the farm's ability to extract sufficient water supplies from its production wells, ultimately resulting in the closure of well HF1 and the reduction of the water allocation available from the farm's other production wells. As the result of the contamination from the SJCC and GSC sites, the plaintiffs have suffered damages. The absence of adequate groundwater supplies has also compromised the plaintiffs' development rights.

15.     Those damages have been quantified by the Honorable Steven P. Perskie, J.S.C., who, on May 9,, 2008, entered judgment against SJCC and GSC, jointly and severally.

16.     There exists a Consent Decree entered into between the defendants, SJCC, GSC, the United States and the State of New Jersey in the United States District Court of New Jersey in the matter entitled *United States of America v. South Jersey Clothing Company*, Civil Action No. 01-04379 (hereinafter the "Consent Decree").

17.     The Consent Decree identified settlement agreements entered into between SJCC, GSC and their respective insurers, not only resolving the issues involved in the EPA's enforcement action but memorializing agreements between SJCC, GSC and their respective insurers, releasing the insurance carriers beyond those amounts paid to settle the federal enforcement action. The settlements with SJCC and GSC's

GIANSANTE & COBB, LLC
63 EAST MAIN STREET

insurance carriers were designed by the insurance companies to effect a complete release of any future liability they may have as the result of the contamination emanating from the SJCC and GSC sites, which was still uncontrolled at the time of the Consent Decree.

18.     The settlement and release between SJCC, GSC and their insurance carriers amounted to a complete "buy back" of the policies by the carriers for far less than the coverage limits that had been purchased by SJCC and GSC at the time they were insuring against the very environmental risk which has caused the Marolda's harm. This, so called, buy back is an unearned windfall to the insurance carriers.

19.     The Consent Decree memorialized representations made by SJCC and GSC to the USEPA to the effect that the clean-up liabilities at their respective sites greatly exceeded the assets of the companies and the individuals who owned them.   As such, at the time of the execution of the Consent Decree, SJCC and GSC were insolvent; their liabilities greatly exceeding their assets.

### FIRST COUNT
#### Action in Garnishment

20.     The plaintiffs restate the allegations contained in paragraph 1 through 19 as if set forth at length herein.

21.     The plaintiffs are judgment creditors of SJCC and GSC by virtue of the judgment secured and docketed in May, 2008.  A writ of execution was deemed to be returned unsatisfied on December 3, 2010.

22.     The Defendants are insurance carriers who issued liability insurance to either SJCC or GSC and are responsible to satisfy the plaintiffs' judgment.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants declaring that the Defendants are liable to satisfy the plaintiffs' judgment and are garnishees of the

proceeds recoverable under SJCC or GSC's policies, as well as an assessment of costs and attorneys fees and any other relief this Court deems equitable and just.

GIANSANTE & COBB, LLC
63 East Main Street

## SECOND COUNT
### Equitable and Legal Fraud

27.    The Plaintiffs restate the allegations contained in paragraph 1 through 26 as if set forth at length herein.

28.  The Defendants' were required by their insurance contracts to defend SJCC and GSC from claims raised by the EPA and DEP.  They were also required to indemnify SJCC and GSC, at the very least, up to their respective policy limits.

29.    The defendants failed to defend SJCC and GSC and failed to negotiate in good faith with their insureds, conditioning the resolution of the claims made by the EPA and DEP upon a complete buy back of all remaining coverage that it had issued to SJCC and GSC.

30.    The settlement agreements between the Defendants, SJCC and GSC were unconscionable and constituted legal and equitable fraud upon SJCC, GSC and the creditors of both companies.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against Defendants assessing damages, punitive damages, as well as an assessment of costs and attorneys fees along with any other relief this Court deems equitable and just.

## THIRD COUNT
### Fraudulent Conveyance of Assets

31.    The Plaintiffs restate the allegations contained in paragraph 1 through 30 as if set forth at length herein.

32.    The defendants, so called, Buy Back agreements were made at time when SJCC and GSC were admittedly insolvent, their environmental liabilities far exceeding the companies assets, and constituted a sale of the companies assets out side of the ordinary course of business.

GIANSANTE & COBB, LLC
63 EAST MAIN STREET

WHEREFORE, the Plaintiffs demand judgment in their favor and against Defendants declaring that the Defendants constituted a fraudulent conveyance of the companies' assets and that those policies are available to satisfy the plaintiffs' judgment, as well as an assessment of costs and attorneys fees along with any other relief this Court deems equitable and just.

## FOURTH COUNT
### Unjust Enrichment

33.   The Plaintiffs restate the allegations contained in paragraph 1 through 32 as if set forth at length herein.

34.   As a direct result of the aforementioned actions, the Defendants have been unjustly enriched at the expense of the creditors of SJCC and GSC.

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants ordering them to disgorge the benefits that they improperly received as the result of the unconscionable Buy Back Agreements, as well as an assessment of and costs and attorneys fees along with any other relief this Court deems equitable and just.

## FIFTH COUNT
### Declaratory Action

35.   The Plaintiffs restate the allegations contained in paragraph 1 through 34 as if set forth at length herein.

36.   Plaintiff, judgment creditor, seeks a declaration, pursuant to the New Jersey Declaratory Judgment Act, N.J.S.A. §§ 2A:16-51, et seq., that the, so called, "Buy Back" agreements that are the subject of this litigation are void as against public policy.

WHEREFORE, the plaintiffs demand judgment declaring the, so called, buy back agreements void as against public policy and further declaring that the proceeds of the defendants' policies are

GIANSANTE & COBB, LLC
63 EAST MAIN STREET

available to satisfy the plaintiffs' judgment, as well as an assessment of attorney fees, costs of suit and any other relief that this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Please take notice that the Plaintiffs demand trial by jury as to all counts in the Plaintiffs' complaint.

## DESIGNATION OF TRIAL COUNSEL

Louis Giansante, Esquire is hereby designated trial counsel for the Plaintiffs in this matter.

GIANSANTE & COBB, LLC

By: _____
Carol Rogers Cobb, Esq.
**Attorney for the Plaintiffs**

Dated: February 2, 2010

## CERTIFICATION

Pursuant to R. 4:5-1, I hereby certify that, to the best of my knowledge information and belief, that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding.

At this time, the plaintiffs know of no other parties to be joined to this litigation.

GIANSANTE & COBB, LLC

By: _____
Carol Rogers Cobb, Esq.
**Attorney for the Plaintiffs**

Dated: February 2, 2010

GIANSANTE & COBB, LLC
63 EAST MAIN STREET
MOORESTOWN, NJ 08057

# EXHIBIT B

EXHIBIT "B"



Figure 50

Intermediate Capture Zones & 2005 Concentrations
November 2004 Calibration
SJCC/GSC Superfund Site
May 2006

## Intermediate Capture Zones
### (Bottom of Upper Sand 2)

| Well | Rate (GPM) |
|------|-----------|
| EWS1 | 8 |
| EWS3 | 20 |
| EWS4 | 8 |
| EWI9 | 45 |
| EWI12 | 65 |
| EWS15 | 33 |
| **Total** | **179** |

EWS 2, 5, 8, 14 = 0
EWI7, 8,10, 11, 13

Capture Zones - Intermediate wells

TCE (ppb) - Intermediate wells
- ND
- 0.3 - 1
- 1 - 5
- 5 - 10
- 10 - 50
- 50 - 100
- 100 - 250
- 250 - 500
- 500 - 1000
- 1000 - 5000

TCE (ppb) - contours
- 1
- 10
- 50
- 100
- 250
- 500

# EXHIBIT C

EXHIBIT "C"

4

It's my understanding that the tort defendants here, Lirio Chemical and PPG, will each pay to the plaintiff the sum of $50,000.00 for a total settlement with six of the seven defendants in the amount of $366,000.00. The sum of $366,000.00 is to be payable no later than the conclusion of the trial and/or settlement, if such should occur, with Zurich Insurance Company in the month of January.

There is, in addition to the claims specifically articulated in the complaint moving papers of all the parties and discovery, a claim that has been commonly referred to in this litigation as the Spill Fund or Water Lateral Claim, which is a claim upon which the plaintiff, South Jersey Clothing Company, have been made aware by a correspondence from the State of New Jersey asserting that South Jersey Clothing Company may or is responsible for the payment of sums of money to the State and ultimately to the residents of the Borough of Buena for water hook-ups to a public water system installed by the Borough of Buena. That matter is an additional damage claim which was asserted by South Jersey Clothing Company upon notification from the State. As to

5

that matter, the four settling insurance companies
have agreed to provide a defense and to pay all
of the costs of defense, including counsel fees,
investigation fees, experts' fees and all of the
normal costs attendant to the defense of the
matter in connection with the claim of the State
and those parties and the Borough of Buena hook-
ing up to the public water system.

As to the issue of indemnification or
otherwise sometimes referred to as coverage, the
obligation of the insurance carrier under its
contract of insurance to indemnify or cover or
pay damages, that issue is not being decided.
It is being held in abeyance until a later date,
at which time, either the matter becomes ripe
because there is an actual claim that's made or
until one of the parties raises the matter before
this court, either by motion or separate cause
of action.  It is the understanding, however,
that none of the partys' rights are prejudiced
with regard to that issue of indemnification or
coverage with respect to the Spill Fund or Water
Lateral Connection Claim.  It is my understanding
-- further understanding that as part of this
settlement, we are discharging the insurance

# EXHIBIT D

EXHIBIT "D"



Figure 55
Transport Run Resulting Plume – Plan View
July 1993 Flow Field
SJCC/GSC Superfund Site
May 2006

# EXHIBIT E

EXHIBIT "E"

**GIANSANTE & COBB, LLC**
By Carol R. Cobb, Esq.
23 East Main Street
Moorestown, New Jersey 08057-3309
(856) 273-8866
Attorneys for the Plaintiffs,
Marolda Farms, Inc., Rigi Holdings, LLC
Sherry Marolda, and Richard Marolda

**FILED**

MAY 09 2008

**Steven P. Perskie, J.S.C.**

---

**MAROLDA   FARMS,   INC,   RIGI HOLDINGS,   LLC,   SHERRY   MARLODA, AND RICHARD MARLODA, SR.**

      Plaintiffs

          vs

**STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL   PROTECTION,   SOUTH JERSEY CLOTHING COMPANY, SOUTH JERSEY CLOTHING CO., INC. GARDEN   STATE   CLEANERS   COMPANY, JOHN   DOES   (1-100)   AND   ABC COMPANIES (1-100)**

      Defendants

: SUPERIOR COURT OF NEW JERSEY
:  ATLANTIC COUNTY
:  LAW DIVISION
:
:  DOCKET NO. L-3440-06
:
:
:  ORDER FOR FINAL JUDGMENT BY
:  DEFAULT
:
:
:

RECORDED AS A LIEN

JUN 16 2008

*134921-08*

---

    This matter having been brought before the Court by way of a

motion by Giansante & Cobb, LLC on behalf of the plaintiffs for

entry of final default judgment, and the Court, having, on notice

to the defendants, reviewed the submitted papers and heard

testimony on September 6, 2007 and for good cause shown it is on

this _____ day of _____, 2008

    **IT IS HEREBY ORDERED** that final judgment is entered upon the

docket in favor of the plaintiffs and against the defendants, South

Jersey Clothing Company, South Jersey Clothing Co., Inc., and

Garden State Cleaners Company, jointly, severally, and in the

alternative, in the amount of $9,170,600.00.

                             Steven P. Perskie, JSC

[ ] Opposed

[ ✓ ] Unopposed

Pa23

Page 1 of 1

# EXHIBIT F

EXHIBIT "F"

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

RECEIVED CLERK

'11 A 10 08

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 96-3166 (JBS) |
| | )   (Hon. Jerome B. Simandle) |
| SOUTH JERSEY CLOTHING COMPANY, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| SOUTH JERSEY CLOTHING COMPANY, | ) |
| INC., | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GARDEN STATE CLEANERS, INC., | ) |
| et al., | ) |
| | ) |
| Third-Party Defendants. | ) |
| | ) |
| NEW JERSEY DEPARTMENT OF | ) |
| ENVIRONMENTAL PROTECTION, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil No. 01-04379 (JBS) |
| | )   (Hon. Jerome B. Simandle) |
| SOUTH JERSEY CLOTHING COMPANY, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

# FILED

SEP 2 5 200?

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

## CONSENT DECREE

Pa38

## TABLE OF CONTENTS

I.      RECITALS AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

III.    PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

IV.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

V.      REIMBURSEMENT OF COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

VI.     ACCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

VII.    COVENANTS NOT TO SUE BY THE UNITED STATES AND
        STATE OF NEW JERSEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

VIII.   RESERVATION OF RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

IX.     COVENANTS NOT TO SUE BY THE SJCC PARTIES
        AND THE GSC PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

X.      FINANCIAL DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

XI.     EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION . . . . . . . . -35-

XII.    RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

XIII.   NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

XIV.    ENFORCEMENT OF TERMS OF CONSENT DECREE . . . . . . . . . . . . . -40-

XV.     INTEGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

XVI.    RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

XVII.   APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

XVIII.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . . . . . . -41-

XIX.    EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

XX.     SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

## I. RECITALS AND BACKGROUND

A. The United States of America, on behalf of the Administrator of the United States Environmental Protection Agency ("the United States"), filed a complaint in this matter against South Jersey Clothing Company, Inc. ("SJCC"), pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, seeking the reimbursement of response costs incurred and to be incurred in connection with the release or threatened release of hazardous substances at the South Jersey Clothing Company Superfund Site in Buena Borough, Atlantic County, New Jersey (the "SJCC Site").

B. SJCC thereafter filed a third-party action against Garden State Cleaners, Co., Albert Trasferini and John Trasferini (hereinafter the "GSC Parties," unless otherwise specified individually) in this matter. The GSC parties own and operate a parcel adjacent to the SJCC Site known as the Garden State Cleaners Superfund Site, also located in Buena Borough, Atlantic County, New Jersey (the "GSC Site").

C. The New Jersey Department of Environmental Protection, the Administrator, New Jersey Spill Compensation Fund, and the Commissioner of the New Jersey Department of Environmental Protection as Trustee for Natural Resources ("the State") filed a complaint against the GSC Parties and the SJCC Parties (as hereinafter defined) pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, and the New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58: 10-23.11, *et seq.*, seeking the reimbursement of response costs and damages incurred and to be incurred in connection with the release or threatened release of hazardous

substances at the SJCC and GSC Sites.  That case is denominated as *New Jersey Department of Environmental Protection, et al. v. South Jersey Clothing Company, et al*, Civil Action No. 01-CV04379 (JBS), as to which the State intends to file a motion to consolidate with this action for purposes of entry of this Consent Decree.

D.  On September 26, 1991, EPA issued Records of Decision under CERCLA in which it selected remedial actions for the SJCC and GSC Sites (hereinafter collectively, "the Sites"). The remedial action includes the removal of volatile organics from soils at the Sites, and the extraction and treatment of contaminated ground water.

E.  At times relevant hereto, Angelo Sparagna and Francis Sparagna were partners in South Jersey Clothing Company, a New Jersey partnership ("SJCC Partnership"), and/or officers of SJCC.  (Angelo Sparagna and Francis Sparagna will hereinafter collectively be referred to as "the Sparagnas," unless otherwise specified individually.  In addition, SJCC, SJCC Partnership and the Sparagnas will hereinafter collectively be referred to as "the SJCC Parties," unless otherwise specified individually.)

F.  The SJCC Parties and the GSC Parties each allege that they are insured under certain insurance policies which, they allege, provide coverage in connection with the release or threatened release of hazardous substances at or from the Sites.

G.  SJCC has instituted insurance coverage litigation in the Superior Court for the State of New Jersey in a case denominated *South Jersey Clothing Company, Inc. v. Continental Insurance Company, et al.*, Docket No. CUM-L-001038-91 (the "SJCC Coverage Action"),

-2-

seeking, among other things, a declaration that the SJCC Parties are covered under certain insurance policies in connection with the release or threatened release of hazardous substances at or from the SJCC Site.

H. The GSC Parties have instituted insurance coverage litigation in the Superior Court for the State of New Jersey in a case denominated *John Trasferini and Albert Trasferini, t/a Garden State Cleaners, Co. v. The C.N.A. Insurance Companies, et al.*, Docket No. L-317-97 (the "GSC Coverage Action"), seeking, among other things, a declaration that the GSC Parties are covered under certain insurance policies in connection with the release or threatened release of hazardous substances at or from the GSC Site.

I. The Parties to this Consent Decree have engaged in mediation in an attempt to resolve this matter.

J. As part of the settlement of this action, the SJCC Parties have entered into settlement agreements and releases with its insurance carriers, as follows:

1. <u>Maryland Casualty Release</u>: Pursuant to a Settlement Agreement and Release with Maryland Casualty Insurance Company ("Maryland Casualty Release"), attached hereto at Appendix A, Maryland Casualty Insurance Company ("Maryland Casualty") will make payments totaling $142,000.00 on behalf of the SJCC Parties in exchange for the agreement by the SJCC Parties to provide Maryland Casualty with a complete release from all duties, liabilities, responsibilities or obligations related to any environmental claims (as defined in the Maryland Casualty Release) related to the Sites, regardless of whether such environmental

-3-

claims are currently known or unknown to SJCC and regardless of whether such environmental claims now exist or arise in the future.  The Maryland Casualty Release is conditioned on the SJCC Parties obtaining covenants from the United States and the State not to pursue any claims related to the Sites against Maryland Casualty under the Maryland Casualty Insurance Policies, as defined herein.

2.  Insurance Company of the State of Pennsylvania Release: Pursuant to a Settlement Agreement and Release with Insurance Company of Pennsylvania ("ISOP Release"), attached hereto at Appendix B, Insurance Company of Pennsylvania ("ISOP") will make payments totaling $500,000.00 on behalf of the SJCC Parties in exchange for the agreement by the SJCC Parties to provide ISOP with a complete release from all duties, liabilities, responsibilities or obligations related to any environmental claims (as defined in the ISOP Release) related to the Sites, regardless of whether such environmental claims are currently known or unknown to SJCC and regardless of whether such environmental claims now exist or arise in the future.  The ISOP Release is conditioned on the SJCC Parties obtaining covenants from the United States and the State not to pursue any claims related to the Sites against ISOP under the ISOP Insurance Policies, as defined herein.

3.  Zurich Release: Pursuant to a Settlement Agreement and Release with Zurich American Insurance Company, as the successor to Zurich Insurance Company, U.S. Branch, by operation of law ("Zurich Release"), attached hereto at Appendix C, Zurich American Insurance Company ("Zurich") will make payments totaling $1,169,480.00 on behalf of the

-4-

SJCC Parties in exchange for the agreement by the SJCC Parties to provide Zurich with a complete release from all duties, liabilities, responsibilities or obligations related to any environmental claims (as defined in the Zurich Release) related to the Sites, regardless of whether such environmental claims are currently known or unknown to SJCC and regardless of whether such environmental claims now exist or arise in the future. The Zurich Release is conditioned on the SJCC Parties obtaining covenants from the United States and the State not to pursue any claims related to the Sites against Zurich under the Zurich Insurance Policies, as defined herein.

4. North River Release: Pursuant to a Settlement Agreement and Release with North River Insurance Company ("North River Release"), attached hereto at Appendix C, North River Insurance Company ("North River") will make payments totaling $2,338,960.00 on behalf of the SJCC Parties in exchange for the agreement by the SJCC Parties to provide North River with a complete release from all duties, liabilities, responsibilities or obligations related to any environmental claims (as defined in the North River Release) related to the Sites, regardless of whether such environmental claims are currently known or unknown to SJCC and regardless of whether such environmental claims now exist or arise in the future. The North River Release is conditioned on the SJCC Parties obtaining covenants from the United States and the State not to pursue any claims related to the Sites against North River under the North River Insurance Policies, as defined herein.

K. The GSC Parties have entered into a Settlement Agreement and Release with The

-5-

Continental Insurance Company ("Continental Release"), attached hereto at Appendix D, pursuant to which The Continental Insurance Company ("Continental") will make payments totaling $250,000.00 on behalf of the GSC Parties in exchange for the agreement by the GSC Parties to provide Continental with a complete release from all duties, liabilities, responsibilities or obligations related to any environmental claims (as defined in the Continental Release) related to the Sites, regardless of whether such environmental claims are currently known or unknown to GSC and regardless of whether such environmental claims now exist or arise in the future. The Continental Release is conditioned on the GSC Parties obtaining covenants from the United States and the State not to pursue any claims related to the Sites against Continental under the Continental Insurance Policies, as defined herein.

L. Based thereon, the United States, the State, each of the SJCC Parties and each of the GSC Parties have reached a resolution of this matter, as delineated under the terms of this Consent Decree.

M. The Parties hereto agree, and this Court, by entering this Consent Decree, finds that this Consent Decree has been negotiated by the Parties in good faith, and that this Consent Decree is fair, reasonable, and in the public interest.

THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331(a) and 1345, and 42 U.S.C. §§ 9606, 9607 and 9613(b). This Court has

personal jurisdiction over the Parties hereto. Solely for the purposes of this Consent Decree, each of the SJCC Parties and each of the GSC Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. Each of the SJCC Parties and each of the GSC Parties shall not challenge the terms of this Consent Decree, the entry of this Consent Decree, or this Court's jurisdiction to enter and enforce this Consent Decree.

## III. **PARTIES BOUND**

2. This Consent Decree applies to and is binding upon the United States and the State, and upon each of the SJCC Parties and each of the GSC Parties and their respective heirs, successors and assigns. Any change in ownership or corporate or legal status of each of the SJCC Parties or each of the GSC Parties, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter each such Party's status, obligations or responsibilities under this Consent Decree. Nothing in this Consent Decree precludes the transfer by the SJCC parties or the GSC parties of their interest in their respective Sites, provided the transferee(s) is (are) bound by the access requirements of this Consent Decree.

## IV. **DEFINITIONS**

3. Unless otherwise expressly provided herein, terms used in the Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below

-7-

are used in this Consent Decree or in the appendices attached hereto, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq*.

b. "Consent Decree" shall mean this Decree and all appendices attached hereto.

c. "Continental" shall mean The Continental Insurance Company and shall also include any predecessors, successors, assigns parent corporations, subsidiaries, affiliates and agents, and their officers, directors, employees, agents, shareholders and representatives.

d. "Continental Release" shall mean the Settlement Agreement and Release entered into between the GSC Parties and Continental, and which is attached hereto at Appendix D.

e. "Continental Policies" shall mean all known and unknown policies of insurance issued by Continental to one or more of the GSC Parties, including but not limited to those policies of insurance bearing the following policy numbers: SMP-8-01-89-95, SMP-6-08-75-24, SMP-2-41-80-55, SMP-2-67-61-23, SMP-3-32-64-23, BOX-1-44-79-11, BOX-1-44-79-10, CBP-319-844 and CBP-391-832.

f. "Day" shall mean a calendar day. In computing any period of time

-8-

**Pa47**

under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

g. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

h. "GSC" shall mean Garden State Cleaners, Co., a partnership which exists or existed under the laws of the State of New Jersey.

i. "GSC Coverage Action" shall mean *John Trasferini and Albert Trasferini, t/a Garden State Cleaners, Co. v. The C.N.A. Insurance Companies, et al.*, Docket No. L-317-97 (N.J. Super.), and appeals thereto.

j. "GSC Parties" shall mean GSC, John Trasferini and Albert Trasferini.

k. "GSC Site" shall mean the Garden State Cleaners Superfund Site, in Minotola, Buena Borough, Atlantic County, New Jersey, and depicted generally on the map attached at Appendix E.

l. "ISOP" shall mean Insurance Company of the State of Pennsylvania, and shall also include any other company affiliated with American International Group, Inc. their predecessors, successors, assigns, parent corporations, subsidiaries, affiliates and agents, and their officers, directors, employees, agents, shareholders and representatives.

m. "ISOP Release" shall mean the Settlement Agreement and Release entered into between the SJCC Parties and ISOP, and which is attached hereto at Appendix B.

n. "ISOP Insurance Policies" shall mean all known and unknown policies

-9-

of insurance issued by ISOP, including but not limited to those policies of insurance bearing the following policy numbers: MP-1685985 and MP-1688449.

o. "Insurance Companies" shall mean Maryland Casualty, ISOP, Zurich, North River and Continental.

p. "Insurance Releases" shall mean, collectively, the Agreements of Settlement and Release appended hereto at Appendices A through D.

q. "Maryland Casualty" shall mean Maryland Casualty Insurance Company and shall also include any predecessors, successors, assigns parent corporations, subsidiaries, affiliates and agents, and their officers, directors, employees, agents, shareholders and representatives.

r. "Maryland Casualty Release" shall mean the Settlement Agreement and Release entered into between the SJCC Parties and Maryland Casualty, and which is attached hereto at Appendix A.

s. "Maryland Casualty Insurance Policies" shall mean all known and unknown policies of insurance issued by Maryland Casualty to one or more of the SJCC Parties, including but not limited to those policies of insurance bearing the following policy numbers: 28265007, GL-58307997 and GL-47434501.

t. "North River" shall mean North River Insurance Company and shall also include any predecessors, successors, assigns parent corporations, subsidiaries, affiliates and agents, and their officers, directors, employees, agents, shareholders and representatives.

-10-

u. "North River Release" shall mean the Settlement Agreement and Release entered into between the SJCC Parties and North River, and which is attached hereto at Appendix C.

v. "North River Insurance Policies" shall mean all known and unknown policies of insurance issued by North River to one or more of the SJCC Parties, including but not limited to those policies of insurance bearing the following policy numbers: 520-165357-2, 540-208704-6, 523-030503-6, 540-384652-8 and 523-062995-4.

w. "Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper or lower case letter.

x. "Parties" shall mean the United States, the State of New Jersey, each of the SJCC Parties and each of the GSC Parties.

y. "Records of Decision" or "RODs" shall mean the EPA Records of Decision relating to the Sites, both signed on September 26, 1991, by the Regional Administrator, Region II, or his/her delegate, and all attachments thereto.

z. "Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that EPA, the Department of Justice acting on behalf of the EPA, and the State incurred or will incur at or in connection with the Sites, plus interest on all such costs which has accrued pursuant to U.S.C. § 9607(a).

aa. "Section" shall mean a portion of this Consent Decree identified by a roman numeral.

-11-

bb. "Sites" shall mean, collectively, the GSC Site and the SJCC Site.

cc. "SJCC" shall mean South Jersey Clothing Company, Inc., which is/was organized and existing under the laws of the State of New Jersey.

dd. "SJCC Coverage Action" shall mean *South Jersey Clothing Company, Inc. v. Continental Insurance Company, et al.*, Docket No. CUM-L-001038-91 (N.J. Super.), and appeals thereto.

ee. "SJCC Parties" shall mean SJCC, SJCC Partnership, and Angelo Sparagna and Francis Sparagna, both individually and as partners in SJCC Partnership.

ff. "SJCC Partnership" shall mean South Jersey Clothing Company, a partnership which exists or existed under the laws of the State of New Jersey.

gg. "SJCC Site" shall mean the South Jersey Clothing Company Superfund Site, in Minotola, Buena Borough, Atlantic County, New Jersey, and depicted generally on the map attached at Appendix E.

hh. "Sparagnas" shall mean Angelo Sparagna and Francis Sparagna, both individually and as partners in SJCC Partnership.

ii. "Spill Act" shall mean the New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58: 10-23.11, *et seq.*

jj. "State" shall mean the New Jersey Department of Environmental Protection and the Administrator, New Jersey Spill Compensation Fund.

-12-

kk. "Trasferinis" shall mean, collectively, John Trasferini and Albert Trasferini.

ll. "United States" shall mean the United States of America.

mm. "Zurich" shall mean Zurich American Insurance Company and shall also include any predecessors, successors, assigns parent corporations, subsidiaries, affiliates and agents, and their officers, directors, employees, agents, shareholders and representatives.

nn. "Zurich Release" shall mean the Settlement Agreement and Release entered into between the SJCC Parties and Zurich, and which is attached hereto at Appendix C.

oo. "Zurich Insurance Policies" shall mean all known and unknown policies of insurance issued by Zurich to one or more of the SJCC Parties, including but not limited to those policies of insurance bearing policy numbers: 86-57-197 and 87-29-137 and any policy of insurance issued by Zurich underlying policies 86-57-197 and 87-29-137.

## V. REIMBURSEMENT OF COSTS

4. With respect to the claims of the United States and the State, the SJCC Parties shall cause $4,150,440.00 to be paid from the proceeds of the settlement of the insurance coverage dispute with its insurers, as follows:

a. Payments by Maryland Casualty

1) $84,618.00 shall be paid to/on behalf of the United States by Maryland Casualty pursuant to Appendix A within sixty (60) days of notice to Gerald Hughes,

-13-

counsel for Maryland Casualty, of the entry of this Consent Decree, according to the instructions set forth in Paragraph 6.

2) $56,417.00 shall be paid to/on behalf of the State by Maryland Casualty pursuant to Appendix A within sixty (60) days of notice to said counsel for Maryland Casualty of the entry of this Consent Decree, according to the instructions set forth in Paragraph 7.

3) $965.00 shall be paid by Maryland Casualty pursuant to Appendix A to the SJCC Parties and their attorney, Thomas P. Farnoly, within sixty (60) days of notice to said counsel for Maryland Casualty of the entry of this Consent Decree, for attorneys fees and costs with respect to prosecuting the SJCC Coverage Action.

b. Payments by ISOP

1) $297,696.00 shall be paid to/on behalf of the United States by ISOP pursuant to Appendix B within sixty (60) days of notice to Richard Kuhl, counsel for ISOP, of the entry of this Consent Decree, according to the instructions set forth in Paragraph 6.

2) $198,464.00 shall be paid to/on behalf of the State by ISOP pursuant to Appendix B within sixty (60) days of notice to said counsel for ISOP of the entry of this Consent Decree, according to the instructions set forth in Paragraph 7.

3) $3,840 shall be paid by ISOP pursuant to Appendix B to the SJCC Parties and their attorney, Thomas P. Farnoly, within sixty (60) days of notice to said

-14-

counsel for ISOP of the entry of this Consent Decree, for attorneys fees and costs with respect to prosecuting the SJCC Coverage Action.

### c. Payments by Zurich

1) $696,312.00 shall be paid to/on behalf of the United States by Zurich pursuant to Appendix C within sixty (60) days of notice to Peter Petrou, counsel for Zurich, of the entry of this Consent Decree, according to the instructions set forth in Paragraph 6.

2) $464,208.00 shall be paid to/on behalf of the State by Zurich pursuant to Appendix C within sixty (60) days of notice to said counsel for Zurich of the entry of this Consent Decree, according to the instructions set forth in Paragraph 7.

3) $8,960.00 shall be paid by Zurich pursuant to Appendix C to the SJCC Parties and their attorney, Thomas P. Farnoly, within sixty (60) days of notice to said counsel for Zurich of the entry of this Consent Decree, for attorneys fees and costs with respect to prosecuting the SJCC Coverage Action.

### d. Payments by North River

1) $1,392,432.00 shall be paid to/on behalf of the United States by North River pursuant to Appendix C within sixty (60) days of notice to Robert Walsh, counsel for North River, of the entry of this Consent Decree, according to the instructions set forth in Paragraph 6.

2) $928,288.00 shall be paid to/on behalf of the State by North River pursuant to Appendix C within sixty (60) days of notice to said counsel for North River of the entry of this Consent Decree, according to the instructions set forth in Paragraph 7.

3) $18,240.00 shall be paid by North River pursuant to Appendix C to the SJCC Parties and their attorney, Thomas P. Farnoly, within sixty (60) days of notice to said counsel for Zurich of the entry of this Consent Decree, for attorneys fees and costs with respect to prosecuting the SJCC Coverage Action.

5. With respect to the claims of the United States and the State for Response Costs and the claims of the SJCC Parties against the GSC Parties, the GSC Parties shall cause $250,000.00 to be paid to/on behalf of the United States and the State from the proceeds of the Continental Policies, as follows:

a. $100,000 shall be paid to/on behalf of the United States by Continental pursuant to Appendix D within sixty (60) days of notice to John Favate, counsel for Continental, of the entry of this Consent Decree, according to the instructions set forth in Paragraph 6.

b. $66,667 shall be paid to/on behalf of the State by Continental pursuant to Appendix D within sixty (60) days of notice to said counsel for Continental of the entry of this Consent Decree, according to the instructions set forth in Paragraph 7.

c. $83,333.00 shall be paid by Continental pursuant to Appendix D to the GSC Parties and their attorney, Kenneth A. DiMuzio, within sixty (60) days of notice to said

counsel for Continental of the entry of this Consent Decree, for attorneys fees and costs with respect to prosecuting the GSC Coverage Action.

6. Payments to/on behalf of the United States shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice account in accordance with current EFT procedures, referencing USAO File Number 9603434, the EPA Region and Site Spill ID Number for the SJCC Site is 02-3S, the EPA Region and Site Spill ID Number for the GSC Site is 02-3R, and DOJ Case Number 90-11-2-1037. Payment shall be made in accordance with instructions provided by the Financial Litigation Unit of the U.S. Attorney's Office in the District of New Jersey following lodging of the Consent Decree. Any payments received by the Department of Justice after 4:00 p.m. Eastern Time shall be credited on the next business day. Notice of such payment shall be sent to EPA and DOJ in accordance with Section XIII (Notices and Submissions), and to Ronald Gherardi, Chief, Financial Management Branch, Office of Policy and Management, EPA Region II, 290 Broadway, New York, New York 10007.

7. Payments to/on behalf of the State shall be made by certified or cashiers check, made payable to the "Treasurer, State of New Jersey," forwarded via United States certified mail to counsel for the State at the following address:

-17-

Kenneth W. Elwell
Deputy Attorney General
Division of Law
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey  08625-0093

The Parties agree that the State, in its sole discretion, may apportion the monies due it under this Consent Decree between its claim for costs and its claim for natural resource damages, provided that the State and EPA agree that any such allocation shall not alter the agreement between the State and EPA contained in the State Superfund Contract for the Sites regarding the funding of operation and maintenance and the potential return of monies to EPA.

8. In the event that Maryland Casualty, ISOP, Zurich and/or North River fail to make a payment to/on behalf of the United States or the State pursuant to Paragraph 4, the SJCC Parties agree to continue in good faith to diligently prosecute the SJCC Coverage Action in order to maximize recovery therein against each such insurance company failing to make said payment.  All proceeds from the SJCC Coverage Action which may accrue after the entry of this Consent Decree, if any (less reasonable attorneys' fees and costs), shall be paid over to/on behalf of the United States and the State within thirty (30) days of receipt thereof, in accordance with the instructions in Paragraphs 6 and 7, as well as in accordance with further instructions provided by the United States and the State with respect to the appropriate division thereof.

-18-

9. In the event that Continental fails to make a payment to the United States or the State pursuant to Paragraph 5, the GSC Parties agree to continue in good faith to diligently prosecute the GSC Coverage Action in order to maximize recovery therein. All proceeds from the GSC Coverage Action which may accrue after the entry of this Consent Decree, if any (less reasonable attorneys' fees and costs), shall be paid over to/on behalf of the United States and the State within thirty (30) days of receipt thereof, in accordance with the instructions in Paragraphs 6 and 7, as well as in accordance with further instructions provided by the United States and the State with respect to the appropriate division thereof.

## VI. ACCESS

10. Commencing upon the date of lodging of this Consent Decree, each of the SJCC Parties and each of the GSC Parties agree to provide to the United States and its representatives, including EPA and its contractors, and the State, including its contractors, access at all reasonable times to their respective Sites (to the extent access to such Site is under their control), and any other property owned or controlled by them to which access is required for implementation of response actions for the Sites, including, but not limited to:

    a.      monitoring, investigation, remedial, or other activities at the Sites;

    b.      verifying any data or other information submitted to the United States or the State;

    c.      conducting investigations relating to contamination at or near the Sites;

    d.      obtaining samples; and

-19-

e.   assessing the need for, planning, or implementing response actions at or near the Sites.

11. Notwithstanding any provision of this Consent Decree, the United States and the State retain all of their access authorities and rights, including enforcement authorities related thereto, under CERCLA, the Resource Conservation and Recovery Act, 42 U.S.C. § 6927, the Spill Act, and any other applicable statutes or regulations.

12. Each of the SJCC Parties and each of the GSC Parties agree to cooperate fully with EPA and the State in the implementation of all response actions at the Sites, and recognize that response actions may be performed by contractors, consultants, agents, or authorized representatives of EPA or the State.  Each of the SJCC Parties and each of the GSC Parties further agree neither to interfere with such response actions nor take actions at the Sites that are inconsistent with any response action selected by EPA and carried out by any person. Each of the SJCC Parties and each of the GSC Parties recognize that the implementation of response actions at the Sites may interfere with their use of the Sites and that certain remedial activities will occur at the Sites that may interrupt normal operations.

## VII. COVENANTS NOT TO SUE BY THE UNITED STATES AND STATE OF NEW JERSEY

### A. To Maryland Casualty

13. In consideration of the Maryland Casualty Release and upon payment to/on behalf of the United States of moneys required by Paragraph 4.a.1), and except as specifically provided in Section VIII (Reservation of Rights), the United States covenants not

-20-

to sue or assert claims against Maryland Casualty, or assign or transfer any such claim to a third party, with respect to known or unknown environmental claims, existing now or arising in the future, relating to the Sites under the Maryland Casualty Insurance Policies.

14. In consideration of the Maryland Casualty Release and upon payment to/on behalf of the State of the moneys required by Paragraph 4.a.2), and except as specifically provided in Section VIII (Reservation of Rights), the State covenants not to sue or assert claims against Maryland Casualty, or assign or transfer any such claim to a third party, with respect to known or unknown environmental claims, existing now or arising in the future, relating to the Sites under the Maryland Casualty Insurance Policies.

B. To ISOP

15. In consideration of the ISOP Release and upon payment to/on behalf of the United States of moneys required by Paragraph 4.b.1), and except as specifically provided in Section VIII (Reservation of Rights), the United States covenants not to sue or assert claims and/or transfer, against ISOP, or assign or transfer any such claim to a third party, with respect to known or unknown environmental claims, existing now or arising in the future, relating to the Sites under the ISOP Insurance Policies.

16. In consideration of the ISOP Release and upon payment to/on behalf of the State of moneys required by Paragraph 4.b.2), and except as specifically provided in Section VIII (Reservation of Rights), the State covenants not to sue or assert claims against ISOP, or assign or transfer any such claim to a third party, with respect to known or unknown

-21-

environmental claims, existing now or arising in the future, relating to the Sites under the ISOP Insurance Policies.

### C. To Zurich

17. In consideration of the Zurich Release and upon payment to/on behalf of the United States of moneys required by Paragraph 4.c.1), and except as specifically provided in Section VIII (Reservation of Rights), the United States covenants not to sue or assert claims against Zurich, or assign or transfer any such claim to a third party, with respect to known or unknown environmental claims, existing now or arising in the future, relating to the Sites under the Zurich Insurance Policies.

18. In consideration of the Zurich Release and upon payment to/on behalf of the State of moneys required by Paragraph 4.c.2), and except as specifically provided in Section VIII (Reservation of Rights), the State covenants not to sue or assert claims against Zurich, or assign or transfer any such claim to a third party, with respect to known or unknown environmental claims, existing now or arising in the future, relating to the Sites under the Zurich Insurance Policies.

### D. To North River

19. In consideration of the North River Release and upon payment to/on behalf of the United States of moneys required by Paragraph 4.d.1), and except as specifically provided in Section VIII (Reservation of Rights), the United States covenants not to sue or assert claims against North River, or assign or transfer any such claim to a third party, with

-22-

respect to known or unknown environmental claims, existing now or arising in the future,

relating to the Sites under the North River Insurance Policies.

20. In consideration of the North River Release and upon payment to/on behalf

of the State of moneys required by Paragraph 4.d.2), and except as specifically provided

in Section VIII (Reservation of Rights), the State covenants not to sue or assert claims against

North River, or assign or transfer any such claim to a third party, with respect to known or

unknown environmental claims, existing now or arising in the future, relating to the Sites

under the North River Insurance Policies.

E. To Continental

21. In consideration of the Continental Release and upon payment to/on behalf

of the United States of moneys required by Paragraph 5.a., and except as specifically provided

in Section VIII (Reservation of Rights), the United States covenants not to sue or assert claims

against Continental, or assign or transfer any such claim to a third party, with respect to known

or unknown environmental claims, existing now or arising in the future, relating to the Sites

under the Continental Insurance Policies. The United States Environmental Protection Agency

has not recorded any liens with respect to the Sites.

22. In consideration of the Continental Release and upon payment to/on behalf

of the State of moneys required by Paragraph 5.b., and except as specifically provided in

Section VIII (Reservation of Rights), the State covenants not to sue or assert claims against

Continental, or assign or transfer any such claim to a third party, with respect to known or

unknown environmental claims, existing now or arising in the future, relating to the Sites under the Continental Insurance Policies.

### F. To the SJCC Parties

23. In consideration of the actions that will be performed and upon receipt of all of the payments to be made to/on behalf of the United States and the State by Maryland Casualty, ISOP, Zurich and North River under this Consent Decree, and except as specifically provided in Section VIII (Reservations of Rights), the United States and the State covenant not to sue or take administrative action against any of the SJCC Parties under Sections 106 or 107 of CERCLA or the Spill Act with regard to the Sites. This covenant not to sue shall take effect only upon receipt by the United States or the State of all payments required by Paragraph 4 of Section V (Reimbursement of Costs). This covenant not to sue is conditioned upon the satisfactory performance by each of the SJCC Parties of his/its obligations under this Consent Decree and the truthfulness of the certifications made by them in Paragraph 49 of Section XII (Records). The covenant not to sue set forth in this Paragraph extends only to the SJCC Parties and does not extend to any other person.

24. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel the SJCC Parties (1) to perform further response actions relating to the Sites, or (2) to reimburse the United States or the State for additional costs of response if, prior

to certification of completion of the remedial action:

        a.     conditions at the Sites, previously unknown to EPA, are discovered; or,

        b.     information, previously unknown to EPA, is received, in whole or in part,

and those previously unknown conditions or that information together with any other relevant information indicates that the remedial action is not protective of human health or the environment.

        25. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel the SJCC Parties (1) to perform further response actions relating to the Sites, or (2) to reimburse the United States or the State for additional costs of response if, subsequent to certification of completion of the remedial action:

        a.     conditions at the Sites, previously unknown to EPA, are discovered; or,

        b.     information, previously unknown to EPA, is received, in whole or in part,

and those previously unknown conditions or that information together with any other relevant information indicates that the remedial action is not protective of human health or the environment.

        26. For purposes of Paragraph 24, the information and conditions known to EPA

shall include only that information and those conditions known to EPA as of the date the ROD

was signed and set forth in the Records of Decision for the Sites and the administrative records

supporting the Records of Decision. For purposes of Paragraph 25, the information and the

conditions known to EPA shall include only that information and those conditions known to

EPA as of the date of the certification of the remedial action and set forth in the Records of

Decision, the administrative record supporting the Records of Decision, the post-ROD

administrative records, or in any information received by EPA pursuant to the requirements of

this Consent Decree prior to the certification of completion of the remedial action.

G. To the GSC Parties

27. In consideration of the actions that will be performed and upon receipt of all

of the payments to/on behalf of be made to the United States and the State by Continental

under this Consent Decree, and except as specifically provided in Section VIII (Reservations

of Rights), the United States and the State covenant not to sue or take administrative action

against any of the GSC Parties under Sections 106 or 107 of CERCLA or the Spill Act, or

under any other applicable federal, state or local statute, regulation, ordinance, or common law,

with regard to the Sites. This covenant not to sue shall take effect only upon receipt by the

United States or the State of all payments required by Paragraph 5 of Section V

(Reimbursement of Costs). This covenant not to sue is conditioned upon the satisfactory

performance by each of the GSC Parties of his/its obligations under this Consent Decree and

the truthfulness of the certifications made by them in Paragraph 49 of Section XII (Records).

The covenant not to sue set forth in this Paragraph extends only to the GSC Parties and does not extend to any other person.

27A.  In further consideration of the aforesaid actions  and payments, the State covenants to discharge within fifteen (15) days of receipt of payment any and all liens of record pertaining to or affecting the GSC Site, including but not limited to, the priority lien of the New Jersey Spill Compensation Fund filed in the Superior Court of New Jersey, Docket No. DJ86557-99, in the sum of $48,000 as of February 1999, as well as any liens for any future expenditures after that date.  Discharge of any and all liens of record by the State shall not prejudice the State from enforcing its rights under this Consent Decree, including but not limited to Paragraphs 28, 29 or 30, or Sections VII (Reservation of Rights), VI (Access) or XIV (Enforcement of Terms of Consent Decree) of this Consent Decree.

28.  Notwithstanding any other provision of this Consent Decree, the United States and the State reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel the GSC Parties (1) to perform further response actions relating to the Sites, or (2) to reimburse the United States or the State for additional costs of response if, prior to certification of completion of the remedial action:

      a.    conditions at the Sites, previously unknown to EPA, are discovered; or,

      b.    information, previously unknown to EPA, is received, in whole or in part,

and those previously unknown conditions or that information together with any other relevant information indicates that the remedial action is not protective of human health or the environment.

29. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve, and this Consent Decree is without prejudice to, the right to institute proceedings in this action or in a new action, or to issue an administrative order, seeking to compel the GSC Parties (1) to perform further response actions relating to the Sites, or (2) to reimburse the United States or the State for additional costs of response if, subsequent to certification of completion of the remedial action:

       a.     conditions at the Sites, previously unknown to EPA, are discovered; or,

       b.     information, previously unknown to EPA, is received, in whole or in part,

and those previously unknown conditions or that information together with any other relevant information indicates that the remedial action is not protective of human health or the environment.

30. For purposes of Paragraph 28, the information and conditions known to EPA shall include only that information and those conditions known to EPA as of the date the ROD was signed and set forth in the Records of Decision for the Sites and the administrative records supporting the Records of Decision. For purposes of Paragraph 29, the information and the

conditions known to EPA shall include only that information and those conditions known to EPA as of the date of the certification of the remedial action and set forth in the Records of Decision, the administrative record supporting the Records of Decision, the post-ROD administrative records, or in any information received by EPA pursuant to the requirement of this Consent Decree prior to the certification of completion of the remedial action.

## VIII. RESERVATION OF RIGHTS

31. The covenants contained in Section VII (Covenants Not to Sue by the United States and State of New Jersey) extend only to the named party(ies) therein and do not extend to any other person.

32. The covenants contained in Paragraphs 13, 14 and 23 of Section VII (Covenants Not to Sue by the United States and State of New Jersey) are conditioned upon the complete and satisfactory performance by Maryland Casualty of its payment obligations under this Consent Decree and the Maryland Casualty Release. The failure of SJCC, GSC or any other insurer to satisfy its obligations under this Consent Decree shall not limit or otherwise impair the covenants of the United States and State of New Jersey to Maryland Casualty contained in Paragraphs 13 and 14 of Section VII.

33. The covenants contained in Paragraphs 15, 16 and 23 of Section VII (Covenants Not to Sue by the United States and State of New Jersey) are conditioned upon the complete and satisfactory performance by ISOP of its payment obligations under this Consent Decree and the ISOP Release. The failure of SJCC, GSC or any other insurer to satisfy its

-29-

obligations under this Consent Decree shall not limit or otherwise impair the covenants of the United States and State of New Jersey to ISOP contained in Paragraphs 15 and 16 of Section VII.

34. The covenants contained in Paragraphs 17, 18 and 23 of Section VII (Covenants Not to Sue by the United States and State of New Jersey) are conditioned upon the complete and satisfactory performance by Zurich of its payment obligations under this Consent Decree and the Zurich Release. The failure of SJCC, GSC or any other insurer to satisfy its obligations under this Consent Decree shall not limit or otherwise impair the covenants of the United States and State of New Jersey to Zurich contained in Paragraphs 17 and 18 of Section VII.

35. The covenants contained in Paragraphs 19, 20 and 23 of Section VII (Covenants Not to Sue by the United States and State of New Jersey) are conditioned upon the complete and satisfactory performance by North River of its payment obligations under this Consent Decree and the North River Release. The failure of SJCC, GSC or any other insurer to satisfy its obligations under this Consent Decree shall not limit or otherwise impair the covenants of the United States and State of New Jersey to North River contained in Paragraphs 19 and 20 of Section VII.

36. The covenants contained in Paragraphs 21, 22, 27 and 27A. of Section VII (Covenants Not to Sue by the United States and State of New Jersey) are conditioned upon the complete and satisfactory performance by Continental of its payment obligations under this

Consent Decree and the Continental Release. The failure of SJCC, GSC or any other insurer to satisfy its obligations under this Consent Decree shall not limit or otherwise impair the covenants of the United States and State of New Jersey to Continental contained in Paragraphs 21 and 22 of Section VII.

37. The covenants not to sue set forth in Paragraphs 23, 27 and 27A. of Section VII (Covenants Not to Sue by the United States and State of New Jersey) do not pertain to any matters other than those expressly specified therein, and do not extend to any other person or entity than those specified therein. The United States reserves, and this Consent Decree is without prejudice to, all rights against any of the SJCC Parties or any of the GSC Parties with respect to all other matters, including, but not limited to, the following:

  a.   claims based on a failure by any of the SJCC Parties or any of the GSC Parties to meet a requirement of this Consent Decree;

  b.   liability arising from the past, present or future disposal, release or threat of release of hazardous substances, pollutants, or contaminants outside the Sites;

  c.   liability for future disposal of hazardous substances, pollutants, or contaminants at the Sites;

  d.   liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; and

  e.   criminal liability.

38. The covenants not to sue set forth in Paragraphs 23, 27 and 27A. of Section VII (Covenants Not to Sue by The United States and State of New Jersey) do not pertain to any

-31-

matters other than those expressly specified therein, and do not extend to any other person or entity than those specified therein. The State reserves, and this Consent Decree is without prejudice to, all rights against any of the SJCC Parties or any of the GSC Parties with respect to all other matters, including, but not limited to, the following:

    a.    claims based on a failure by any of the SJCC Parties or any of the GSC Parties to meet a requirement of this Consent Decree;

    b.    liability arising from the past, present or future disposal, release or threat of release of hazardous substances, pollutants, or contaminants outside the Sites;

    c.    liability for future disposal of hazardous substances, pollutants, or contaminants at the Sites; and,

    d.    criminal liability.

39. Nothing in this Consent Decree shall preclude the United States or the State from enforcing the provisions hereof in any judicial or administrative proceeding.

## IX. COVENANTS NOT TO SUE BY THE SJCC PARTIES AND THE GSC PARTIES

40. Each of the SJCC Parties and each of the GSC Parties hereby covenant not to sue and agree not to assert any claims or causes of action against the United States or the State, or their contractors or employees, with respect to the Sites or this Consent Decree, including but not limited to:

    a.    any direct or indirect claim for reimbursement of Response Costs from the Hazardous Substance Superfund based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision

-32-

Pa71

of law, or for cleanup and removal costs or natural resource damages from the Spill Compensation Fund, N.J.S.A. 58:10-23.11;

b.   any claim arising out of response actions at the Sites for which the Response Costs were or will be incurred, or for cleanup and removal costs;

c.   any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613;

d.   any claim under the Fifth Amendment of the United States Constitution for "takings"; and

e.   any claim under the Tucker Act, 28 U.S.C. § 1491, or at common law, arising out of or relating to the response activities undertaken at the Site.

41.  Nothing in this Consent Decree shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## X. FINANCIAL DISCLOSURE

42.  Each of the SJCC Parties and each of the GSC Parties have represented to the United States and the State that they are unable to pay the total Response Costs in connection with the Sites and have provided the United States and the State with financial disclosure statements, under oath, disclosing their assets, upon which the United States and the State have relied in compromising their claims and agreeing to the settlement contained herein. The agreement of the United States and the State to the terms of this settlement with respect to each such Party is expressly conditioned on the accuracy and truth of such asset disclosure

-33-

statements. Since the submission of the aforesaid financial disclosure statements, each of the individual SJCC Parties and each of the individual GSC Parties hereby certifies that his financial condition, on an objective basis, has not materially changed.

43. In the event that a SJCC Party or a GSC Party has made any statement in its/his asset disclosure statement that is false in any material respect, fails to disclose any transfer of property required to be disclosed under the terms of the asset disclosure statement, or fails to disclose any asset required to be disclosed under the terms of the asset disclosure statement, then: (1) the covenants set forth in Paragraphs 23, 27 and 27A. of Section VII (Covenants Not to Sue by the United States and State of New Jersey), whichever is applicable, shall be nullified as to each such Party making such representation, and the United States or the State shall be free to pursue its claims against such Party, notwithstanding any statute of limitations that would otherwise bar such claim and notwithstanding the payment(s) made by any of the Insurance Companies; (2) the United States or the State shall be free to pursue claims against such Party and/or any property transferee for fraudulent conveyance by such Party under the Federal Debt Collection Procedure Act, 28 U.S.C. § 3301, *et seq.*, notwithstanding any statute of limitations that would otherwise bar such claim; (3) such Party agrees to forfeit to the United States and the State, within thirty (30) days of demand, any asset that was not disclosed in that Party's asset disclosure statement; and (4) the United States or the State may pursue all remedies available to each under law, including criminal prosecution

for perjury or false swearing, notwithstanding any statute of limitations that would bar such remedy.

## XI. <u>EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION</u>

44. Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree. Notwithstanding the foregoing, Maryland Casualty, ISOP, Zurich, North River and Continental are third-party beneficiaries of this Consent Decree. Each of the Parties expressly reserves any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Sites against any person not a Party hereto; provided, however, that (i) SJCC and GSC waive any right of indemnity or contribution they may have against each other with respect to any liabilities subject to this Consent Decree, and (ii) the reservation of rights by the SJCC Parties and GSC Parties set forth in this Paragraph does not apply to any rights or claims released or waived by and between the SJCC Parties or the GSC Parties and their respective insurers pursuant to the Insurance Releases attached hereto as Exhibits A through D.

45. The Parties agree, and by entering this Consent Decree this Court finds, that the Parties are entitled, as of the effective date of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in this Consent Decree. The "matters addressed" in this

Consent Decree are all response actions taken or to be taken and all Response Costs incurred or to be incurred by the United States, the State or any other person with respect to the Sites. The "matters addressed" in this settlement do not include those response costs or response actions as to which the United States or the State have reserved their rights under this Consent Decree.

46. The Parties agree that the actions undertaken by the Parties or the Insurance Companies do not constitute an admission of any liability by any of them. This Consent Decree shall not be used as evidence in any judicial or administrative proceeding except one to enforce this Consent Decree or any of the Insurance Releases.

47. Each Party agrees that, with respect to any suit for contribution brought by it for matters related to this Consent Decree, it will notify EPA, DOJ and the State in writing no later than thirty (30) days prior to the initiation of such suit, provided, however, that no notification is required with respect to any new claim brought against a Party already named in this action. Each Party also agrees that, with respect to any suit for contribution brought against it for matters related to this Consent Decree, it will notify EPA, DOJ and the State in writing within thirty (30) days of service of the complaint upon it.

48. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief or other relief relating to the Sites, a Party shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any

contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the Covenants Not to Sue by the United States and the State of New Jersey set forth in Section VII.

## XII. **RECORDS**

49. By signing this Consent Decree, each Party certifies individually that, to the best of his or its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to its potential liability regarding the Sites since notification of potential liability by the United States or the State, or the filing of this suit, and that it has fully complied with any and all requests for information by the United States, EPA or the State.

50. Until seven (7) years after the entry of this Consent Decree, each of the SJCC Parties and each of the GSC Parties shall preserve and retain the respective records and documents now in their possession or control, or which come into their respective possession or control, that relate in any manner to response actions taken at the Sites, the liability of any person for response actions conducted and to be conducted at the Sites, or a Party's financial condition or asset transfers, regardless of any document retention policy to the contrary.

51. At the conclusion of the document retention period described in the preceding paragraph, the SJCC Parties and the GSC Parties shall notify the United States and the State at least ninety (90) days prior to the destruction of any such records or documents,

and shall deliver any such records or documents to the United States or the State upon request. A Party may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If a Party asserts such a privilege, such Party shall supply the United States and the State with the following: (1) the title of the document, record or information; (2) the date of the document, record or information; (3) the name and title of the author of the document, record or information; (4) the name and title of each recipient of the document, record or information; (5) a description of the subject of the document, record or information; and (6) the privilege asserted. However, no documents, records or other information created or generated pursuant to the requirements of this or any other consent decree with the United States or the State shall be withheld on the grounds that they are privileged. If a claim of privilege applies only to a portion of a record or document, the record or document shall be provided to the United States and the State in redacted form to mask the privileged information only. The Party claiming privilege shall retain all records and documents that are claimed to be privileged until the United States and the State have had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in that Party's favor.

## XIII. NOTICES AND SUBMISSIONS

52. Whenever, under the terms of this Consent Decree, notice is required to be given or a document is required to be sent to the United States or the State, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors

(     (

give notice of a change thereof to the other Parties in writing. All notices and submissions

shall be considered effective upon receipt, unless otherwise provided. Written notice as

specified herein shall constitute complete satisfaction of any written notice requirement of the

Consent Decree.

### As to the United States:

Bruce Gelber
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611

      Re: 90-11-2-1037

### As to EPA:

Clay Monroe
Assistant Regional Counsel
Region II
U.S. Environmental Protection Agency
290 Broadway
New York, New York 10007-1866

### As to the State:

Kenneth W. Elwell
Deputy Attorney General
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
Trenton, New Jersey 08625

      and

-39-

Susan Boyle
Assistant Commissioner, Site Remediation, and
Acting Administrator of Spill Compensation Fund
P.O. Box 028
401 E. State Street
Floor 6
Trenton, New Jersey 08625-0028.

## XIV. ENFORCEMENT OF TERMS OF CONSENT DECREE

53. Notwithstanding any requirements of this Consent Decree, the United States and the State reserve any and all rights under federal law, state law, or the Federal Rules of Civil Procedure to enforce the provisions of this Consent Decree.

54. If the United States or the State brings an action to enforce this Consent Decree against any Party, that Party shall reimburse the United States or the State for all costs of such action, including, but not limited to, costs of attorney time.

## XV. INTEGRATION

55. This Consent Decree and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree. The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XVI. RETENTION OF JURISDICTION

56. This Court shall retain jurisdiction of this matter for the purpose of enforcing the terms of this Consent Decree.

## XVII. **APPENDICES**

57. The following appendices are attached to and incorporated into this Consent Decree: "Appendix A" is the Maryland Casualty Release; "Appendix B" is the ISOP Release; "Appendix C" is the Zurich Release and the North River Release; "Appendix D" is the Continental Release; "Appendix E" is the map of the GSC and SJCC Sites.

## XVIII. **LODGING AND OPPORTUNITY FOR PUBLIC COMMENT**

58. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate. Each of the SJCC Parties and each of the GSC Parties consent to the entry of this Consent Decree without further notice.

59. If for any reason this Court should decline to approve this Consent Decree in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between or among the Parties.

## XIX. **EFFECTIVE DATE**

60. The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, unless otherwise provided herein.

## XX. **SIGNATORIES/SERVICE**

61. Each undersigned Party or representative of a Party to this Consent Decree

-41-

certifies that he or she is fully authorized to enter into the terms and conditions of this Consent

Decree and to execute and legally bind such Party to this document.

62. Each of the SJCC Parties and each of the GSC Parties hereby agree not to

oppose entry of this Consent Decree by this Court or to challenge any provision of this

Consent Decree unless the United States has notified the SJCC Parties or the GSC Parties in

writing that it no longer supports entry of this Consent Decree.

63. Each of the SJCC Parties and each of the GSC Parties shall identify, on the

attached signature page, the name address and telephone number of an agent who is authorized

to accept service of process by mail on behalf of that Party with respect to all matters arising

under or relating to this Consent Decree. Each of the SJCC Parties and each of the GSC

Parties agree to accept service in that manner and to waive the formal service requirements set

forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this

Court, including, but not limited to, service of a summons.

SO ORDERED THIS 25th DAY OF _Sept_, 2002.

_Jerome B. Simandle_
JEROME B. SIMANDLE
United States District Judge

-42-

The Undersigned Party enters into this Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

FOR THE UNITED STATES OF AMERICA

Date: 5/17/02

CATHERINE McCABE
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

Date: 6/14/02

BRIAN G. DONOHUE
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
 Division
United States Department of Justice
Washington, D.C. 20530

ROBERT J. CLEARY
United States Attorney
District of New Jersey

LOUIS BIZARRI
Assistant United States Attorney
District New Jersey
Camden, New Jersey

-43-

The Undersigned Party enters into this Partial Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

FOR THE U.S. ENVIRONMENTAL
PROTECTION AGENCY

Date: 6/20/02

WILLIAM J. MUSZYNSKI
Deputy Regional Administrator
U.S. Environmental Protection
  Agency - Region II
290 Broadway
New York, New York  10007-1866

Date: 6/14/02

CLAY MONROE
Assistant Regional Counsel
U.S. Environmental Protection
  Agency - Region II
290 Broadway
New York, New York  10007-1866

-44-

The Undersigned Party enters into this Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

FOR THE STATE OF NEW JERSEY

Date: 4/1/01

SUSAN BOYLE
Assistant Commissioner, Site Remediation
N.J. Department of Environmental Protection
P.O. Box 028
401 E. State Street
Floor 6
Trenton, New Jersey 08625-0028

Date: 3/27/01

CARI J. WILD
Assistant Commissioner
Natural and Historic Resources
P.O. Box 404
Station Plaza 5
501 E. State Street
Trenton, New Jersey 08625-0404

Date: 3/5/01

KENNETH W. ELWELL
Deputy Attorney General
State of New Jersey
Department of Law and Public Safety
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NJ 08625-0093

-45-

The Undersigned Party enters into this Partial Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

Date: _Mar 5th 02_

ANGELO SPARAGNA, JR.
1100 Pear Street
Vineland, New Jersey 08360

Agent Authorized to Accept Service
on Behalf of Above-Signed Party:

Name:     James J. Gruccio, Esquire
Title:     Attorney for SJCC Parties
Address:     817 East Landis Avenue
        Vineland, NJ    08362
        (856) 691-0100
Phone Number:

-48-

The Undersigned Party enters into this Partial Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

Date: 3/6/2000

FRANCIS SPARAGNA
5547 Central Avenue
Ocean City, New Jersey 08226

Agent Authorized to Accept Service
on Behalf of Above-Signed Party:

Name:      James J. Gruccio, Esquire
Title:     Attorney for SJCC Parties
Address:   817 East Landis Avenue
           Vineland, NJ   08362

Phone Number:   (856) 691-0100

-49-

The Undersigned Party enters into this Partial Consent Decree in the matter of United States v. South Jersey Clothing Company, Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

FOR GARDEN STATE CLEANERS, CO.

Date: *March 4, 2002*

JOHN TRASFERINI
Partner
795 South Bluebell Road
Vineland, New Jersey 08360

Date: *March 4, 2002*

ALBERT TRASFERINI
Partner
545 North West Avenue
Vineland, New Jersey 08360

Agent Authorized to Accept Service
on Behalf of Above-Signed Party:

Name:       Kenneth A. DiMuzio, Esquire
Title:      Attorney for GSC Parties
Address:    25 Hunter Street
            Woodbury NJ 08096

Phone Number:   856-686-3503

-50-

Pa87

The Undersigned Party enters into this Partial Consent Decree in the matter of
<u>United States v. South Jersey Clothing Company, Inc., et al.</u>, Civil No. 96-3166(JBS), relating
to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

Date: March 4, 2002

JOHN TRASFERINI
795 South Bluebell Road
Vineland, New Jersey 08360

Agent Authorized to Accept Service
on Behalf of Above-Signed Party:

Name:  Kenneth A. DiMuzio, Esquire
Title:  Attorney for GSC Parties
Address: 25 Hunter Street
Woodbury NJ 08096

Phone Number: 856-686-3503

-51-

The Undersigned Party enters into this Partial Consent Decree in the matter of United States v. South Jersey Clothing Company. Inc., et al., Civil No. 96-3166(JBS), relating to the South Jersey Clothing Company and Garden State Cleaners Superfund Sites.

Date: March 4, 2002

ALBERT TRASFERINI
545 North West Avenue
Vineland, New Jersey 08360

Agent Authorized to Accept Service
on Behalf of Above-Signed Party:

| | |
|---|---|
| Name: | Kenneth A. DiMzuio, Esquire |
| Title: | Attorney for GSC Parties |
| Address: | 25 Hunter Street |
| | Woodbury NJ 08096 |

Phone Number:   856-686-3503

-52-

APPENDIX A

## SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter "Agreement") is entered into as of this 4th day of January , 2001, by and between SOUTH JERSEY CLOTHING COMPANY (hereinafter "SJCC" as defined in Section 2.6), and MARYLAND CASUALTY COMPANY (hereinafter "Maryland Casualty" as defined in Section 2.10) in accordance with the terms, conditions and definitions set forth below. SJCC and Maryland Casualty are collectively referred to herein as "the Parties."

## RECITALS

WHEREAS, the UNITED STATES OF AMERICA (hereinafter "United States" as defined in Section 2.6) and the STATE OF NEW JERSEY (hereinafter defined as "State" in Section 2.8) have asserted certain Environmental Claims (as defined in Section 2.3) against SJCC relating to the ownership and/or operation of SJCC's former manufacturing facility in Minotola, New Jersey (hereinafter "Site At Issue" as defined in Section 2.11).

WHEREAS, SJCC has made demands for defense and indemnification under some or all of the Policies (as defined in Section 2.5) with respect to certain Environmental Claims arising out of the operations at the Site At Issue.

WHEREAS, Maryland Casualty issued the following primary liability Policies of insurance to SJCC:

1. Policy No. GL 28265007
2. Policy No. GL 37392843
3. Policy No. GL 58307997; and
4. Policy No. GL 47434501.

WHEREAS, Maryland Casualty agrees to pay the sum of $142,000.00 (one hundred forty two thousand dollars) to SJCC. SJCC and Maryland Casualty agree that such payment is made under the Policies, and that both the per occurrence and aggregate limits of the Policies are thereby exhausted. SJCC further agrees that subject to the Agreement, it releases and forever discharges Maryland Casualty from any and all past, present and future obligations that may have been, that are, and that otherwise may be owed in the future.

WHEREAS, in its complaint, the United States alleges that on or about July 5, 1988 and August 31, 1988, it notified SJCC and Garden State Cleaners (as defined in Section 2.12) that they were Potentially Responsible Parties in connection with the release of hazardous substances, primarily TCE and PCE, in the area surrounding the Site At Issue. The United States has undertaken or will undertake remediation of the Site At Issue pursuant to its Record of Decision dated September 26, 1991.

WHEREAS, the United States added the Site At Issue and the Garden State Cleaners site to the National Priority List in 1989.

WHEREAS, on July 9, 1996, the United States instituted suit against SJCC in the United States District Court, District of New Jersey, seeking recovery of all past and future costs incurred at the Site At Issue, and SJCC asserted claims against Garden State in this lawsuit by way of third-party complaint. On May 28, 1998, at the request of SJCC and the United States, the District Court entered an administrative order dismissing the United States's claims, without prejudice, to enable the parties to pursue mediation.

WHEREAS, the State is currently asserting at least four claims against SJCC arising out of SJCC's ownership or operation of the Site At Issue:

1. By a Directive issued on or about December 11, 1996, the State has directed SJCC to undertake remediation of the soil at the Site At Issue.

2. By letters dated January 9, 1997 and May 20, 1997, the State demanded from SJCC reimbursement for oversight costs paid to the United States by the State in connection with the United States' oversight of the superfund remediation of the Site At Issue.

3. In October, 1997, the State has demanded reimbursement of costs associated with the 1982 roadside dumping of waste by an environmental disposal company known as Graves Resource Management, which waste allegedly included soil excavated from the Site At Issue.

4. The State has also asserted natural resource damage resulting from groundwater contamination allegedly caused by SJCC's activities at the Site At Issue.

WHEREAS, a controversy has arisen between SJCC and Maryland Casualty concerning the existence of insurance coverage for Environmental Claims arising out of or relating to the Site At Issue under the Policies. This controversy is the subject of litigation involving SJCC and its insurers in the Superior Court of New Jersey, Law Division, Cumberland County, entitled:  South Jersey Clothing Company v. Continental Insurance Company, et al., Docket No. L-1038-91 (hereinafter the "Lawsuit").

WHEREAS, SJCC disputes any and all liability to the United States and the State for Environmental Claims arising out of or relating to the Site At Issue.

WHEREAS, Maryland Casualty disputes any and all liability to SJCC in connection with the subject matter of the Lawsuit and the Environmental Claims arising out of or relating to the Site At Issue.

WHEREAS, the Parties to this Agreement make no admissions as to the correctness of the position taken by any other party in the Lawsuit, and Maryland Casualty does not acknowledge that they are obligated to defend and/or indemnify SJCC for any liability that SJCC has or may incur for any known or unknown Environmental Claims as defined herein, or any other Claim (as defined in Section 2.4) or circumstance.

WHEREAS, the Parties seek to resolve all Claims between them which are the subject of the Lawsuit and all past, present and future claims for defense and indemnification concerning known and unknown Environmental Claims arising out of or relating to the Site At Issue. Accordingly, the Parties hereby agree to resolve: (a) any and all Claims for defense and indemnification which have been set forth in the Lawsuit; and (b) any and all Environmental Claims which are currently known or may become known in the future arising out of or relating to the Site At Issue.

WHEREAS, in consideration of the payments to be made by Maryland Casualty pursuant to Section 3 of this Agreement, SJCC, Garden State, United States and State have agreed to enter into a Consent Decree settling SJCC's potential liability to the United States and State for Environmental Claims pursuant to which the United States and State have agreed to enter into covenants not to sue or assert claims against Maryland Casualty.

WHEREAS, by entering into this Agreement, no Party is making any admission of liability, nor does this Agreement, or any Party to it, adopt any particular position as to defense and indemnification. This Agreement is the product of informed negotiation and compromise, following consultation with legal counsel. This Agreement does not necessarily reflect the views of Maryland Casualty as to the actual scope of their rights and obligations as such rights and obligations may relate to matters or persons outside the scope of this Agreement. With respect to all such matters or persons, the Parties hereby reserve all previously held positions and all other rights and privileges.

## AGREEMENT

NOW, THEREFORE, in consideration of and in reliance upon the definitions, recitals, mutual promises, covenants, understandings and obligations, hereinbefore and hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound hereby, the Parties mutually agree as follows:

1.   INCORPORATION OF RECITALS

The foregoing recitals are incorporated herein as if fully set forth in the text of this Agreement.

2.   DEFINITIONS

As used in this Agreement, and for the purpose of this Agreement only, the following terms have the following meanings:

2.1   "Person" means any individual, corporation, partnership, association, proprietorship, trust, organization, Governmental Agency (as defined in Section 2.2), or any other entity, including but not limited to, estates, guardians or beneficiaries thereof.

2.2     "Governmental Agency" means (i) the government of the United States of America, and any state, commonwealth, territory or possession of the United States of America, including the District of Columbia and Puerto Rico, and the government of any county, province, city or municipality thereof; (ii) any subdivision, instrumentality, department or agency of any of the foregoing; (iii) the government of any foreign country, state or territory and any province, county, city or municipality thereof; and (iv) any subdivision, instrumentality, department or agency of any such foreign country, state, territory or any province, county, city or municipality thereof.

2.3     "Environmental Claims" means any and all past, present or future Claims (as defined in Section 2.4), whether presently known, unknown or unknowable, involving SJCC and arising out of, or as a consequence of, actual, alleged, threatened or potential pollution, contamination or other injurious environmental condition, the release discharge, dispersal, escape, or exposure to any substance, including without limitation any hazardous substance or waste as defined in 42 U.S.C. § 9601, smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants, including, but not limited to, any such Claims involving actual, alleged, threatened or potential property damage (or injury to property or damage to natural resources), bodily injury, personal injury and claims to recover clean up or remediation costs, including but not limited to costs incurred and sums expended, or which in the future may be expended or incurred for investigation, removal, distribution, treatment or containment.  This definition includes Claims arising out of any materials sold by SJCC for salvage, scrap or recycling.

For purposes of this Agreement, Environmental Claims shall also include, without limitation, any and all past, existing, alleged, future or potential: (a) Claims brought by or on behalf of any Person or Governmental Agency, or any actions taken by SJCC (voluntarily or otherwise) in response to claims alleging bodily injury, personal injury, property damage, or advertising liability, or alleging any other right to relief against SJCC arising from alleged, potential, threatened or actual pollution by, contamination with, or exposure to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants, or any form of toxic, hazardous or injurious substances or materials, including without limitation, any hazardous substance or waste as defined in 42 U.S.C. § 9601; and (b) all costs incurred, directly or indirectly, for cleanup, study, prevention, or remediation, or as statutory fines or penalties, or as damages for environmental damage to persons, property (tangible or intangible) or natural resources.

2.4     "Claims" means any past, present or future claim, right, demand, order, directive, action, suit, cause of action, crossclaim, counterclaim, third party action, arbitration or mediation demand, statutory or regulatory obligation, request, allegation, administrative proceeding, lien, debt, bill, account, duty, dues, reckoning, sum of money, bond, specialty, right of indemnity, right of subrogation, demand for injunctive relief, controversy, contribution, exoneration, covenant, agreement, contract, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fees and liability whatsoever, currently known or unknown, that any Person may now have, or hereinafter may have, of or against SJCC,

whether at law, equity, admiralty or otherwise, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative or common law cause of action of any sort.

2.5    "Policies" means any and all known or unknown primary, umbrella, excess or other insurance policies, contracts, and/or agreements of any nature, type or kind issued to and/or alleged to have been issued to SJCC by Maryland Casualty (including but not limited to the insurance policies set forth in the Recitals to this Agreement) and any amendments, revisions, extensions, or endorsements to such policies.

2.6    "SJCC" means Francis Sparagna, Angelo Sparagna, South Jersey Clothing Company, Inc., South Jersey Clothing Company (a partnership), and any of South Jersey Clothing Company's employees, officers, directors, principals, affiliates, agents, servants, representatives, and its predecessors, successors, assigns, subsidiaries, divisions, operating units or groups, holding companies, parent companies and any Person insured by any of the Policies issued to Francis Sparagna, Angelo Sparagna or South Jersey Clothing Company, and any named insured, person insured, additional insured, or additional named insured under the Policies issued to Francis Sparagna, Angelo Sparagna or South Jersey Clothing Company.

2.7    "United States" means the United States of America and any subdivision, instrumentality, department or agency of the foregoing, including but not limited to the Environmental Protection Agency of the United States of America.

2.8    "State" means the State of New Jersey and any subdivision, instrumentality, department or agency of the foregoing, including but not limited to the Department of Environmental Protection and Energy of the State of New Jersey.

2.9    "Maryland Casualty" means Maryland Casualty Company, and its past, present and future agents, servants, employees, successors, assigns, predecessors, affiliates, subsidiaries, parents, officers, directors, attorneys and representatives.

2.10    "Site At Issue" means SJCC's manufacturing facility in Minotola, New Jersey, and the land, air and waters at and adjacent to it. The land, air and waters at and adjacent to the Site at Issue include, but are not limited to the air (and atmosphere) above it, soils (whether said soils are surface soils or sub-surface soils) and waters (whether these waters be surface waters remaining on the site or flowing through or over the site or groundwater flowing under or through the site and up or down gradient of the site). In addition, the land, air and waters at and adjacent to the Site at Issue include soil, groundwater surface water and subsurface soil and rock which is or are affected by any hazardous substance arising from or migrating from the Site at Issue.

2.11    "Garden State" means Garden State Cleaners and its past, present and future employees, officers, directors, principals, attorneys, agents, representatives, affiliates, predecessors, successors and assigns.

2.12   "Continental" means Continental Insurance Company and its past, present and future employees, officers, directors, principals, attorneys, agents, representatives, affiliates, predecessors, successors and assigns.

2.13   "Consent Decree" means the proposed Consent Decree to which this Agreement shall be attached as Appendix A entered into by and between SJCC, Garden State, United States and State for submission to the United States District Court for the District of New Jersey for judicial approval.

2.14   "Settlement Amount" means the sum of $142,000.00 (one hundred forty two thousand dollars) Maryland Casualty agrees to pay to SJCC and that it is agreed that that such payment is made under the Policies; and that both the per occurrence and aggregate limits of the Policies are thereby exhausted.   SJCC further agrees that subject to the Agreement, it releases and forever discharges Maryland Casualty from any and all past, present and future obligations that may have been, that are, and that otherwise may be owed in the future.

2.15   Each term defined herein stated in a singular form shall include the plural form, and each defined term stated in a plural form shall include the singular form.

3.   SETTLEMENT OF THE COVERAGE DISPUTE AND THE LAWSUIT; PAYMENT OF SETTLEMENT AMOUNT; DISMISSAL OF LAWSUIT

3.1.   Within sixty (30) days of the effective date of the Consent Decree, Maryland Casualty agrees to pay to SJCC $142,000.00.

Payment to SJCC by Maryland Casualty shall not be made directly, but shall be accomplished by transmitting funds on behalf of SJCC in accordance with Section V of the Consent Decree which directs that payments be made in the following manner:

a)   $84,618.00 shall be paid to/on behalf of the United States by Maryland Casualty within thirty (30) days of the effective date of the Consent Decree. Payments to/on behalf of the United States shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice account in accordance with current EFT procedures, referencing USAO File Number 9603434, the EPA Region and Site Spill ID Number for the SJCC Site is 02-3S, the EPA Region and Site Spill ID Number 02-3R, and DOJ Case Number 90-11-2-1037.   Payment shall be made in accordance with instructions provided by the Financial Litigation Unit of the U.S. Attorney's Office in the District of New Jersey following lodging of the Consent Decree.  Any payments received by the Department of Justice after 4:00 p.m. Eastern Time shall be credited on the next business day.  Notice of such payment shall be sent to EPA and DOJ in accordance with Section XIII (Notices and Submissions) of the Consent Decree, and to Ronald Gherardi, Chief, Financial Management Branch, Office of Policy and Management, EPA Region II, 290 Broadway, New York, New York 10007.

b)   $56,417.00 shall be paid to/on behalf of the State of New Jersey by Maryland Casualty within thirty (30) days of the effective date of the Consent Decree.

Payments to/on behalf of the State shall be made by check made payable to the Treasurer, State of New Jersey, forwarded via United States certified mail to counsel for the State at the following address:

> Kenneth Elwell, Deputy Attorney General
> Division of law
> Richard J. Hughes Justice Complex
> 25 Market Street
> P.O. Box 093
> Trenton, New Jersey  08625-0093

c) $965.00 shall be paid by Maryland Casualty by check to the SJCC Parties and their attorney, Thomas P. Farnoly, for attorneys fees and costs, forwarded via United States certified mail to the following address:

> Thomas Farnoly, Esq.
> GRUCCIO, PEPPER, GIOVINAZZI,
> DeSANTO & FARNOLY, P.A.
> 817 East Landis Avenue
> Vineland, NJ  08362

The payments by Maryland Casualty of the above settlement amounts shall constitute full and complete settlement.

3.2    Maryland Casualty agrees that if payment is not timely made in accordance with Section 3.1 of this Agreement, interest will accrue against it only beginning from the date that payment falls overdue through the date of payment.

3.3    Within seven (7) business days after the payment of the monies described in Section 3.1, SJCC shall file a Voluntary Dismissal With Prejudice (hereinafter "Dismissal") dismissing Maryland Casualty with prejudice from the Lawsuit, and Maryland Casualty shall file a Voluntary Dismissal With Prejudice of all counterclaims and crossclaims asserted in the Lawsuit. Each Party shall bear its own attorneys' fees, expenses and other costs in connection with the conduct and dismissal of any claims, counterclaims or crossclaims asserted in the Lawsuit.

3.4    The Parties are aware that the amounts paid and to be paid by or on behalf of SJCC as a result of, or in connection with, SJCC's liability for Environmental Claims arising from or relating to the Site At Issue are in dispute.

3.5    It is agreed that by making the payment pursuant to this Agreement, Maryland Casualty is not acting as a volunteer.

4.    RELEASE OF MARYLAND CASUALTY

4.1   In consideration of the promises contained in this Agreement and the payments by Maryland Casualty as set forth in Section 3.1, SJCC hereby releases and forever discharges Maryland Casualty from any and all past, present, and future liabilities, duties or obligations under the Policies for any and all known or unknown Environmental Claims arising out of or in any way related to the Site At Issue, including, but not limited to, any obligation on the part of Maryland Casualty to investigate, defend, indemnify, pay defense costs, settle claims or suits, or pay settlements or judgments relative thereto.

4.2   SJCC hereby further releases and forever discharges Maryland Casualty, and its attorneys, from any and all Claims for compensatory damages, punitive damages, statutory damages or equitable relief based upon any allegations of bad faith, unfair claim practice, unfair trade practice, unfair defense or settlement practice, insurance or other statutory violation, breach of fiduciary duty, fraud, malice, oppression or other act, state of affairs or failure to act in connection with the investigations, handling, adjustment, litigation or settlement of the claims asserted in the Lawsuit or known or unknown Environmental Claims arising out of or relating to the Site At Issue.

4.3   This Agreement operates as and constitutes full releases of the Policies as to known and unknown Environmental Claims arising out of or relating to the Site At Issue. These releases include, but are not limited to, relieving Maryland Casualty of any duties or obligations whatsoever in relation to any known or unknown Environmental Claims arising out of or relating to the Site At Issue which are presently pending or which may be brought in the future against any or all of the Parties under or with respect to the Policies.

4.4   By entering into this Agreement, SJCC expressly assumes the risk that the damages or costs sustained as a result of any Environmental Claims relating to the Site At Issue may be greater than SJCC now presently realizes, that the damages may increase in amount or in severity over time, that the injuries, damages, and/or claims may be progressive, cumulative, unknown and/or unforeseeable, and that there may be hidden, unknown and unknowable damages or costs. SJCC nevertheless waives, surrenders and abandons any right to recover future monies from Maryland Casualty under the Policies with respect to such damages or liabilities.

4.5   It is expressly understood and agreed between the Parties that the settlement and release embodied in this Agreement is intended to satisfy fully any and all liability, cost or expense Maryland Casualty might otherwise incur, directly or indirectly in any way relating to or arising from any Environmental Claim relating to the Site At Issue. Because this Agreement operates and constitutes a full release of the Policies with respect to the Environmental Claims relating to the Site At Issue, SJCC expressly waives any and all rights it may have under any statute, code or ordinance which may limit or restrict the effect of a general release as to Claims which SJCC does not know or suspect to exist in its favor at the time of the execution of this Agreement.

4.6   Maryland Casualty agrees to pay the sum of $142,000.00 (one hundred forty two thousand dollars) to SJCC as set forth in Section 3 of this Agreement. SJCC and Maryland Casualty agree that such payment is made under the Policies, and that both the per

occurrence and aggregate limits of the Policies are thereby exhausted. SJCC further agrees that subject to the Agreement, it releases and forever discharges Maryland Casualty from any and all past, present and future obligations that may have been, that are, and that otherwise may be owed in the future.

5.    ACTIONS BY OTHER INSURANCE COMPANIES

5.1    SJCC will attempt to minimize the possibility of crossclaims or other actions against Maryland Casualty with respect to Environmental Claims encompassed by this Agreement by any other insurance company. In this connection, if SJCC settles with any other insurance company with respect to Environmental Claims at or emanating from the Site At Issue, it shall obtain from each insurance company settling with it a covenant not to sue Maryland Casualty, substantially in the form set forth in paragraph 5.2 of this Agreement. SJCC agrees that it will not demand, claim, seek or recover from or against any other Person, including any insurance company, any amount for defense or indemnity allocable to Maryland Casualty arising from the Site at Issue.

5.2    Maryland Casualty hereby covenant not to sue or proceed with any action or claim against any other insurance company for indemnity or contribution with respect to its payment to or on behalf of SJCC pursuant to this Agreement for the Environmental Claims at or emanating from the Site At Issue, provided, however, that such other insurer or party has not presented a claim or action against Maryland Casualty that involves the subject matter of this Agreement.

5.3    Paragraphs 5.1 and 5.2 shall not affect the rights Maryland Casualty has to reinsurance or retrocessional recoveries arising as a result of this settlement, nor shall it affect the rights that Maryland Casualty may have to seek those reinsurance or retrocessional recoveries in any action or proceeding of its choosing.

5.4    If any claim, crossclaim or action is instituted or continued against Maryland Casualty by one or more insurance company(ies) that allegedly issued any primary, umbrella or excess insurance policy or policies to SJCC which relate to the Environmental Claims at or emanating from the Site At Issue, SJCC and its employees and agents shall attend hearings and trials, make available all related records, and assist in securing and giving evidence and obtaining the attendance of witnesses. In any such proceeding, SJCC shall resist production of all documents or things and shall resist providing any information which Maryland Casualty reasonably asserts not to be properly discoverable in any suit or proceeding. SJCC agrees to enter into appropriate confidentiality agreements to protect privileged and/or confidential material which may be needed and disclosed to Zurich's and North River's counsel in the defense of Maryland Casualty in any proceeding or litigation.

6.    MERGER OF AGREEMENT

6.1    The Parties agree that other understandings and agreements, if any, previously made between the Parties with respect to the Lawsuit and known or unknown Environmental

Claims arising out of or relating to the Site At Issue are merged into this Agreement.  This Agreement is an integrated agreement and contains the entire agreement regarding the matters herein between the Parties.  No representations, warranties, or promises, have been made or relied on by any signatory hereto other than as set forth herein.  This Agreement supersedes and controls any and all prior communications between any of the parties or their representatives relative to the matters contained herein.

6.2    This Agreement may not be modified, amended or supplemented except upon the execution and delivery of a written agreement executed by the Parties.  This provision cannot be orally waived.

7.    BINDING NATURE OF TERMS

7.1    Each of the terms of this Agreement is binding upon each of the signatories hereto, their respective predecessors, successors, transferees, assigns, representatives, principals, agents, officers, directors and employees.

7.2    If any term or provision of this Agreement or its application to any Person or circumstance, other than the provisions of Sections 3 and 4 of this Agreement, shall to any extent be invalid or unenforceable, the remainder of this Agreement or its application to Persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

8.    RIGHTS RESERVED UNDER THIS AGREEMENT

8.1    Maryland Casualty reserves all of their rights without limitation to deny coverage to SJCC on any and all grounds for any and all claims for coverage which are not released in this Agreement.

8.2    This Agreement is the result of compromise and accord, and shall not be considered an admission of liability or responsibility by Maryland Casualty.   SJCC acknowledges that Maryland Casualty disputes coverage under the Policies with respect to Environmental Claims arising out of or relating to the Site At Issue.  SJCC recognizes that the payment under Section 3.1 above is made in compromise of disputed coverage demands and is not, and cannot be construed as, an admission by Maryland Casualty that any defense, indemnity or other coverage exists under any of the Policies, or that Maryland Casualty has any other obligation of any nature whatsoever (other than those arising under this Agreement) with respect to known or unknown Environmental Claims arising out of or in any way relating to the Site At Issue.

8.3    Except as otherwise stated in this Agreement, with respect to the rights and obligations regarding all matters outside the scope of the Agreement or asserted by any Person not a Party to this Agreement, the Parties reserve all positions and all other rights, defenses and privileges concerning such matters of such Persons.  The Parties agree that none of the terms of this Agreement, nor any aspect of its negotiation or performance shall be used in any manner by any Person in any future action or proceeding as evidence of the rights,

duties or obligations of the Parties under the Policies; provided, however, the Parties may offer this Agreement as evidence of exhaustion of both the per occurrence and aggregate limits of liability of the Policies by the Settlement Amounts paid hereunder, and any Party to this Agreement or the United States and State may offer this Agreement as evidence in any action to enforce the provisions hereof. SJCC agrees that it does not have or claim coverage from Maryland Casualty under any other Policies with respect to any issues that are or could have been litigated at the Lawsuit as defined herein, including any claims for duty to defend, bad faith, extra contractual claims, indemnification or claims handling.

8.4    Except as set forth in Section 13.2 below, this Agreement is intended to confer rights and benefits only upon the Parties hereto, and not upon any other party or entity; no party or entity other than the Parties hereto shall have any legally enforceable rights under this Agreement. Any right of action for breach of this Agreement is reserved to the Parties only.

8.5    Notwithstanding the releases contained in this Agreement, the Parties shall have the right to enforce the terms of this Agreement by way of all legal and equitable remedies.

## 9.    ASSISTANCE AND COOPERATION

9.1    Each of the Parties further agrees that it will execute and deliver to the other Party all instruments and do such further acts and things as the other Parties may reasonably request when such things are necessary to effectuate the purposes of this Agreement.

9.2    Should any person or entity not a party hereto challenge the validity of this Agreement, or any term thereof, the Parties shall provide to each other such cooperation and assistance as the other Parties may reasonably request in order to resist such a challenge.

9.3    Maryland Casualty agrees to comply with Section XIII of the Consent Decree (Notice and Submissions) which directs that notice or requested documents be submitted to the individuals specified therein. All notices and submissions are considered effective upon receipt, unless otherwise provided. Written notice in accordance with these terms shall constitute complete satisfaction of any written notice requirement.

## 10.    REPRESENTATION AS TO NON-ASSIGNMENT OF RIGHTS

No Party to this Agreement shall in any manner assign, transfer, convey or sell or purport to assign, transfer, convey or sell this Agreement without first obtaining the written consent of the other parties; provided, however, that this sentence shall not prohibit any assignment by a Party by merger, consolidation, operation of law or to a party who succeeds to all or substantially all of such party's assets. Subject to the foregoing, this Agreement shall extend to and be binding upon the successors and assigns of the Parties.

## 11.    ARMS LENGTH TRANSACTION

This Agreement is a compromise and settlement of disputed claims. It is the product of arms length negotiations with all Parties receiving advice from independent legal counsel. This Agreement is entered into without prejudice or precedential value and is not intended to be, nor shall it be construed as, an interpretation of any insurance policy and shall not be used as evidence or in any other manner in any court or dispute resolution proceeding to create, prove or interpret the obligations of Maryland Casualty under the Policies.

12.    CONSTRUCTION OF AGREEMENT

This Agreement is not a policy of insurance and the signatories do not intend that it will be interpreted as such. It is also expressly agreed and understood by the Parties that the language of this Agreement shall not be presumptively construed against any of the Parties hereto because of the identity of the drafter or the fact that Maryland Casualty is an insurance company.

13.    RIGHTS OF NON-PARTIES

13.1    Except as set forth below, this Agreement confers rights and benefits only on the signatories hereto and is not intended to confer any right or benefit upon any other person or entity. Except as set forth below, no person or entity other than the signatories hereto shall have any legally enforceable right under this Agreement. Except as set forth below, all rights of action for any breach of this Agreement are hereby reserved to the signatories hereto.

13.2    The parties agree that the United States and State shall be third party beneficiaries of this Agreement with respect to the payment obligations set forth in Section 3.1. The United States and State may directly enforce the payment obligations under Section 3.1 of this Agreement. The Parties further agree that the Consent Decree may be used as evidence by them, the United States or the State to enforce compliance with this Agreement.

13.3    Maryland Casualty acknowledges that the covenants not to sue by the United States and State contained in Paragraph 13 of the Consent Decree shall be contingent upon Maryland Casualty's performance of its payment obligations under Section 3.1 of this Agreement.

13.4    Maryland Casualty hereby agrees and consents to the covenants not to sue contained in Section IX of the Consent Decree.

13.5    Maryland Casualty agrees that it shall not challenge the entry and language of the Consent Decree to which this Agreement shall be attached as Appendix A.

14.    NOTICE AND COUNTERPARTS

14.1    This Agreement shall be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original, and all such counterparts shall

Pa102

constitute one and the same instrument.  This Agreement consists of ___ typewritten pages, inclusive of signature pages.

14.2    Any statements, communications or notices to be provided pursuant to this Agreement shall be sent to the attention of the person indicated below, until such time as notice of any change of person to be notified or change of address is forwarded to the Parties hereto:

    (a).    Francis Sparagna
          5547 Central Avenue
          Ocean City, New Jersey  08226

and copy to:

        Thomas P. Farnoly, Esq.
        Gruccio, Pepper, Giovinazzi, DeSanto & Farnoly, P.A.
        817 Landis Avenue.
        CN 1501
        Vineland, New Jersey 08362

    (b).    Robert Edwards
          MARYLAND CASUALTY COMPANY
          3910 Keswick Road
          Baltimore, MD  21211

and copy to:

        Gerald A. Hughes, Esq.
        HUGHES & HENDRIX, P.C.
        850 Bear Tavern Road, Suite 304
        West Trenton, New Jersey 08628

## 15.    WARRANTIES AND REPRESENTATIONS OF THE PARTIES

15.1    The Parties represent, warrant and agree that they were not, as of the date of this Agreement, or as a consequence of this Agreement, under any physical duress, economic duress or other threat of harm or injury, and that the Parties entered into this Agreement freely and voluntarily.

15.2    The Parties represent, warrant and agree that they (a) are the sole and lawful owners of all right, title and interest in and to every Claim or matter released herein, and (b) have not assigned or transferred or purported to or attempted to assign or transfer to any person or entity any Claim or other matter released herein.

15.3    Each of the Parties represents, warrants and certifies that the person signing this Agreement on its behalf is duly authorized to execute this Agreement on behalf of the Parties, respectively, and to bind the Parties to the terms, conditions, provisions, duties and obligations set forth in this Agreement, and that this Agreement constitutes a valid and binding obligation.

15.4    SJCC hereby represent and warrant that as of the date of the execution of this Agreement, they are not aware of any other site wherein (1) SJCC has been, or may be in the future, identified or named as an alleged generator and potentially Responsible Party in an United States 104(e) request or equivalent state information request, directive, third-party claim or lawsuit, or (2) SJCC has been, or may be in the future, subject to Environmental Claims asserted or assertable by any Person.

15.5    The Parties represent and warrant to the extent applicable:

(a).    That they have taken all necessary corporate and legal actions to duly approve the making and performance of this Agreement and that no further corporate or other approval is necessary; and

(b).    That the making and performance of this Agreement will not violate any provisions of law or of their respective articles of incorporation or by-laws; and

(c).    That they have read this Agreement and know the contents hereof, that the terms hereof are contractual and not by way of recital, and that they have signed this Agreement of their own free act.

15.6    SJCC represents, warrants and agrees that it will not in any way voluntarily assist any other person or entity in the establishment of any claim, cause of action, action or right against Maryland Casualty, which in any way relates to the investigation, handling, defense or settlement of Environmental Claims arising at or emanating from the Site At issue. In connection herewith, SJCC agrees to hold harmless and to indemnify Maryland Casualty for any breach of any of the foregoing representations and warranties.

IN WITNESS WHEREOF, the undersigned Parties have caused this Agreement to be executed by their duly authorized representatives on the date first set forth above.

By: _____          Witnessed: _____

Angelo Sparagna, Individually

By: _____          Witnessed: _____

Francis Sparagna, Individually

SOUTH JERSEY CLOTHING COMPANY, INC.

By: _Francis Sparagna, Pres_          Witnessed: _Mariane Beechler_
Francis Sparagna, President


SOUTH JERSEY CLOTHING COMPANY (a partnership)

By: _Francis Sparagna_          Witnessed: _Mariane Beechler_
Francis Sparagna, Partner


VISTA CORPORATION

By: _Francis Sparagna_          Witnessed: _Mariane Beechler_

Francis Sparagna, President


MARYLAND CASUALTY COMPANY

By: _Robert Edwards_          Witnessed: _____
ROBERT EDWARDS , Account Specialist

# APPENDIX B

## SETTLEMENT AGREEMENT AND RELEASE
## BY AND BETWEEN SOUTH JERSEY CLOTHING COMPANY, INC.
## AND THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

This Settlement Agreement and Release ("Agreement," "Settlement Agreement," or "Agreement and Release"), is entered into by and between South Jersey Clothing Company, Inc. (hereinafter "SJCC," as defined herein), and the Insurance Company of the State of Pennsylvania (hereinafter "ISOP," as defined herein).  SJCC and ISOP are sometimes collectively referred to hereinafter as the "PARTIES", and may be referenced singularly as a "PARTY".

## WITNESSETH:

WHEREAS, SJCC alleges that ISOP issued liability insurance policies to South Jersey Clothing Company, Inc. or for its benefit, which are identified below within the definition of "Policies";

WHEREAS, various judicial and/or administrative claims and actions have been and may be commenced by the United States and/or the State of New Jersey against SJCC and others seeking various remedies as a result of alleged environmental contamination (hereinafter referred to as the "Underlying Actions")

WHEREAS, SJCC instituted suit against certain of its insurers (naming ISOP as a defendant, although service of process upon ISOP was not perfected) in the case filed in New Jersey Superior Court, Cumberland County, New Jersey, captioned, South Jersey Clothing Company, Inc. v. Continental Insurance Co., et al., No. L-1038-91 (voluntarily stayed by SJCC)(hereinafter, "the Declaratory Judgment Action"), in which SJCC sought a declaration

regarding the obligations, if any, of the insurance company defendants under certain policies of insurance regarding the claims at issue in the Underlying Actions;

WHEREAS, SJCC alleges that ISOP may be obligated under the Policies for SJCC's liabilities arising in the Underlying Actions;

WHEREAS, ISOP disputes that it has any obligation to SJCC under any of the Policies for any claims or actions relating to the Underlying Actions;

WHEREAS, the PARTIES are aware that additional claims or actions may in the future be asserted by the United States, the State of New Jersey, or other third parties against SJCC for which they might, but for the terms of this Agreement, at some future time assert a claim under the Policies;

WHEREAS, the PARTIES wish to avoid the expense and disruption of litigation over the issue of whether ISOP has any obligation to SJCC in connection with the matters released pursuant to this Settlement Agreement, and the PARTIES are prepared to settle their differences strictly as a business decision with respect to all such claims and without prejudice to their respective positions on policy wording or coverage in the Declaratory Judgment Action, or in any other dispute or case; and

WHEREAS, the United States and the State of New Jersey intend to enter into a Consent Decree with SJCC and others with respect to the Underlying Actions, identifying ISOP as a third-party beneficiary, which is contingent in part upon the execution and implementation of this Settlement Agreement;

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the PARTIES hereto agree as follows:

- 2 -

"SJCC," as used herein means the South Jersey Clothing Company, Inc., on behalf of itself and all parents, subsidiaries, affiliates, wholly owned corporations, predecessors, successors, and assigns, and stockholders, principals, and agents, including, but not limited to, Angelo Sparagna, Jr. and Francis Sparagna and their heirs and assigns;

"ISOP," as used herein means the Insurance Company of the State of Pennsylvania, including any other company affiliated with American International Group, Inc., their predecessors, successors, assigns, parent corporations, subsidiaries, affiliates, and agents, and the officers, directors, employees, agents, shareholders and representatives of any of them;

"Policy" or "Policies" as used herein means any policies of insurance ever issued by ISOP to or for the benefit of SJCC, including No. MP168-5985 and No. MP 168-8449, and the PARTIES expressly acknowledge that additional policies of insurance not identified in this Paragraph may have been issued to or for the benefit of SJCC by ISOP, or any other company affiliated with the American International Group, Inc., and any such policies are included within this definition and are subject to this Agreement; and

"Environmental Claim(s)" means any demand, claim, suit, request for relief, action or forbearance of any kind, proceeding and/or notices of partial or total responsibility (including Potential Responsible Party or "PRP" notices) made, asserted, threatened or filed against SJCC by the United States, the State of New Jersey, or any other federal, state, local or other governmental or quasi-governmental agencies and/or private persons, organizations or entities including but not limited to bodily injury, personal injury, property damage, cleanup, restitution, investigation costs, remediation, injury, damage or harm to natural resources, plant life or animal life, or any other harm, injury, damage or violation or need for remedy of any kind, and/or any other claim, demand, or cause of action, arising out of SJCC's alleged, actual, threatened,

potential or vicarious acts, omissions, liability, or responsibility (including, but not limited to,

alleged liability or responsibility as a generator, disposer, manufacturer, distributor, transporter,

facilitator, or operator or as a present or former lessee, lessor, or owner of real or personal

property), whether at law or in equity, and whether sounding in tort, contract, equity, nuisance,

trespass, negligence, strict liability or any statutory, regulatory, equitable or legal theory, basis or

cause of action of any sort, related to, arising out of or involving

        (a)    alleged, actual, threatened or potential pollution, contamination or alleged

injurious environmental or toxic condition,

        (b)    alleged, actual, threatened or potential exposure to or presence of tar,

hydrocarbons, petroleum, constituent of petroleum, derivative of petroleum, asbestos fibers,

smoke, vapors, odors, noise, soot, fumes, acids, alkalis, toxic chemicals, solids, liquids or gases,

waste, recycled or recyclable materials or alleged irritants, contaminants, pollutants, or

constituent of any product used or manufactured by SJCC, including but not limited to cleaning

solvents; or

        (c)    alleged, actual, threatened or potential exposure to or presence of injurious

environmental or toxic conditions, by any form of allegedly harmful, toxic, radioactive, nuclear,

hazardous or injurious substance or material (including, but not limited to, any "hazardous

substance" or "hazardous waste" as those terms are defined in 42 U.S.C. § 9601).

The "Site" or "SJCC Site" means the South Jersey Clothing Company Superfund Site in

Buena Borough, Atlantic County, New Jersey.

"Consent Decree" means the consent decree to be entered into by the United States, the

State of New Jersey, SJCC, and others in settlement of the Underlying Actions, to which this

Agreement and Release shall be annexed as an appendix, and which shall be lodged with a court having jurisdiction.

"State" shall mean the New Jersey Department of Environmental Protection and the Administrator, New Jersey Spill Compensation Fund.

"United States" means the United States of America, including but not limited to its departments and agencies.

1. **Recitals**: The recitals and definitions above are integral to this Agreement and Release and are not merely preamblutory.

2. **Permanent And Binding Resolution**: This Agreement is a permanent and binding accord and resolution of the rights and obligations of the PARTIES with respect to all matters which are the subject of this Agreement and Release.

3. **Third-Party Beneficiaries**: The United States and the State are third-party beneficiaries of this Agreement and Release. If ISOP fails to timely make the payments specified herein, the United State and/or the State may enforce the provisions set forth below directly against ISOP and in such enforcement proceeding, will be entitled to the amounts set forth below, as well as any additional amount accruing as set forth in the last paragraph of 42 U.S.C. Section 9607(a).

4. **Payment By ISOP**: In consideration of the agreement by SJCC to perform the obligations required of them hereunder and to release or procure the release of ISOP to the full extent set forth in this Agreement and in the Consent Decree, ISOP agrees to pay the single and total sum of Five Hundred Thousand Dollars ($500,000.00)(the "Settlement Amount") to, or on behalf of, SJCC in accordance with Section V of the Consent Decree, as follows:

1) $297,696.00 shall be paid to/on behalf of the United States by ISOP within sixty (60) days from the date of receipt by ISOP of notice of entry of the Consent Decree to ISOP's counsel. Payment to on behalf of the United States shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice account in accordance with current EFT procedures, referencing USAO File Number 9603434, the EPA Region and Site Number 0235 and Spill Number NJD980766828, and DOJ Case Number 90-11-2-1037. Payment shall be made in accordance with instructions provided by the Financial Litigation Unit of the U.S. Attorney's Office in the District of New Jersey following lodging of the Consent Decree. Any payments received by the Department of Justice after 4:00 p.m. Eastern Time shall be credited on the next business day. Notice of such payment shall be sent to EPA and DOJ in accordance with Paragraph 27 (Notices) of this Agreement, and to Ronald Gherardi, Chief, Financial Management Branch, Office of Policy and Management, EPA Region II, 290 Broadway, New York, New York 10007.

2) $198,464.00 shall be paid to/on behalf of the State by ISOP within sixty (60) days from the date of notice of entry of the Consent Decree to ISOP's counsel. Payment to/on behalf of the State shall be made by certified or cashiers check made payable to the "Treasurer, State of New Jersey," and forwarded via U.S. Certified Mail to Mr. Kenneth Elwell, Deputy Attorney General, State of New Jersey, at the address specified in Paragraph 27 (Notices) of this Agreement.

3) $3,840.00 shall be paid by ISOP to SJCC in care of its attorney, Thomas P. Farnoly, Esq., 817 East Landis Avenue, P.O. Box 1501, Vineland, NJ 08362-1501, within sixty (60) days from the date of notice of entry of the Consent Decree to ISOP's counsel.

Payments to the United States and to the State shall be deemed complete upon receipt. Payment to SJCC shall be deemed complete upon mailing of payment via U.S. Mail, first-class postage prepaid. Payment hereunder may be allocated by ISOP with respect to their policies or policy years, and otherwise in such manner as they determine in its sole discretion.

5. **Release of ISOP:** (a) In consideration of payment of the Settlement Amount and the other provisions of the Agreement, SJCC hereby releases, remises and forever discharges ISOP from any and all duties, obligations, liabilities and responsibilities of any nature or kind whatsoever arising under any and all Policies with respect to Environmental Claims at or arising from the SJCC Site, whether past, present or future, known or unknown, or asserted or unasserted (including, but not limited to, claims for bad faith, malicious prosecution, statutory or regulatory violation or punitive or other extra-contractual damages of any type);

(b) Further and in addition, SJCC releases, remises and forever discharges ISOP from any and all demands, claims, causes of action or requests for relief, action or forbearance of any kind which were asserted in or could have been asserted in action No. L-1038-91, which is pending (but stayed) in New Jersey Superior Court, Cumberland County, New Jersey;

(c) SJCC represents and warrants that, as of the effective date of this Agreement, the scope of the release afforded under this Agreement is as broad as or broader than any release given to, or to be given to, any other settling insurer in the Declaratory Judgment Action.

(d) It is understood and agreed by the PARTIES that this Release of ISOP by SJCC is contingent upon payment by ISOP of the amounts specified in Paragraph 4, above, which reflects the amounts specified in Section V (Reimbursement of Costs) of the Consent Decree.

(e)    ISOP understands and agrees that the covenants not to sue to be given under Section VII (Covenants Not To Sue By The United States And State Of New Jersey) are contingent upon payment of the amounts specified in Paragraph 4, above.

(f)    From and after the effective date of this Agreement, ISOP shall have no further duties or obligations based upon, arising out of or related in any way to the Policies with respect to any Environmental Claims released hereunder, and the Policies shall be considered null and void *ab initio*, of no further force and effect with respect to any Environmental Claims released hereunder.

6.    **Not a Volunteer**:  It is agreed that in making payments pursuant to this Agreement, ISOP is not acting as a volunteer. SJCC agrees that the sums paid pursuant to this Agreement represent sums incurred or which may be incurred by SJCC with respect to claims brought against SJCC that relate to, or implicate, the Policies.

7.    **Waiver of Punitive/Exemplary Damages**:  In consideration of payment of the Settlement Amount, SJCC forever waives any claims or causes of action against ISOP (and/or their agents, representatives or employees) for bad faith, breach of contract, breach of duty, malicious prosecution, sanctions, statutory or regulatory violation, or punitive, exemplary or extra-contractual damages of any type arising from, connected with, or in any way relating to the released claims, the Declaratory Judgment Action, the Underlying Actions, or the Policies. The PARTIES further waive any and all claims for punitive or exemplary damages relating to any dispute which might arise regarding the terms or implementation of this Agreement.  Any and all notices of suit, claim, or occurrence previously transmitted or communicated to ISOP by or on behalf of SJCC with respect to any suit, claim or occurrence which is the subject of this Agreement shall be deemed withdrawn.

8.    **Dismissal of Declaratory Judgment Action with Prejudice**:  Within ten (10)

days after payment of the sums stated hereinabove, SJCC shall prepare and file a stipulation (or

motion if necessary) dismissing ISOP with prejudice from any pending declaratory judgment

action which relates to the subject matter released herein.  Each PARTY to bear its own costs and

fees, and take what other additional actions may be required to effectuate such dismissal.  SJCC

shall not file any suit or other legal proceeding against ISOP which relates to any matter released

herein.

9.    **Protection against Contribution**:  Subject to the provisions of Paragraph 10: (a)

In the event that SJCC obtains a judgment against any insurer(s) other than ISOP or settles any

claim or action for coverage with respect to an Environmental Claim arising from the SJCC Site

with any such other insurer(s), and in the further event that such other insurer(s) successfully

asserts any suit, claim or action against ISOP for contribution or indemnification relating to such

Environmental Claim(s), SJCC will voluntarily reduce its judgment or claim against the other

insurer(s) of SJCC to the point where such other insurer(s) will not be entitled to any

contribution or indemnification from ISOP.  In the event that SJCC has already recovered such

portion of its judgment against such other insurer which renders them unable to eliminate

entirely the entitlement of such other insurer to recovery against ISOP, SJCC shall use any

combination of a reduction of judgment or return of already collected judgment as effectuates the

intended discharge or elimination of entitlement of recovery by such other insurer(s) against

ISOP.  SJCC reserves the right to argue that any other insurer of SJCC is entitled to no reduction

or only to have a pro tanto reduction in the judgment or claim.  In so arguing,  SJCC shall not

argue that ISOP has any continuing liability or obligation to SJCC or any other insurer of SJCC.

Such pro tanto reduction is not intended to and shall not be construed to require ISOP to incur any liability or obligations beyond those already set forth herein.

(b)    SJCC will use reasonable best efforts to obtain in any settlement with any other insurer an agreement by that insurer not to seek reimbursement payment from or indemnification or contribution against any other settling insurer, including ISOP.

(c)    SJCC hereby covenants and agrees that in settling any Environmental Claim arising from the SJCC Site being made by non-governmental parties or entities, SJCC shall use reasonable best efforts to require any such non-governmental claimants, as part of such settlement, to release and forever discharge any right or standing such claimants might have to file suit, make claim or otherwise proceed against ISOP under the Policies for any and all such Environmental Claims;

(d)    SJCC hereby covenants and agrees that in settling any Environmental Claim arising from the SJCC Site being made by governmental claimants, whether federal, state or local governmental entities, departments or subdivisions thereof, SJCC shall use its reasonable best efforts to require any such governmental claimants, as part of such settlement, to release and forever discharge any right or standing such claimants might have to file suit, make claim or otherwise proceed against ISOP under, arising out of, or in any way related to the Policies for any and all such Environmental Claims;

(e)    Should SJCC fail in its reasonable best efforts to obtain a full release from the non-governmental or governmental claimants for ISOP under the Policies as outlined in subparagraphs (c) and (d) of this Paragraph, above, SJCC covenants and agrees that, with respect to those claims for which SJCC obtains a release for itself from the non-governmental or governmental claimants, SJCC will use its reasonable best efforts to obtain a release for ISOP. It

is understood and agreed that in any release and discharge by non-governmental or governmental claimants to be provided to ISOP pursuant to the terms of this subparagraph (e) of this Paragraph, SJCC shall use its reasonable best efforts to make said release and discharge subject to the same terms and conditions that such non-governmental or governmental claimants require with respect to the release that is being given to SJCC.

10.   **Additional Waivers**: (a) Effective on the same date on which SJCC releases ISOP as provided for herein, ISOP agrees that it shall not seek reimbursement of amounts paid under this Agreement from SJCC, from any other party to the Declaratory Judgment Action, from any other party to the Underlying Claims, or from any other insurer of SJCC, provided, however, that such other party or other insurer has agreed not to seek any reimbursement of sums paid by it against ISOP, and has agreed not to assert any claims against ISOP. Nothing in this Agreement, however, shall affect any rights ISOP may have with respect to its reinsurers pursuant to any reinsurance contracts.

(b)   ISOP hereby acknowledges and agrees to the covenants not to sue set forth in Section IX (Covenants Not To Sue By The SJCC Parties And The GSC Parties).

(c)   ISOP hereby waives any claim to be subrogated to the rights of SJCC against (i) third parties who may have caused or contributed to the environmental contamination or pollution that gave rise to the Underlying Claims with respect to which ISOP is released hereunder, or (ii) any other entity that issued insurance policies to SJCC provided, however, that this subparagraph (c)(ii) shall be effective only if all other non-prevailing or settling insurers also waive or have waived their subrogation rights. ISOP represents that it has not sold, assigned or otherwise transferred any such rights of subrogation to any other person or entity, nor shall it hereafter do so.

(d)     SJCC shall not settle with any other insurer unless that other settlement agreement includes a provision substantially identical to terms or effect of subparagraphs (a) and (c)(ii) of this Paragraph 10.

(e)     ISOP hereby waives any right it may have to challenge the terms, or entry, of the Consent Decree.  If ISOP becomes a party to any action or proceeding to enforce the Consent Decree, however, ISOP reserves all rights it may have to challenge an adverse party's interpretation of the Consent Decree.

11.    **Confidentiality:**  This Agreement shall be attached as an Appendix to the Consent Decree, so that all of the terms and information contained herein shall be made public. However, all of the negotiations leading to this Agreement, all of the communications generated pursuant to it, and the implementation hereof (collectively, "Confidential Compromise Material"), shall be kept strictly confidential and shall not be disclosed to any person, corporation, or other entity not a PARTY to this Agreement except (i) in response to a judicial order compelling disclosure, or as may otherwise be required by law, or as may be necessary to defend or assert claims by or against any PARTY hereto in a judicial proceeding, or to the extent necessary in pleadings or other papers filed in a court of law or equity, or in any proceeding before a tribunal, solely to effectuate the settlement, in whole or in part, of claims asserted by a governmental agency against SJCC, (ii) to subsidiary, affiliate, associated, or parent companies of the PARTIES and their counsel, (iii) to ISOP's reinsurers or retrocessionaires, (iv) to any company engaged to make payments to SJCC on behalf of ISOP, or (v) to auditors of or counsel to the PARTIES upon their request; provided, however, that disclosure pursuant to subparts (iii) through (v) above shall only be made under appropriate assurances or circumstances of confidentiality.  The PARTIES shall cooperate to protect the Confidential Compromise Material

from disclosure. The PARTIES hereto may waive this provision (and any other provision of this Agreement) only if each PARTY hereto consents in writing.

12.   **No Admission**: By entering into this Agreement, the PARTIES do not intend to make, nor shall they be deemed to have made, any admission of any kind. The PARTIES agree that they are entering into this Agreement solely as a business decision for the purposes of settling certain disputes between them and to avoid the cost of further litigation with respect to these disputes. This Agreement is the product of informed negotiations and compromises of previously stated legal positions. Nothing contained in this Agreement shall be construed as an admission by any PARTY as to the merit or lack of merit of any particular theory relating to the payment of claims arising from or relating to SJCC's operations or any other type of claim. Statements made in the course of negotiations have been and shall be without prejudice to the rights of the PARTIES in any disputes or transactions with any other persons or entities not party to this Agreement. This Agreement does not necessarily reflect the views of ISOP as to the actual scope of coverage of their policies. With respect to all such matters or persons, the PARTIES hereby reserve all previously held positions and all other rights and privileges.

13.   **Use of Agreement**: The PARTIES agree that this Agreement and any acts in the performance of this Agreement are not intended to be, nor shall they in fact be, used in any case or other proceeding for any purpose, including, but not limited to, efforts to prove either the acceptance by any PARTY hereto of any particular theory of coverage or as evidence of any obligation that any PARTY hereto has or may have to anyone. Provided, however, that nothing contained in this Paragraph shall be interpreted to restrict the right of any PARTY (a) to disclose the Agreement as permitted by Paragraph 11, herein, (b) to bring a claim or to introduce evidence predicated on a breach of this Agreement, or (c) to provide proof as to the fact of settlement and

release provided herein if necessary to respond to a suit or claim. ISOP and SJCC agree that this Agreement and Release and the Consent Decree to which it shall be attached as an Appendix also may be used as evidence by the United States or the State of New Jersey in an action to enforce compliance with the terms of this Agreement and Release and/or Consent Decree.

14. **Protection Afforded**: In addition to the confidentiality provisions contained herein and not by way of limitation thereof, this Agreement shall be deemed to fall within the protection afforded compromises and offers to compromise Rule 408 of the Federal Rules of Evidence and any similar state law provision.

15. **No Value As Precedent**: This Agreement is without prejudice or value as precedent and shall not be used in any proceeding or hearing to create, prove, enforce or interpret the obligations under, or terms and conditions of, any other agreement or any insurance policy.

16. **Agreement Is Not A Policy Of Insurance**: This Agreement is not a policy of insurance, and the parties do not intend that it will be interpreted as such.

17. **Entire Agreement**: This Agreement constitutes the entire Agreement between SJCC and ISOP regarding alleged insurance coverage under the Policies. Except as may be provided for herein, this Agreement shall not nullify, affect or otherwise modify the terms of any agreement between SJCC and ISOP, or for the benefit of ISOP, which are related to the Policies including, but not limited to, any indemnification agreement, promissory note, credit agreement or retrospective premium agreement. Except as explicitly set forth in this Agreement, there are no representations, warranties, or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Agreement or any of its conditions or terms. All prior negotiations, oral or written, are merged into this Agreement.

18.   <u>No Assignment</u>:  SJCC warrants as of the effective date of this Agreement that it has not assigned, conveyed, or otherwise transferred any claims, demands, causes of action, rights, or obligations related in any way to the Policies or any proceeds thereof, or to the claims, losses, and expenses released herein, to any other person or entity, nor shall SJCC hereafter do so.

19.   <u>Warranty Regarding Known Policies</u>:  SJCC hereby represents and warrants that it is unaware of, and has no knowledge of any information indicating or suggesting, the issuance of any policies of insurance to SJCC by ISOP prior to the effective date hereof other than those policies of insurance specifically identified in the definition, "Policies," above, having diligently searched and investigated for such policies.  The PARTIES to this Agreement consider this representation to be material to this Agreement and acknowledge that the PARTIES expressly rely on this representation in entering into this Agreement.  If prior to the time of the signing of this Agreement SJCC had such awareness or knowledge, there shall be no coverage under any policy issued by ISOP not so listed, and the non-breaching PARTIES retain all remedies they may have at law or otherwise for breach of this Agreement.

20.   <u>Knowledge of Other Environmental Claims</u>:  SJCC represents and warrants that it has not been notified by any actual or potential claimant or by an attorney, agent, broker, representative, or any other person acting or purporting to act on behalf of a claimant or potential claimant (collectively, "Claimant") that an Environmental Claim has been made, asserted or filed or may be made, asserted or filed against SJCC, except those Environmental Claims identified in this Agreement, and one other matter involving six (6) drums or containers of waste removed from SJCC's Buena Borough facility for which the State of New Jersey has issued a letter to SJCC notifying SJCC of the State of New Jersey's intent not to sue.  The PARTIES to this

Agreement consider this representation to be material to this Agreement and acknowledge that ISOP expressly relies upon this representation in entering into this Agreement. If prior to the time of execution of this Agreement SJCC had been notified by a Claimant of an undisclosed actual or potential Environmental Claim, other than those identified herein, there shall be no coverage under any policy issued by ISOP for such Environmental Claim, and ISOP retains all other remedies they may have at law or otherwise for breach of this Agreement.

21. **Other Assurances**: Each PARTY hereto shall provide such further and other written assurances necessary to effectuate the terms and intent hereof. In the event that either PARTY seeks a Court Order determining that the settlement was effective and/or in good faith, the PARTIES, to the fullest extent possible, shall cooperate and assist each other in obtaining said good faith settlement determination. In the event any claim or action is brought against ISOP by any person with respect to liabilities or obligations released hereunder, SJCC agrees that they will not take any position that is inconsistent with the position of ISOP that no such claim will now lie against ISOP.

22. **Applicable Law**: This Agreement shall be interpreted under and governed by the laws of the State of New York without regard to general principles of choice of law which might otherwise call for the application of a different state's law.

23. **Authorship**: The PARTIES agree that this Agreement reflects the joint drafting efforts of all PARTIES. In the event any dispute, disagreement or controversy arises regarding this Agreement, the PARTIES shall be considered joint authors and no provision shall be interpreted against any PARTY because of authorship. Each PARTY also agrees that it is fully informed as to the meaning and intent of this Agreement and has been advised by independent counsel of its choosing in that regard.

24.   **Execution**: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

25.   **Amendment**: This Agreement may not be amended or modified except by a written instrument signed by the duly authorized representatives of all of the PARTIES.

26.   **Headings**: The headings of Paragraphs and subparagraphs are designed to facilitate ready reference to subject matter and shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement.

27.   **Notices**: Any statements, communications or notices to be provided pursuant to this Agreement and Release, and/or the Consent Decree to which this Agreement and Release shall be attached as an Appendix, shall be sent via Certified Mail to the attention of the PARTIES indicated below, until such time as notice of any change of person to be notified or change of address is forwarded to all PARTIES. All notices and submissions shall be considered effective upon receipt, unless otherwise provided herein or in the Consent Decree. Written notice as specified herein shall constitute complete satisfaction of any written notice requirement of this Agreement and Release and/or Consent Decree.

    (a)    SJCC:

           Thomas P. Farnoly, Esq.,
           Gruccio, Pepper, Giovinazzi,
           DeSanto & Farnoly
           817 East Landis Avenue
           P.O. Box 1501
           Vineland, NJ 08362-1501

(b)     ISOP:

Mr. Andrew Engel
Environmental Claims Department
AIG Technical Services, Inc.
Sixth Floor
80 Pine Street
New York, New York 10005

With A Copy To:

Richard S. Kuhl, Esquire
Jackson & Campbell, P.C.
1120 20th Street, N.W., Suite 300 South
Washington, D.C. 20036

(c)     The United States:

Bruce Gelber
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
(Marked, "Re: 90-11-2-1037")

(d)     The U.S. Environmental Protection Agency:

Clay Monroe
Assistant Regional Counsel
Region II
U.S. Environmental Protection Agency
290 Broadway
New York, New York 10007-1866

(e)     The State of New Jersey:

Kenneth W. Elwell
Deputy Attorney General
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
Trenton, New Jersey 08625

and

**Pa124**

- 18 -

Susan Boyle
Assistant Commissioner, Site Remediation, and
Acting Administrator of Spill Compensation Fund
P.O. Box 028
401 E. State Street
Floor 6
Trenton, New Jersey 08625-0028

28.    **Authority to Sign Agreement**:  The individuals signing this Agreement and the

PARTIES on whose behalf such individual are signing hereby represent and warrant that they are

empowered and authorized to sign on behalf of and bind the PARTIES for whom they have

signed.

29.    **Effective Date**:  This Agreement shall take effect on the latter date this

Agreement is signed by a duly authorized representative of a PARTY.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties have executed this Agreement and Release by

their duly authorized representatives.

Francis Sparagna
as Authorized Agent for SJCC

By: _Francis Sparagna_

Printed: _FRANCIS SPARAGNA_

Title: _President_

Pa125

- 19 -

State of _New Jersey_

County of _Cumberland_

Before me, a notary public, personally appeared _Francis Sparagna_ who, being

duly sworn, stated that s/he has executed the foregoing Agreement on behalf of the Party named

above and is duly authorized to do so.

Witness my hand and notarial seal this _21st_ day of _December_, 2001.

_Denise L. Santagata_

Notary Public

DENISE L. SANTAGATA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 17, 2003

(Printed)

My Commission expires: _June 17, 2003_

AIG TECHNICAL SERVICES, INC.
as authorized agent for

The Insurance Company of the State
of Pennsylvania

By: _____

Printed: _____ KRYSTYNA  M. LASKOWSKI

Title: _____ MANAGER
_____ ENVIRONMENTAL CLAIMS

State of _New York_
County of _New York_

     Before me, a notary public, personally appeared _Krystyna Laskowski_ who, being

duly sworn, stated that s/he has executed the foregoing Agreement on behalf of the Parties named

above and is duly authorized to do so.

     Witness my hand and notarial seal this _1st_ day of _February_ 2001. 2

_____
Notary Public

_____ Jacqueline Merson _____
(Printed)

My Commission expires:

JACQUELINE MERSON
Notary Public, State of New York
No. 02ME6002890
Qualified in Queens County
Commission Expires Feb. 17, 2006

Pa127

# APPENDIX  C



## SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter "Agreement") is entered into as of this 25ᵗʰ day of January , 2001 by and between SOUTH JERSEY CLOTHING COMPANY (hereinafter "SJCC" as defined in Section 2.6), ZURICH AMERICAN INSURANCE COMPANY, the successor in interest to Zurich Insurance Company, U.S. Branch, by operation of law (hereinafter "Zurich" as defined in Section 2.9), and THE NORTH RIVER INSURANCE COMPANY (hereinafter "North River" as defined in Section 2.10) in accordance with the terms, conditions and definitions set forth below. SJCC, Zurich and North River are collectively referred to herein as "the Parties."

## RECITALS

WHEREAS, the UNITED STATES OF AMERICA (hereinafter "United States" as defined in Section 2.6) and the STATE OF NEW JERSEY (hereinafter defined as "State" in Section 2.8) have asserted certain Environmental Claims (as defined in Section 2.3) against SJCC relating to the ownership and/or operation of SJCC's former manufacturing facility in Minotola, New Jersey (hereinafter "Site At Issue" as defined in Section 2.11).

WHEREAS, SJCC has made demands for defense and indemnification under some or all of the Policies (as defined in Section 2.5) with respect to certain Environmental Claims arising out of the operations at the Site At Issue.

WHEREAS, Zurich issued the following umbrella liability policies of insurance to SJCC:

1. Policy No. 86-57-197; and
2. Policy No. 87-29-137.

WHEREAS, Zurich is also alleged to have issued primary liability policies of insurance to SJCC for policy periods between 1970 through 1974.

WHEREAS, North River has issued the following primary and umbrella liability policies to SJCC:

1. Policy No. 540-208704-6;
2. Policy No. 540-384652-8;
3. Policy No. 523-030503-6;
4. Policy No. 523-062995-4;
5. Policy No. 523-131051-6; and
6. Policy No. 520-165357-2.

WHEREAS, in its complaint, the United States alleges that on or about July 5, 1988 and August 31, 1988, it notified SJCC and Garden State Cleaners (as defined in Section 2.12) that they were Potentially Responsible Parties in connection with the release of hazardous substances, primarily TCE and PCE, in the area surrounding the Site At Issue. The United States has

undertaken or will undertake remediation of the Site At Issue pursuant to its Record of Decision dated September 26, 1991.

WHEREAS, the United States added the Site At Issue and the Garden State Cleaners site to the National Priority List in 1989.

WHEREAS, on July 9, 1996, the United States instituted suit against SJCC in the United States District Court, District of New Jersey, seeking recovery of all past and future costs incurred at the Site At Issue, and SJCC asserted claims against Garden State in this lawsuit by way of third-party complaint. On May 28, 1998, at the request of SJCC and the United States, the District Court entered an administrative order dismissing the United States's claims, without prejudice, to enable the parties to pursue mediation.

WHEREAS, the State is currently asserting at least four claims against SJCC arising out of SJCC's ownership or operation of the Site At Issue:

1. By a Directive issued on or about December 11, 1996, the State has directed SJCC to undertake remediation of the soil at the Site At Issue.

2. By letters dated January 9, 1997 and May 20, 1997, the State demanded from SJCC reimbursement for oversight costs paid to the United States by the State in connection with the United States' oversight of the superfund remediation of the Site At Issue.

3. In October, 1997, the State has demanded reimbursement of costs associated with the 1982 roadside dumping of waste by an environmental disposal company known as Graves Resource Management, which waste allegedly included soil excavated from the Site At Issue.

4. The State has also asserted natural resource damage resulting from groundwater contamination allegedly caused by SJCC's activities at the Site At Issue.

WHEREAS, a controversy has arisen between SJCC, Zurich and North River concerning the existence of insurance coverage for Environmental Claims arising out of or relating to the Site At Issue under the Policies. This controversy is the subject of litigation involving SJCC and its insurers in the Superior Court of New Jersey, Law Division, Cumberland County, entitled: South Jersey Clothing Company v. Continental Insurance Company, et al., Docket No. L-1038-91 (hereinafter the "Lawsuit").

WHEREAS, SJCC disputes any and all liability to the United States and the State for Environmental Claims arising out of or relating to the Site At Issue.

WHEREAS, Zurich and North River dispute any and all liability to SJCC in connection with the subject matter of the Lawsuit and the Environmental Claims arising out of or relating to the Site At Issue.

WHEREAS, the Parties to this Agreement make no admissions as to the correctness of the position taken by any other party in the Lawsuit, and Zurich and North River do not acknowledge that they are obligated to defend and/or indemnify SJCC for any liability that SJCC has or may incur for any known or unknown Environmental Claims as defined herein, or any other Claim (as defined in Section 2.4) or circumstance.

WHEREAS, the Parties seek to resolve all Claims between them which are the subject of the Lawsuit and all past, present and future claims for defense and indemnification concerning known and unknown Environmental Claims arising out of or relating to the Site At Issue. Accordingly, the Parties hereby agree to resolve: (a) any and all Claims for defense and indemnification which have been set forth in the Lawsuit; and (b) any and all Environmental Claims which are currently known or may become known in the future arising out of or relating to the Site At Issue.

WHEREAS, in consideration of the payments to be made by Zurich and North River pursuant to Section 3 of this Agreement, SJCC, Garden State, United States and State have agreed to enter into a Consent Decree settling SJCC's potential liability to the United States and State for Environmental Claims pursuant to which the United States and State have agreed to enter into covenants not to sue or assert claims against Zurich or North River.

WHEREAS, by entering into this Agreement, no Party is making any admission of liability, nor does this Agreement, or any Party to it, adopt any particular position as to defense and indemnification. This Agreement is the product of informed negotiation and compromise, following consultation with legal counsel. This Agreement does not necessarily reflect the views of Zurich and North River as to the actual scope of their rights and obligations as such rights and obligations may relate to matters or persons outside the scope of this Agreement. With respect to all such matters or persons, the Parties hereby reserve all previously held positions and all other rights and privileges.

## AGREEMENT

NOW, THEREFORE, in consideration of and in reliance upon the definitions, recitals, mutual promises, covenants, understandings and obligations, hereinbefore and hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound hereby, the Parties mutually agree as follows:

1. INCORPORATION OF RECITALS

The foregoing recitals are incorporated herein as if fully set forth in the text of this Agreement.

2. DEFINITIONS

As used in this Agreement, and for the purpose of this Agreement only, the following terms have the following meanings:

Pa131

3

2.1   "Person" means any individual, corporation, partnership, association, proprietorship, trust, organization, Governmental Agency (as defined in Section 2.2), or any other entity, including but not limited to, estates, guardians or beneficiaries thereof.

2.2   "Governmental Agency" means (i) the government of the United States of America, and any state, commonwealth, territory or possession of the United States of America, including the District of Columbia and Puerto Rico, and the government of any county, province, city or municipality thereof; (ii) any subdivision, instrumentality, department or agency of any of the foregoing; (iii) the government of any foreign country, state or territory and any province, county, city or municipality thereof; and (iv) any subdivision, instrumentality, department or agency of any such foreign country, state, territory or any province, county, city or municipality thereof.

2.3   "Environmental Claims" means any and all past, present or future Claims (as defined in Section 2.4), whether presently known, unknown or unknowable, involving SJCC and arising out of, or as a consequence of, actual, alleged, threatened or potential pollution, contamination or other injurious environmental condition, the release discharge, dispersal, escape, or exposure to any substance, including without limitation any hazardous substance or waste as defined in 42 U.S.C. § 9601, smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants, including, but not limited to, any such Claims involving actual, alleged, threatened or potential property damage (or injury to property or damage to natural resources), bodily injury, personal injury and claims to recover clean up or remediation costs, including but not limited to costs incurred and sums expended, or which in the future may be expended or incurred for investigation, removal, distribution, treatment or containment.   This definition includes Claims arising out of any materials sold by SJCC for salvage, scrap or recycling.

For purposes of this Agreement, Environmental Claims shall also include, without limitation, any and all past, existing, alleged, future or potential:  (a) Claims brought by or on behalf of any Person or Governmental Agency, or any actions taken by SJCC (voluntarily or otherwise) in response to claims alleging bodily injury, personal injury, property damage, or advertising liability, or alleging any other right to relief against SJCC arising from alleged, potential, threatened or actual pollution by, contamination with, or exposure to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants, or any form of toxic, hazardous or injurious substances or materials, including without limitation, any hazardous substance or waste as defined in 42 U.S.C. § 9601; and (b) all costs incurred, directly or indirectly, for cleanup, study, prevention, or remediation, or as statutory fines or penalties, or as damages for environmental damage to persons, property (tangible or intangible) or natural resources.

2.4   "Claims" means any past, present or future claim, right, demand, order, directive, action, suit, cause of action, crossclaim, counterclaim, third party action, arbitration or mediation demand, statutory or regulatory obligation, request, allegation, administrative proceeding, lien, debt, bill, account, duty, dues, reckoning, sum of money, bond, specialty, right of indemnity,

right of subrogation, demand for injunctive relief, controversy, contribution, exoneration, covenant, agreement, contract, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fees and liability whatsoever, currently known or unknown, that any Person may now have, or hereinafter may have, of or against SJCC, whether at law, equity, admiralty or otherwise, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative or common law cause of action of any sort.

2.5   "Policies" means any and all known or unknown primary, umbrella, excess or other insurance policies, contracts, and/or agreements of any nature, type or kind issued to and/or alleged to have been issued to SJCC by Zurich and North River (including but not limited to the insurance policies set forth in the Recitals to this Agreement) and any amendments, revisions, extensions, or endorsements to such policies.

2.6   "SJCC" means Francis Sparagna, Angelo Sparagna, South Jersey Clothing Company, Inc., South Jersey Clothing Company (a partnership) and Vista Corporation, and any of South Jersey Clothing Company's employees, officers, directors, principals, affiliates, agents, servants, representatives, and its predecessors, successors, assigns, subsidiaries, divisions, operating units or groups, holding companies, parent companies and any Person insured by any of the Policies issued to Francis Sparagna, Angelo Sparagna or South Jersey Clothing Company, and any named insured, person insured, additional insured, or additional named insured under the Policies issued to Francis Sparagna, Angelo Sparagna or South Jersey Clothing Company.

2.7   "United States" means the United States of America and any subdivision, instrumentality, department or agency of the foregoing, including but not limited to the Environmental Protection Agency of the United States of America.

2.8   "State" means the State of New Jersey and any subdivision, instrumentality, department or agency of the foregoing, including but not limited to the Department of Environmental Protection and Energy of the State of New Jersey.

2.9   "Zurich" means Zurich American Insurance Company, as successor in interest to Zurich Insurance Company, U.S. Branch, by operation of law, and its past, present and future agents, servants, employees, successors, assigns, predecessors, affiliates, subsidiaries, parents, officers, directors, attorneys and representatives.

2.10   "North River" means The North River Insurance Company and its past, present and future agents, servants, employees, successors, assigns, predecessors, affiliates, subsidiaries, parents, officers, directors, attorneys and representatives.

2.11   "Site At Issue" means SJCC's manufacturing facility in Minotola, New Jersey, and the land, air and waters at and adjacent to it. The land, air and waters at and adjacent to the Site at Issue include, but are not limited to the air (and atmosphere) above it, soils (whether said soils are surface soils or sub-surface soils) and waters (whether these waters be surface waters remaining on the site or flowing through or over the site or groundwater flowing under or

through the site and up or down gradient of the site). In addition, the land, air and waters at and adjacent to the Site at Issue include soil, groundwater surface water and subsurface soil and rock which is or are affected by any hazardous substance arising from or migrating from the Site at Issue.

2.12   "Garden State" means Garden State Cleaners and its past, present and future employees, officers, directors, principals, attorneys, agents, representatives, affiliates, predecessors, successors and assigns.

2.13   "Continental" means Continental Insurance Company and its past, present and future employees, officers, directors, principals, attorneys, agents, representatives, affiliates, predecessors, successors and assigns.

2.14   "Consent Decree" means the proposed Consent Decree to which this Agreement shall be attached as Appendix C entered into by and between SJCC, Garden State, United States and State for submission to the United States District Court for the District of New Jersey for judicial approval.

2.15   Each term defined herein stated in a singular form shall include the plural form, and each defined term stated in a plural form shall include the singular form.

3. ·   SETTLEMENT OF THE COVERAGE DISPUTE AND THE LAWSUIT; PAYMENT OF SETTLEMENT AMOUNT; DISMISSAL OF LAWSUIT

3.1.   Within sixty (60) days of judicial approval of the Consent Decree Zurich and North River agree to pay to SJCC the following amounts:

Zurich:       $1,169,480.00
North River:  $2,338,960.00

Payment to SJCC by Zurich and North River shall not be made directly but shall be accomplished by transmitting funds State on behalf of SJCC in accordance with Section V of the Consent Decree.

The insurers are not jointly responsible for the total amount of the insurer settlements. Each insurer is severally and independently responsible for its own contribution to this settlement. The insurers may allocate this sum to or among any of the Policies in any manner that they deem appropriate.

The payments by the insurers of the above settlement amounts shall constitute full and complete settlement.

3.2   Zurich and North River agree that if payment is not timely made in accordance with Section 3.1 of this Agreement, interest will accrue against the non-paying party only beginning from the date that payment falls overdue through the date of payment.

3.3   Within seven (7) business days after the payment of the monies described in Section 3.1, SJCC shall file a Voluntary Dismissal With Prejudice (hereinafter "Dismissal")

dismissing Zurich and North River with prejudice from the Lawsuit, and Zurich and North River shall file a Voluntary Dismissal With Prejudice of all counterclaims and crossclaims asserted in the Lawsuit. Each Party shall bear its own attorneys' fees, expenses and other costs in connection with the conduct and dismissal of any claims, counterclaims or crossclaims asserted in the Lawsuit.

3.4   The Parties are aware that the amounts paid and to be paid by or on behalf of SJCC as a result of, or in connection with, SJCC's liability for Environmental Claims arising from or relating to the Site At Issue are in dispute.

3.5   It is agreed that by making the payment pursuant to this Agreement, neither Zurich nor North River is acting as a volunteer.

## 4   RELEASE OF ZURICH AND NORTH RIVER

4.1   In consideration of the promises contained in this Agreement and the payments by Zurich and North River as set forth in Section 3.1, SJCC hereby releases and forever discharges Zurich and North River from any and all past, present, and future liabilities, duties or obligations under the Policies for any and all known or unknown Environmental Claims arising out of or in any way related to the Site At Issue, including, but not limited to, any obligation on the part of Zurich and North River to investigate, defend, indemnify, pay defense costs, settle claims or suits, or pay settlements or judgments relative thereto. The failure of either Zurich or North River to comply with its obligations under Section 3.1 shall not diminish any rights or benefits received by the other insurer under this Agreement provided that insurer has complied with Section 3.1.

4.2   SJCC hereby further releases and forever discharges Zurich and North River, and their attorneys, from any and all Claims for compensatory damages, punitive damages, statutory damages or equitable relief based upon any allegations of bad faith, unfair claim practice, unfair trade practice, unfair defense or settlement practice, insurance or other statutory violation, breach of fiduciary duty, fraud, malice, oppression or other act, state of affairs or failure to act in connection with the investigations, handling, adjustment, litigation or settlement of the claims asserted in the Lawsuit or known or unknown Environmental Claims arising out of or relating to the Site At Issue.

4.3   This Agreement operates as and constitutes full releases of the Policies as to known and unknown Environmental Claims arising out of or relating to the Site At Issue. These releases include, but are not limited to, relieving Zurich and North River of any duties or obligations whatsoever in relation to any known or unknown Environmental Claims arising out of or relating to the Site At Issue which are presently pending or which may be brought in the future against any or all of the Parties under or with respect to the Policies.

4.4   By entering into this Agreement, SJCC expressly assumes the risk that the damages or costs sustained as a result of any Environmental Claims relating to the Site At Issue may be greater than SJCC now presently realizes, that the damages may increase in amount or in severity over time, that the injuries, damages, and/or claims may be progressive, cumulative,

unknown and/or unforeseeable, and that there may be hidden, unknown and unknowable damages or costs. SJCC nevertheless waives, surrenders and abandons any right to recover future monies from Zurich and North River under the Policies with respect to such damages or liabilities.

4.5    It is expressly understood and agreed between the Parties that the settlement and release embodied in this Agreement is intended to satisfy fully any and all liability, cost or expense Zurich and North River might otherwise incur, directly or indirectly in any way relating to or arising from any Environmental Claim relating to the Site At Issue.  Because this Agreement operates and constitutes a full release of the Policies with respect to the Environmental Claims relating to the Site At Issue, SJCC expressly waives any and all rights it may have under any statute, code or ordinance which may limit or restrict the effect of a general release as to Claims which SJCC does not know or suspect to exist in its favor at the time of the execution of this Agreement.

5.    HOLD HARMLESS AND INDEMNIFICATION:

5.1    SJCC agrees to indemnify, save and hold harmless Zurich and North River for all settlements and judgments against Zurich and North River, from and against all claims, crossclaims, actions or liability by any Person (including, but not limited to direct action suits, suits for contribution, indemnification or subrogation and any claims for coverage by any other insured or alleged insured under the Policies) arising from the Environmental Claims released in this Agreement, including, but not limited to, any crossclaims, counterclaims or new matters filed against Zurich and North River in the Lawsuit, and from all costs or expenses, including reasonable attorneys' fees incurred from and after the date hereof in defending against any such claims.

5.2    SJCC agrees to defend Zurich and North River for all claims, crossclaims, actions or liability indemnified under Section 5.1 above with counsel selected by Zurich and North River.  Nothing herein shall constitute any waiver of Zurich and North River's attorney-client privilege.

5.3    In connection with any claim, crossclaim or action indemnified under this Section, Zurich and North River shall not voluntarily make any payment, assume any obligation or incur any expense for which SJCC is liable, without prior approval of SJCC.  SJCC shall have the right to settle any claim, crossclaim or action falling within the limits of SJCC's indemnification obligation under this Section.

5.4    Zurich and North River shall not make any claims or file any actions (including, but not limited to, claims or actions for contribution, indemnity [other than reinsurance], subrogation, attorneys' fees or costs) against SJCC or any insurer of SJCC, acting as such, for reimbursement of any part or all of the Settlement Amount paid by Zurich and North River pursuant to Section 3.1 or other costs associated with the Lawsuit; provided, however, that nothing in this subsection shall prevent either SJCC or Zurich and North River from enforcing the terms of this Agreement.  SJCC will cooperate with Zurich and North River in minimizing

the possibility of crossclaims or other actions, arising from Environmental Claims, against Zurich and North River by any of SJCC's other insurance companies.

5.5    It is the intent of this Agreement that the obligations of SJCC under Sections 5.1 and 5.2 with respect to any Claims arising out of or relating to the Site At Issue shall not be limited even if the damages claimed are currently unknown, unknowable or non-existent. Neither shall the obligations of SJCC under Sections 5.1 and 5.2 be limited by any judicial or other enforceable determination that the scope of the release granted in Sections 4 above shall be unenforceable or otherwise limited because a particular claim asserted or damage sought was either unknown, unknowable or nonexistent at the time of execution of this Agreement.

6.    ACTIONS BY OTHER INSURANCE COMPANIES

6.1    SJCC will attempt to minimize the possibility of crossclaims or other actions against Zurich and North River with respect to Environmental Claims encompassed by this Agreement by any other insurance company. In this connection, if SJCC settles with any other insurance company with respect to Environmental Claims at or emanating from the Site At Issue, it shall obtain from each insurance company settling with it a covenant not to sue Zurich and North River, substantially in the form set forth in paragraph 6.2 of this Agreement. SJCC agrees that it will not demand, claim, seek or recover from or against any other Person, including any insurance company, any amount for defense or indemnity allocable to Zurich or North River arising from the Site at Issue.

6.2    Zurich and North River hereby covenant not to sue or proceed with any action or claim against any other insurance company for indemnity or contribution with respect to its payment to or on behalf of SJCC pursuant to this Agreement for the Environmental Claims at or emanating from the Site At Issue, provided, however, that such other insurer or party has not presented a claim or action against Zurich and North River that involves the subject matter of this Agreement.

6.3    Paragraphs 6.1 and 6.2 shall not affect the rights Zurich and North River have to reinsurance or retrocessional recoveries arising as a result of this settlement, nor shall it affect the rights that Zurich and North River may have to seek those reinsurance or retrocessional recoveries in any action or proceeding of its choosing.

6.4    If any claim, crossclaim or action is instituted or continued against Zurich and North River by one or more insurance company(ies) that allegedly issued any primary, umbrella or excess insurance policy or policies to SJCC which relate to the Environmental Claims at or emanating from the Site At Issue, SJCC and its employees and agents shall attend hearings and trials, make available all related records, and assist in securing and giving evidence and obtaining the attendance of witnesses. In any such proceeding, SJCC shall resist production of all documents or things and shall resist providing any information which Zurich and North River reasonably asserts not to be properly discoverable in any suit or proceeding. SJCC agrees to enter into appropriate confidentiality agreements to protect privileged and/or confidential material which may be needed and disclosed to Zurich's and North River's counsel in the defense of Zurich and North River in any proceeding or litigation.

## 7.    MERGER OF AGREEMENT

7.1    The Parties agree that other understandings and agreements, if any, previously made between the Parties with respect to the Lawsuit and known or unknown Environmental Claims arising out of or relating to the Site At Issue are merged into this Agreement. This Agreement is an integrated agreement and contains the entire agreement regarding the matters herein between the Parties. No representations, warranties, or promises, have been made or relied on by any signatory hereto other than as set forth herein. This Agreement supersedes and controls any and all prior communications between any of the parties or their representatives relative to the matters contained herein.

7.2    This Agreement may not be modified, amended or supplemented except upon the execution and delivery of a written agreement executed by the Parties. This provision cannot be orally waived.

## 8.    BINDING NATURE OF TERMS

8.1    Each of the terms of this Agreement is binding upon each of the signatories hereto, their respective predecessors, successors, transferees, assigns, representatives, principals, agents, officers, directors and employees.

8.2    If any term or provision of this Agreement or its application to any Person or circumstance, other than the provisions of Sections 3 and 4 of this Agreement, shall to any extent be invalid or unenforceable, the remainder of this Agreement or its application to Persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each such provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

## 9.    RIGHTS RESERVED UNDER THIS AGREEMENT

9.1    Zurich and North River reserve all of their rights without limitation to deny coverage to SJCC on any and all grounds for any and all claims for coverage which are not released in this Agreement.

9.2    This Agreement is the result of compromise and accord, and shall not be considered an admission of liability or responsibility by Zurich and North River. SJCC acknowledges that Zurich and North River dispute coverage under the Policies with respect to Environmental Claims arising out of or relating to the Site At Issue. SJCC recognizes that Zurich's and North River's payment under Section 3.1 above is made in compromise of disputed coverage demands and is not, and cannot be construed as, an admission by Zurich and North River that any defense, indemnity or other coverage exists under any of the Policies, or that Zurich and North River has any other obligation of any nature whatsoever (other than those arising under this Agreement) with respect to known or unknown Environmental Claims arising out of or in any way relating to the Site At Issue.

9.3     Except as otherwise stated in this Agreement, with respect to the rights and obligations regarding all matters outside the scope of the Agreement or asserted by any Person not a Party to this Agreement, the Parties reserve all positions and all other rights, defenses and privileges concerning such matters of such Persons.  The Parties agree that none of the terms of this Agreement, nor any aspect of its negotiation or performance shall be used in any manner by any Person in any future action or proceeding as evidence of the rights, duties or obligations of the Parties under the Policies; provided, however, that the Parties may offer this Agreement as evidence of the reduction or exhaustion of any applicable limits of liability by the Settlement Amounts paid hereunder, and any Party to this Agreement or the United States and State may offer this Agreement as evidence in any action to enforce the provisions hereof.

9.4     Except as set forth in Section 14.2 below, this Agreement is intended to confer rights and benefits only upon the Parties hereto, and not upon any other party or entity; no party or entity other than the Parties hereto shall have any legally enforceable rights under this Agreement.  Any right of action for breach of this Agreement is reserved to the Parties only.

9.5     Notwithstanding the releases contained in this Agreement, the Parties shall have the right to enforce the terms of this Agreement by way of all legal and equitable remedies.

10.     ASSISTANCE AND COOPERATION

10.1    Each of the Parties further agrees that it will execute and deliver to the other Party all instruments and do such further acts and things as the other Parties may reasonably request when such things are necessary to effectuate the purposes of this Agreement.

10.2    Should any person or entity not a party hereto challenge the validity of this Agreement, or any term thereof, the Parties shall provide to each other such cooperation and assistance as the other Parties may reasonably request in order to resist such a challenge.

10.3    Zurich and North River agree to comply with Section XIII of the Consent Decree (Notice and Submissions) which directs that notice or requested documents be submitted to the individuals specified therein.  All notices and submissions are considered effective upon receipt, unless otherwise provided.  Written notice in accordance with these terms shall constitute complete satisfaction of any written notice requirement.

11.     REPRESENTATION AS TO NON-ASSIGNMENT OF RIGHTS

No Party to this Agreement shall in any manner assign, transfer, convey or sell or purport to assign, transfer, convey or sell this Agreement without first obtaining the written consent of the other parties; provided, however, that this sentence shall not prohibit any assignment by a Party by merger, consolidation, operation of law or to a party who succeeds to all or substantially all of such party's assets.  Subject to the foregoing, this Agreement shall extend to and be binding upon the successors and assigns of the Parties.

12.    ARMS LENGTH TRANSACTION

This Agreement is a compromise and settlement of disputed claims. It is the product of arms length negotiations with all Parties receiving advice from independent legal counsel. This Agreement is entered into without prejudice or precedential value and is not intended to be, nor shall it be construed as, an interpretation of any insurance policy and shall not be used as evidence or in any other manner in any court or dispute resolution proceeding to create, prove or interpret the obligations of Zurich and North River under the Policies.

13.    CONSTRUCTION OF AGREEMENT

This Agreement is not a policy of insurance and the signatories do not intend that it will be interpreted as such. It is also expressly agreed and understood by the Parties that the language of this Agreement shall not be presumptively construed against any of the Parties hereto because of the identity of the drafter or the fact that either Zurich and North River is an insurance company.

14.    RIGHTS OF NON-PARTIES

14.1    Except as set forth below, this Agreement confers rights and benefits only on the signatories hereto and is not intended to confer any right or benefit upon any other person or entity. Except as set forth below, no person or entity other than the signatories hereto shall have any legally enforceable right under this Agreement. Except as set forth below, all rights of action for any breach of this Agreement are hereby reserved to the signatories hereto.

14.2    The parties agree that the United States and State shall be third party beneficiaries of this Agreement with respect to the payment obligations set forth in Section 3.1. The United States and State may directly enforce the payment obligations under Section 3.1 of this Agreement. The Parties further agree that the Consent Decree may be used as evidence by them, the United States or the State to enforce compliance with this Agreement.

14.3    Zurich acknowledges that the covenants not to sue by the United States and State contained in Paragraphs 17 and 18 of the Consent Decree shall be contingent upon Zurich's performance of its payment obligations under Section 3.1 of this Agreement. North River acknowledges that the covenants not to sue by the United States and State contained in Paragraphs 19 and 20 of the Consent Decree shall be contingent upon North River's performance of its payment obligations        Section 3.1 of this Agreement.

14.4    Zurich and North River hereby agree and consent to the covenants not to sue contained in Section IX of the Consent Decree.

14.5    Zurich and North River agree that they shall not challenge the entry and language of the Consent Decree to which this Agreement shall be attached as Appendix C.



### 15.   NOTICE AND COUNTERPARTS

15.1   This Agreement shall be executed in two or more counterparts, each of which when executed and delivered shall be deemed an original, and all such counterparts shall constitute one and the same instrument.  This Agreement consists of 16 typewritten pages, inclusive of signature pages.

15.2   Any statements, communications or notices to be provided pursuant to this Agreement shall be sent to the attention of the person indicated below, until such time as notice of any change of person to be notified or change of address is forwarded to the Parties hereto:

    (a).    Francis Sparagna
           5547 Central Avenue
           Ocean City, New Jersey  08226

    and copy to:

           Thomas P. Farnoly, Esq.
           Gruccio, Pepper, Giovinazzi, DeSanto & Farnoly, P.A.
           817 Landis Avenue
           CN 1501
           Vineland, New Jersey 08362

    (b).    Director of Environmental Claims
           Zurich American Insurance Company
           1400 American Lane
           Schaumburg, Illinois 60196-1056

    and copy to:

           Peter Petrou, Esq.
           Cuyler Burk
           Parsippany Corporate Center
           Four Century Drive
           Parsippany, New Jersey 07054-4663

    (c).    Senior Vice President, Claims
           Riverstone Claims Management, LLC
           250 Commercial Street
           Suite 5000
           Manchester, NH  03110

    and copy to:

Robert F. Walsh, Esq.
Melito & Adolfsen, P.C.
Woolworth Building
233 Broadway, 28th Floor
New York, New York  10279-0118

## 16.   WARRANTIES AND REPRESENTATIONS OF THE PARTIES

16.1   The Parties represent, warrant and agree that they were not, as of the date of this Agreement, or as a consequence of this Agreement, under any physical duress, economic duress or other threat of harm or injury, and that the Parties entered into this  Agreement freely and voluntarily.

16.2   The Parties represent, warrant and agree that they (a) are the sole and lawful owners of all right, title and interest in and to every Claim or matter released herein, and (b) have not assigned or transferred or purported to or attempted to assign or transfer to any person or entity any Claim or other matter released herein.

16.3   Each of the Parties represents, warrants and certifies that the person signing this Agreement on its behalf is duly authorized to execute this Agreement on behalf of the Parties, respectively, and to bind the Parties to the terms, conditions, provisions, duties and obligations set forth in this Agreement, and that this Agreement constitutes a valid and binding obligation.

16.4   SJCC hereby represent and warrant that as of the date of the execution of this Agreement, they are not aware of any other site wherein (1) SJCC has been, or may be in the future, identified or named as an alleged generator and potentially Responsible Party in an United States 104(e) request or equivalent state information request, directive, third-party claim or lawsuit, or (2) SJCC has been, or may be in the future, subject to Environmental Claims asserted or assertable by any Person.

16.5   The Parties represent and warrant to the extent applicable:

(a).   That they are corporations duly organized and validly existing in good standing under the laws of one of the states of the United States; and

(b).   That they have taken all necessary corporate and legal actions to duly approve the making and performance of this Agreement and that no further corporate or other approval is necessary; and

(c).   That the making and performance of this Agreement will not violate any provisions of law or of their respective articles of incorporation or by-laws; and

(d).   That they have read this Agreement and know the contents hereof, that the terms hereof are contractual and not by way of recital, and that they have signed this Agreement of their own free act.

16.6   SJCC represents, warrants and agrees that it will not in any way voluntarily assist any other person or entity in the establishment of any claim, cause of action, action or right

against Zurich and North River, which in any way relates to the investigation, handling, defense or settlement of Environmental Claims arising at or emanating from the Site At issue. In connection herewith, SJCC agrees to hold harmless and to indemnify Zurich and North River for any breach of any of the foregoing representations and warranties.

IN WITNESS WHEREOF, the undersigned Parties have caused this Agreement to be executed by their duly authorized representatives on the date first set forth above.

By: _____
Angelo Sparagna, Individually

Witnessed: _____

By: _____
Francis Sparagna, Individually

Witnessed: _____

SOUTH JERSEY CLOTHING COMPANY, INC.

By: _____
Francis Sparagna, President

Witnessed: _____

SOUTH JERSEY CLOTHING COMPANY (a partnership)

By: _____
Francis Sparagna, Partner

Witnessed: _____

VISTA CORPORATION

By: _____
Francis Sparagna, President

Witnessed: _____

ZURICH AMERICAN INSURANCE COMPANY

By: _____
Kathryn Gallanis, Account Specialist

Witnessed: _____

against Zurich and North River, which in any way relates to the investigation, handling, defense or settlement of Environmental Claims arising at or emanating from the Site At issue. In connection herewith, SJCC agrees to hold harmless and to indemnify Zurich and North River for any breach of any of the foregoing representations and warranties.

IN WITNESS WHEREOF, the undersigned Parties have caused this Agreement to be executed by their duly authorized representatives on the date first set forth above.

By: _____            Witnessed: _____
     Angelo Sparagna, Individually


By: _____            Witnessed: _____
     Francis Sparagna, Individually


SOUTH JERSEY CLOTHING COMPANY, INC.


By: _____            Witnessed: _____
     Francis Sparagna, President


SOUTH JERSEY CLOTHING COMPANY (a partnership)


By: _____            Witnessed: _____
     Francis Sparagna, Partner


VISTA CORPORATION


By: _____            Witnessed: _____
     Francis Sparagna, President


ZURICH AMERICAN INSURANCE COMPANY


By: _Kathryn Gallanis_____           Witnessed: _Marjorie A. Mecann_
     Kathryn Gallanis, Account Specialist

THE NORTH RIVER INSURANCE COMPANY

By: _____          Witnessed: _____
    Carlos Del Carpio
    Its Authorized Representative

# APPENDIX D

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter "Agreement") is entered into on this _____ day of _____ _____, 2001 by and between Garden State Cleaners Co., John Trasferini and Albert Trasferini (hereinafter collectively referred to as "GSC"), as defined herein, and the Continental Insurance Company (hereinafter "Continental"), as defined herein.

WHEREAS, GSC owns and operates a dry cleaning establishment located on Summer Avenue, Buena Borough, Atlantic County, New Jersey;

WHEREAS, Continental is alleged to have issued certain policies of insurance to GSC, including, but not limited to, those policies identified on Schedule A annexed hereto (hereinafter "the Policies");

WHEREAS, GSC is subject to claims in an action entitled United States of America v. South Jersey Clothing Company, Civil Action No. 96-CV-3166 (JBS) (hereinafter referred to as the "South Jersey Litigation"), pending in the United States District Court for the District of New Jersey, wherein it is alleged that GSC is partially responsible for contamination at and from what are known as the South Jersey Clothing Superfund Site and the Garden State Cleaners Superfund Site (hereinafter "the Sites");

WHEREAS, GSC alleges that Continental is obligated to defend and indemnify it in connection with the claims asserted against

it in the South Jersey Litigation and/or in connection with claims arising from the Sites;

WHEREAS, Continental has denied that it has any obligation to defend or indemnify GSC with respect to the South Jersey Litigation and/or in connection with claims arising from the Sites;

WHEREAS, GSC has instituted suit against Continental in the Superior Court of New Jersey, Law Division, Gloucester County, under the caption of <u>John Trasferini and Albert Trasferini t/a Garden State Cleaners Co. v. The Continental Insurance Company, et al</u>, Docket No. L-317-97 (hereinafter "the coverage action");

WHEREAS, GSC and Continental previously entered into a separate Confidential Partial Settlement Agreement and Release with respect to their dispute as to costs incurred by GSC to defend the South Jersey Litigation; and

WHEREAS, GSC and Continental desire to amicably resolve and compromise their disputes with respect to the cost to settle and compromise the claims against GSC in the South Jersey Litigation.

NOW, THEREFORE, in consideration of and in reliance upon the definitions, recitals, mutual promises, covenants, understandings and obligations, hereinbefore and hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound hereby, GSC and Continental mutually agree, as follows:

1.    <u>Incorporation of Recitals</u>.   The foregoing recitals are incorporated herein and form a part of this Agreement.

2.  <u>Definitions</u>.

2.1. For purposes of this Agreement, "GSC" shall mean Garden State Cleaners Company, its predecessors, successors, affiliates, parents, subsidiaries, officers, shareholders, employees, including, but not limited to, John Trasferini and Albert Trasferini, as well as their respective heirs, successors and assigns.

2.2. For purposes of this Agreement, "Continental" shall mean The Continental Insurance Company, as well as its predecessors, successors, assigns, affiliates, parents, subsidiaries, shareholders, officers, directors, employees and representatives.

2.3. For purposes of this Agreement, "Sites" shall mean the Garden State Cleaners facility located on Summer Avenue, Buena Borough, Atlantic County, New Jersey, the South Jersey Clothing Company facility located on Central Avenue, Buena Borough, Atlantic County, New Jersey, including, but not limited to, the air above, soils on and below and waters, both surface and ground, on, in or which flow over, through or beneath the facilities, the air, soils and waters, surface and ground, adjacent to and/or which have in any way been impacted to any extent by any contamination allegedly emanating from either or both facilities, as well as the entire area alleged in the South Jersey Litigation to be contaminated.

3.  <u>Release by GSC</u>.  In consideration of the promises and undertakings provided for herein and the payment provided for in

Paragraph 4 hereof, GSC hereby unconditionally releases and forever discharges Continental from any and all past, present and future claims, liabilities, obligations, demands, rights, causes of action, losses, damages, and responsibilities of every type and kind, known and unknown, including, but not limited to, any obligation to provide a defense, pay defense costs for, settle or pay any judgments with respect to any and all past, present or future claims arising from, connected with or relating to the Sites, as well as any and all claims of every type and kind arising from, connected with or relating to any policy or policies of insurance issued by Continental to GSC, including, but not limited to, Policy Nos. SMP6087524, SMP2418055, SMP2676123, and SMP3326423, as well as any other known and unknown policy of insurance which Continental may have issued to GSC or under which GSC claims or may in the future claim a right to insurance coverage.  This release includes, but is not limited to, any and all past, present and future claims against Continental for damages of every type and kind, including, but not limited to, claims for property damage, bodily injury and personal injury, as well as attorneys' fees, litigation costs, and interest.  This release is general, unconditional and without exception.  GSC and Continental acknowledge and agree that the Release herein and the Covenants Not to Sue by the United States and State of New Jersey contained in the Consent Decree to be entered in the South Jersey Litigation are contingent upon the

timely payment of the Settlement Payment provided for in Section 4 herein.

4.   <u>Settlement Payment</u>.   In consideration for the promises and undertakings set forth herein, as well as the release set forth in Paragraph 3 hereof, Continental agrees to pay on behalf of GSC the sum of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000) in accordance with the terms and conditions of the Consent Decree to be entered in the South Jersey Litigation, pending in the United States District Court for the District of New Jersey. This Agreement will be attached to the Consent Decree as Appendix D.  The settlement payment provided for herein shall be made within 60 days of the entry by the Court of the Consent Decree in the South Jersey Litigation, and only after this Agreement has been fully and properly executed by duly authorized representatives of GSC.  Continental's total $250,000 settlement payment will be made in accordance with the payment procedure specified in Section V of the Consent Decree and shall be disbursed as follows:

a.   $100,000 to the United States of America;

b.   $66,667 to the Treasurer, State of New Jersey; and

c.   $83,333 to Kenneth A. DiMuzio, attorney for GSC.

In the event that Continental fails to make timely payment of $100,000 to the United States of America in accordance with this Agreement or payment of $66,667 to the State of New Jersey, interest will accrue on the unpaid amount from the last date that the payment was due until such time as the payment is made.  With

the exception of any such interest that may accrue, Continental's liability under this Agreement shall not exceed the total $250,000 settlement amount in increments set forth in subparagraphs a through c herein.

5. Dismissal of Coverage Action. Within seven days of the settlement payment provided for in Paragraph 4 hereof, GSC will take all actions necessary to dismiss with prejudice and without costs to either party the coverage action entitled John Trasferini and Albert Trasferini t/a Garden State Cleaners Co. v. Continental Insurance Company, et al, Docket No. L-317-97, pending in the Superior Court of New Jersey, Law Division, Gloucester County. GSC and Continental consent to and will not challenge the entry or terms of the Consent Decree in the South Jersey Litigation. GSC and Continental acknowledge and agree to the provisions of Sections IX and XIII of the Consent Decree in the South Jersey Litigation.

6. Arms-Length Negotiations. This Agreement is a compromise and settlement of disputed claims. It is the product of arms-length negotiations during which each of the parties was represented by and received the advice of counsel of its choosing. It is entered into without prejudice or precedential value and is not intended to be, nor shall it be construed as, an interpretation of any insurance policy and shall not be used as evidence or in any other manner in any court or dispute resolution proceeding to create, prove or interpret any

6

obligations or alleged obligations of Continental under any Policies.

7.   <u>Authorization of Signatories</u>.   The persons signing this Agreement represent and warrant that they are duly authorized to execute this Agreement on behalf of GSC and Continental, and to bind said corporations, to the terms, conditions, provisions, duties, and obligations set forth in this Agreement.

8.   <u>Representation as to Non-Assignment of Rights</u>.   GSC represents and warrants that it has not and will not in any manner assign, transfer, convey or sell or purport to assign, transfer, convey or sell to any entity or person any cause of action, chose in action, or part thereof, arising out of or connected with the matters released herein, and that it is the only entity entitled to recover for any damages under such Claims, causes of action, actions and rights.   GSC represents, warrants and agrees that it will not in any way voluntarily assist any other person or entity in the establishment of any Claim, cause of action, action or right against Continental, arising out of or connected with the matters released herein, which in any way relate to the investigation, handling, defense or settlement of Claims arising at or emanating from the Site. In connection herewith, GSC agrees to hold harmless and to indemnify Continental for any breach of any of the foregoing representations and warranties.   It is acknowledged and understood by GSC and Continental that United States of America and State of New Jersey are beneficiaries of this Agreement and

can enforce this Agreement in the event of a failure to perform any obligations imposed by this Agreement by GSC or Continental.

9.  No Admission of Liability or Responsibility.

9.1.  This Agreement is the result of a negotiated settlement and compromise and shall not be considered an admission of liability or responsibility by Continental, which continue to deny any liability and disclaim any responsibility to GSC with respect to any and all Claims arising from, connected with or relating to the Site, which GSC has asserted against them.  In particular, and without limitation, nothing contained herein constitutes an admission by Continental that GSC was or is entitled to any insurance coverage in connection with Claims arising from, connected with or relating to the Site or with respect to any other matter, under any Policy which may have been issued by Continental to GSC.

9.2.  This Agreement shall not be admissible in any legal proceeding except to enforce its terms.

10.1  Entire Agreement.  This Agreement is the entire Agreement between the parties with respect to the subject matter hereof and supercedes all prior understandings or agreements by and between the parties with respect to that subject matter.  Except it is acknowledged and agreed that this Agreement shall not supercede the Confidential Partial Settlement Agreement and Release between the parties dated September 24, 1998, as well as the Settlement Agreement between the parties entered into in 1990.

8

10.2 <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto by their duly authorized representatives, affix their signatures hereto as of this _____ day of _____, 2001.

DATED:

GARDEN STATE CLEANERS COMPANY

_Kennett A. D'Augis, Esq_
WITNESS

By: _____

9

DATED:                                 ALBERT TRASFERINI

_____              By: _____
WITNESS

DATED:                                 JOHN TRASFERINI

_____              By: _____
WITNESS

DATED:                                 THE CONTINENTAL INSURANCE
                                       COMPANY


_____              By: _____
WITNESS                                    Mark R. Hayden,
                                           Claims Counsel


f:\cases\69.12370\garden-state-settlement-agreement.wpd


Pa156
10

DATED:

_Kenneth A. Di Buzio Esq_
WITNESS

DATED:

_Kenneth A. Di Buzio, Esq_
WITNESS

DATED:

_____
WITNESS

ALBERT TRASFERINI

By: _[signature]_

JOHN TRASFERINI

By: _[signature]_

THE CONTINENTAL INSURANCE
COMPANY

By: _[signature]_
Mark R. Hayden,
Claims Counsel

f:\cases\69.12370\garden-state-settlement-agreement.wpd

# APPENDIX E



FIGURE 1
AREA MAP

SOUTH JERSEY CLOTHING COMPANY
AND GARDEN STATE CLEANERS
MINOTOLA, BUENA BOROUGH, NEW JERSEY

RT ENVIRONMENTAL SERVICES, INC.
215 West Church Road
King of Prussia, PA 19406

⊕ INTERMEDIATE MONITORING WELL
◆ SHALLOW MONITORING WELL
⊕ DEEP MONITORING WELL

Scale (feet)
0      250      500

DAMES AND MOORE SITE PLAN DATED JANUARY 1994.

Pa159

# EXHIBIT G

EXHIBIT "G"

**GIANSANTE & COBB, LLC**
By: Louis Giansante, Esq.
63 East Main Street
Moorestown, New Jersey 08057-3309
(856) 273-8866
Attorneys for the Plaintiffs

DEC 03 7 1

---

MAROLDA FARMS, INC, RIGI HOLDINGS, LLC, :
SHERRY MAROLDA, AND RICHARD MAROLDA, :
SR.                                          :
                                             :
      Plaintiffs                           :
                                             :
      vs                                   :
                                             :
STATE OF NEW JERSEY DEPARTMENT OF :
ENVIRONMENTAL PROTECTION, SOUTH :
JERSEY CLOTHING COMPANY, GARDEN :
STATE CLEANERS COMPANY, JOHN DOES (1- :
100) AND ABC COMPANIES (1-100)             :
                                             :
      Defendants                           :
                                             :

**SUPERIOR COURT OF NEW JERSEY**
  ATLANTIC COUNTY
  LAW DIVISION

DOCKET NO. L-3440-06
JUDGMENT NO. J-134921-08

**ORDER DEEMING PLAINTIFFS'
WRIT OF EXECUTION RETURNED
UNSATISFIED**

---

This matter, having been brought before the Court by the Petitioner, Judgment Creditor,

for an Order Deeming its Writ of Execution to be returned unsatisfied, and the Court, having

considered the Petition of the Judgment Creditor, and for good cause shown, it is on this

day of November, *December, 2010*.

ORDERED that the plaintiffs' Writ of Execution is hereby deemed served and returned

unsatisfied.

By the Court:

JAMES E. ISMAN, J.T.C. t/a

# EXHIBIT H

EXHIBIT "H"

1                       SUPERIOR COURT OF NEW JERSEY
                       LAW DIVISION

2                       ATLANTIC COUNTY, NEW JERSEY
                       DOCKET NO.  ATL-L-861-11

3                       A.D. #

4   MAROLDA FARMS, INC.,     )
     et al                )

5                         )
               Plaintiffs  )

6                         )
         V             )   TRANSCRIPT OF

7                       )   MOTION TO DISMISS
   MARYLAND CASUALTY      )

8   INSURANCE COMPANY,
    INSURANCE COMPANY OF THE )

9   STATE OF PENNSYLVANIA,  )
    ZURICH AMERICAN        )

10  INSURANCE COMPANY,      )
    NORTH RIVER INSURANCE   )

11  COMPANY, AND         )
    CONTINENTAL INSURANCE   )

12  COMPANY             )
                        )

13            Defendants  )

14

15               PLACE:  ATLANTIC COUNTY SUPERIOR COURT
                       ATLANTIC CITY, NJ   08401

16               DATE:  AUGUST 18, 2011

17  BEFORE:

18    HONORABLE JOSEPH E. KANE, J.S.C.

19

20  TRANSCRIPT ORDERED BY:

21    LOUIS GIANSANTE, ESQUIRE
     (GIANSANTE & COBB, LLC)

22

23  APPEARANCES:

24    LOUIS GIANSANTE, ESQUIRE
     (GIANSANTE & COBB, LLC)
     Attorney for Plaintiffs

25

                    Tr1

 1    STEVE ADAMS, ESQUIRE
      Attorney for Defendant
 2    Insurance Company of Pennsylvania

 3    SUZANNE MIDLIGE, ESQUIRE
      Attorney for Defendants
 4    Maryland Casualty Company,
      Zurich American Insurance Company, and
 5    Continental Insurance Company

 6    JOHN FAVATE, ESQUIRE
      Attorney for Defendant
 7    North River Insurance Company

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                    Transcriber:   JOAN A. GIULIANTE
24
                    CV Recorded
25                  Recording Operator:

1          THE COURT:  Thank you.  Have a seat.  All

2    right.  Counsel, please enter your appearances.

3          MR. GIANSANTE:  Good afternoon, Your Honor.

4    Louis Giansante representing plaintiffs

5          THE COURT:  Okay.  And for defense?

6          MR. ADAMS:  Steve Adams representing Insurance

7    Company of the State of Pennsylvania.

8          MS. MIDLIGE:  Good afternoon, Your Honor.

9    Suzanne Midlige.  I'm from Coughlin Duffy on behalf of

10   Mar -- Maryland Casualty Company, Zurich American

11   Insurance Company, and Continental Insurance Company.

12         THE COURT:  Okay.

13         MR. FAVATE:  Judge, good afternoon.  John

14   Favate, Hardin, Kundla, McKeon, and Poletto for the

15   defendant North River Insurance Company.

16         THE COURT:  All right.  Let me thank everybody

17   for being here today.  I'm glad you could -- ev --

18   everybody could make it on such short notice.  Who'd

19   like to begin?

20         MR. GIANSANTE:  Your Honor, it's the defense

21   motion.  I think I'll wait to hear what they have to

22   say.

23         THE COURT:  Okay.  Go ahead.

24         MR. FAVATE:  Judge, John Favate for defendant

25   North River.  I'll address a few points and if -- if

1   it's okay with the Court, I'd like to just reserve a
2   few minutes perhaps to respond to what Mr. Giansante
3   has to say.
4           THE COURT:   Sure.
5           MR. FAVATE:   Judge, there -- there's an
6   over-arching, and I submit, dispositive fact that's
7   evident on the face of the plaintiffs' complaint and
8   the documents that are referenced in that complaint
9   that I submit compels the dismissal of this case at
10  this stage.   And that fact is the negotiated settlement
11  and compromise that was entered into by my client North
12  River, as well as the other insured defendants that are
13  before the Court in 2002.   And I submit that this
14  complaint does not set forth the facts necessary to
15  support a finding by the Court that there's clear and
16  convincing proof that the settlement was fraudulent or
17  that there's some other compelling circumstance that
18  would justify the Court allowing that settlement to be
19  undone.   Judge, pursuant to the 2002 settlement, North
20  River compromised disputed coverage obligations,
21  significant disputes concerning whether it had any duty
22  to defend or to pay any indemnity on behalf of South
23  Jersey Clothing Company with respect to the
24  environmental liabilities that arose from its
25  operations at the Minotola site.   In exchange for a

Page 4

1   release of every environmental claim that in any way

2   arose from or had any connection with the Minotola

3   site, North River paid substantial, and I submit,

4   reasonable compensation, $2,338,960.00, and that

5   consideration was for the release that I described.

6   That's the release that we submit precludes the

7   plaintiffs' claim in this case.  The settlement, Judge,

8   was the product of an extensive negotiation and

9   mediation process.  It resulted in the resolution of

10  four lawsuits.  The United States government sued

11  against South Jersey Clothing Company.  That was filed

12  in Federal Court.  The State of New Jersey, Department

13  of Environmental Protection lawsuit.  That was filed

14  against South Jersey Clothing and Garden State

15  Cleaners.  South Jersey Clothing Company's lawsuit in

16  State Court against my client North River, as well as

17  the other insurers regarding the coverage disputes and

18  Garden State Cleaner's lawsuit also filed in State

19  Court against its insurers over insurance coverage

20  issues there.  The settlement was the product of a

21  mediation -- Again, that encompassed and arose out of

22  those four lawsuits.  The mediation was presided over

23  by a retired judge of the Appellate Division.  The

24  mediation took place over an extended period of months,

25  indeed years, and that mediation resulted in a

1  settlement, the terms of which were embodied in the

2  settlement agreements that are exhibits on the motion

3  before the Court which were part of a consent decree.

4  The terms of those settlement agreements were vetted

5  with the Justice Department on behalf of USEPA, the New

6  Jersey Attorney General's Office on behalf of the New

7  Jersey Department of Environmental Protection, as well

8  as the parties, South Jersey Clothing and its counsel,

9  North River and its counsel, and the other insurers and

10  their counsel.  Once -- So all of those parties had

11  input and played a role in what the terms and

12  conditions of the final settlement document would be.

13  That final settlement document then became a part of a

14  consent decree.  The consent decree was lodged in the

15  Federal Court in I believe it was June or July of 2002.

16  It was the subject of public notice.  It was published

17  in a federal register and there was a public comment

18  period on the consent decree.  When that comment period

19  expired, there was a motion brought on before Judge

20  Simandle in United States District Court seeking to

21  approve that consent decree.  Judge Simandle in

22  entering that consent decree found specifically -- and

23  this is part of the record on the motion -- that the

24  settlement was the result of good faith negotiations.

25  That it was fair, that it was reasonable, and that it

1    was in the public's interest.  We submit , Your Honor,

2    in the face of those indisputable facts, those facts

3    which are evident from the face of plaintiffs'

4    complaint -- Plaintiff's complaint refers to the

5    consent decree.  Plaintiff's complaint refers to the

6    settlement agreements.  Those documents irrefutably

7    establish the facts that I just outlined for the Court

8    and we submit that in the face of those irrefutable

9    facts, plaintiffs' case cannot proceed.  It fails to

10    state a claim for the reasons that we've outlined in

11    the brief.  And let me start with what I consider to be

12    the overall point and I'll move into some of the more

13    specifics.  The overall point, Judge, is there's a

14    count in the complaint -- I believe it's the fourth or

15    the fifth count -- that seeks a declaration that the

16    settlement is fraudulent, it's in bad faith, and it

17    somehow violates public policy.  There are absolutely

18    no facts of any kind pled in the complaint that could

19    support that cause of action.  The fact of the matter

20    is New Jersey, like most states, has a long history, an

21    establish public policy that overwhelmingly favors the

22    settlement of litigated disputes.  And our courts have

23    said over and over again, we are going to respect and

24    enforce settlements absent clear and convincing proof

25    that they were fraudulent or in some other way

1    compelling -- some other set of compelling

2    circumstances that would require a departure from that

3    settlement.  And, Judge, I submit that with respect to

4    the declaratory count, there is absolutely no evidence

5    of any kind that -- or no facts of any kind that are

6    pled in this complaint that could support the

7    declaratory relief that is sought.  In fact, Judge,

8    it's important to note that the motion to dismiss filed

9    by my client and I believe the other defendants, deals

10   with each and every one of the counts of the complaint.

11   The plaintiffs' opposition to that motion frankly does

12   not oppose dismissal of the second count of the

13   complaint, which is an equitable and legal fraud count;

14   the fourth count of the complaint, which is an unjust

15   for -- enrichment count; and the fifth count of the

16   complaint, which is the declaratory count that I just

17   talked about.  I want to quickly dress (sic) -- address

18   the question of the legal and equitable fraud claim.  I

19   think that the case law talked about in the briefs

20   shows beyond question that whether it's legal fraud or

21   whether it's equitable fraud, the fact of the matter is

22   a fraud claim requires -- absolutely has to have --

23   allegations and specific facts pled with respect to a

24   misrepresentation that was relied upon to the detriment

25   of in this case the plaintiffs.  And, Your Honor, one,

1   those facts are nowhere pled in this complaint and,

2   two, even if the Court were to allow the plaintiff to

3   amend to assert those facts, the truth is that in light

4   of the circumstances that gave rise to the settlements

5   and the consent decree, a claim for fraud, whether it's

6   legal fraud or equitable fraud, cannot be established

7   on -- on -- on the -- the basis of -- of the evidence

8   in this case.  The other causes of action, Judge, as

9   we've outlined in our pleading, garnishment is one I

10  wanted to talk about.  Okay.  Garnishment requires that

11  there have been -- that -- that a party such as my

12  client be in possession of an asset that the judgment

13  debtor has a right to and ex -- exactly the -- the case

14  in -- in this instance, Judge, is very simple.

15  Whatever rights that South Jersey Clothing, the

16  judgment debtor, may have had under my client's policy

17  with respect to the environmental claims arising from

18  the South Jersey Clothing site were fully and

19  completely released as part of the settlement in 2002.

20  Those rights were released with respect to all claims,

21  past, present, and future, known and unknown, whether

22  they were being asserted by South Jersey Clothing,

23  USEPA, NJDEP, or any other person, which would include

24  the plaintiffs.  And that release was supported by 2.3

25  million dollars worth of cash that was paid to and on

1  behalf of South Jersey Clothing, USEPA, and NJDEP for
2  use in remediating the contamination at these sites.
3  So with respect to the garnishment claim, Judge, at the
4  time that the -- the default judgment that the
5  plaintiffs obtained, South Jersey Clothing had no
6  rights to coverage under my client's policy for the
7  environmental claims asserted by the plaintiffs because
8  those rights had been released in exchange for
9  consideration in 2002.  So there's nothing to garnish.
10 There's nothing that subjects my client's policies to
11 garnishment under the circumstances of this case even
12 if the policies themselves could be subject to
13 garnishment, which I submit is a separate legal issue
14 that the plaintiffs have all -- also failed to meet.
15 Judge, there's also a -- what I'll call a fraudulent
16 conveyance cause of action advanced in this complaint
17 and I think that the essential theory underlying that
18 is that there was -- South Jersey Clothing was
19 insolvent at the time it entered into this settlement.
20 So, therefore, it's a fraudulent conveyance and it
21 should be set aside.  Two problems with that, Judge.
22 First and foremost, that claim I submit is barred by
23 the limitations period that expressly governs
24 fraudulent conveyance claims in New Jersey pursuant to
25 the Uniform Fraudulent Transfer Act.  That's a 4-year

Page 10

1  statute of limitations, Judge.  4 years from the date
2  of the transfer.  Nobody can dispute that the transfer
3  if, in fact, it's a transfer for purpose of the
4  fraudulent conveyance statute, took place in 2002.
5  This lawsuit was not filed against my client North
6  River Insurance Company until 2011.  So it is clearly
7  time barred and just like the equitable and legal fraud
8  claims, Judge, even if the plaintiff were able to get
9  the fraudulent conveyance claim past the limitations
10  period that applies to that claim, the fact of the
11  matter is there are no facts pled in this complaint
12  sufficient to set forth a fraudulent conveyance cause
13  of action against my client.  Once again, Judge, I go
14  back to the settlement and I submit that the
15  settlement, it's very clear in express terms as
16  reflected in the settlement agreement and the consent
17  decree, both of which are before the Court, and the
18  circumstances from which that settlement arose make it
19  indisputable, make it irrefutable.  The plaintiff
20  cannot overcome the burden that -- that they would have
21  to overcome to get past that settlement and get to my
22  clients, Judge.  So to sum up this phase of what I
23  wanted to say, Judge, I think the settlement operates
24  as a complete bar to the plaintiffs' claim in this case
25  and I think that the plaintiff has failed in its

1  complaint to advance any facts that are sufficient to

2  get past that settlement and I would urge the Court to

3  grant the motion to dismiss.

4          THE COURT:  I'm assuming all the other

5  defendants also join in.

6          MR. ADAMS:  Yes, Your Honor.

7          THE COURT:  Is there anybody who wants to add

8  anything?

9          MS. MIDLIGE:  Your Honor, with your

10  permission, I would like to reserve an opportunity to

11  comment following Mr. Giansante.

12          THE COURT:  Sure.

13          MS. MIDLIGE:  Thank you.

14          MR. ADAMS:  Me as well, Your Honor.  The --

15  The points made by Mr. Favate apply fully to me, so

16  there's no reason to say the same thing a second time.

17          THE COURT:  Okay.  Let's go back -- or over to

18  plaintiff.

19          MR. GIANSANTE:  Thank you, Your Honor.  Where

20  to start?

21          THE COURT:  Well, how about where is the clear

22  and convincing evidence of fraud?

23          MR. GIANSANTE:  Well, we have to allege fraud.

24  Clear and convincing evidence comes in at the trial

25  stage.  We just have to have pled sufficient facts for

1  the carriers to understand the fraud claims that are

2  being asserted against them and let me just -- I think

3  it's very clear here.  The -- The allegation -- and

4  we're at the pleading stage, we're not at the proving

5  stage yet -- but the allegation here is that they

6  underpaid their own insureds who were insolvent because

7  they failed to defend them in environmental litigation,

8  essentially drove them into the insolvency, and --

9  Let -- Let me just back up.  That's not in the -- in --

10  That -- The part about driving them in is not in the

11  complaint.  It's an implication, but the bottom line is

12  that they -- it is alleged that they underpaid the

13  settlement and they did so because there were already

14  rights that were arising from individuals and entities

15  such as my clients who were impacted by the plume that

16  came from the South Jersey and the Gard -- and the

17  Garden State Cleaners Superfund sites.  If they did

18  that, they did that to avoid having to pay their total

19  limits to those potential claims that are sitting out

20  there and we cite to the Court a number of cases

21  because no one frankly has cited a single New Jersey

22  case to this Court one way or the other that addresses

23  the issue regarding the buy back agreements.  Whether

24  or not -- And we cite to the Court a case out of Oregon

25  where there actually was a switch of a policy while

1  there was a third party out there that had rights that

2  were vesting because injury was occurring.  We also

3  cite to the Court some ancient cases back from the

4  1800s about insurance companies trying to cancel their

5  policies while a fire is raging and what they were

6  insuring was the railroad's cord wood and as the fire

7  approached the cord wood, the companies threw up their

8  hands and said we're canceling that coverage.  The

9  court said you can't do that and you can't do that

10 because this is exactly the risk that you were -- risk

11 that you were insuring against and this risk -- there

12 was already an inevitable act that had been committed

13 that made harm an absolute surety and once that happens

14 there's an interest in a third party that says you

15 cannot cancel that policy.  There's a -- There's an

16 argument made by the defense that this isn't

17 cancellation.  This is buy back.  Well, I don't really

18 see the difference.  If you can't cancel a policy with

19 your own insured and defeat the rights of a third

20 party, what makes you able to conspire with your own

21 insured to protect their interest and defeat those

22 rights of a third party that have already arisen?  And

23 the allegation in the complaint is -- is clearly stated

24 that there's impact prior to the actual negotiation of

25 the settlement.  Why is this any different from an auto

Page 14

1   accident case where there's three cars involved?  Can
2   an insurance carrier run to one of the -- run to their
3   insured and say, okay, we'll settle it -- we'll settle
4   with regard to this and that, but there might a -- an
5   injured third party out there.  You're -- We're going
6   to give a buy back and release that policy.  I don't
7   think there's any question that no court in the State
8   of New Jersey would hold that that kind of a
9   transaction is consistent with our public policy and I
10  think it applies with equal force in the environmental
11  context.  That this transaction essentially violates
12  our public policy and that's the purpose of the
13  declaratory action.  I'll talk a bit about the
14  fraudulent conveyance.  There is no stat -- We -- We
15  actually cite to the Court the provision where there is
16  no statute of limitations on judgment creditors moving
17  to execute a judgment that postdates the fraudulent
18  conveyance.  It's ver -- It's clear from our brief.  I
19  won't belabor the issue.  I'll point the Court just to,
20  if I may, I think it was our first point.  Actually I
21  can't find the citation, but I'll -- I will get back to
22  it.  Let me just talk a bit about the fraud -- the --
23  the rest of the fraudulent con -- Oh, here it is.  In
24  section 3 we discuss the statute of limitations at
25  length and we believe that our -- that our claim

1   arise -- arises under N.J.S.A. 25:2-29b, which does not

2   contain a statute of limitations in that section. It

3   makes no sense to say that you can fraud -- that you

4   can do something without any notice to a person who has

5   been potentially impacted by one of your acts. You can

6   convey assets to which they have no knowledge of for

7   years and years and years, and when they finally

8   realize what you did to them, when they finally go get

9   a judgment, all of a sudden you can't enforce that

10  judgment because the 4-year statute of limitations has

11  expired. That makes absolutely no sense. If your

12  judgment postdates the -- the fraudulent conveyance and

13  postdates it by 4 years, under the defense view of --

14  of the statute of limitations provision contained

15  within the Fraudulent Conveyance Act, those things are

16  gone. That makes no sense in light -- in light of the

17  equitable nature of the -- of the -- of the limitations

18  periods and the way our Supreme Court has analyzed

19  them. Let me talk a bit about the settlement and the

20  consent decree. Section 3 of the consent decree

21  actually lists the parties that are to be bound and

22  we're not named. The -- The consent decree is

23  essentially a settlement between polluters and the

24  government and I don't know of anything in the federal

25  laws that -- that these are based under. The Superfund

laws are state laws that allow insurers to attach their

settlements onto the back of a consent decree and have

the court approve them.  There is no environmental

statute at the federal or state level that I know of or

regulation that permits that.  It was just done here by

the carriers and I guess because there was money

involved, the court didn't want to interfere with the

settlement.  The EPA was happy to get it, but -- but

the problem is it doesn't solve the problem.  That all

these years later these downstream parties that -- that

have been impacted by -- by this spill, all of a sudden

have no place to go because you have these insolvent

entities that are buying out their own protection by

assigning whatever rights that -- that their carriers

want so that they can walk away from the problem and

these injured third parties sit there really having

been defrauded by this transaction.  That's the nature

of the fraud.  The nature of the fraud is knowing that

these claims are developing out there, not putting

these people on notice, and then trying to release your

rights before you have exhausted your policy limits for

policies that you have accepted full premiums for.  I

don't have anything further, Your Honor.

        THE COURT:  Okay.  Respond, please?

        MR. FAVATE:  Thank you, Judge.  John Favate

1   again, Judge.  Let me address the last point that Mr.
2   Giansante made first.  If -- If I'm hearing Mr.
3   Giansante correctly, the plaintiffs are now contending
4   that in some way or another Judge Simandle's approval
5   of the settlements as part of the consent decree in
6   2002 was improper.  Two points to that, Judge.
7   Plaintiffs were the -- Plaintiffs were among the class
8   of individuals who are subject to the public notice and
9   public comment period before that consent decree was
10  approved by Judge Simandle and had every opportunity,
11  just as any member of the public did, to object to it
12  and they didn't.  Second, Judge, I -- I just don't know
13  that this is the proper forum for the plaintiff to make
14  an argument that Judge Simandle in the Federal Court
15  had no authority to enter a consent decree and approve
16  a settlement in a matter that was properly before him.
17  I think --
18          THE COURT:  I'd -- I'd like to think that I
19  have authority over the Federal Court, but maybe
20  they'll tell me differently.
21          MR. FAVATE:  What I'm suggesting, Judge, is
22  if -- if the problem is with Judge Simandle's ruling,
23  then plaintiffs' remedy, if there is one, is before the
24  Federal Court or the Third Circuit, not this Court.
25  And let me just go back to a couple of points that Mr.

1   Giansante made, Judge. First of all, he -- he refers

2   to it as a buy back. These policies were not bought

3   back. These policies were not canceled. What took

4   place was a negotiated settlement of disputed

5   obligations. The disputes were real. They were the

6   subject to ongoing and pending litigation. The

7   disputes related to whether there was any obligation

8   under these policies to provide a defense or indemnity

9   to South Jersey Clothing for the claims that had been

10  brought against them arising from the contamination at

11  this site. There was a negotiated resolution and

12  compromise of those disputed issues distinctly

13  different than a policy cancellation because the

14  difference is real simple, Judge. My client and the

15  other insurers paid substantial consideration totaling

16  nearly 4.5 million dollars in funds that were made

17  available and used for the remediation of contamination

18  at -- at the South Jersey site. Now with respect to

19  the auto example, Judge, again, I go back to the public

20  comment period. The difference here is there was no

21  third party. Mr. Giansante suggested in his statement

22  that this was done without notice to his clients and to

23  other people who may not have claims. Well, the fact

24  of the matter is the evidence before the Court,

25  particularly in the form of the consent decree,

1    demonstrates unequivocally that indeed it was the

2    subject of a public notice period and like any member

3    of the public, these plaintiffs had every opportunity

4    to do something about that settlement if they felt that

5    there was something inappropriate about it.  So, Judge,

6    again, I'll go back to my basic point that this

7    settlement and everything about this settlement that

8    you can divine at this stage of the case from the

9    pleadings, from the settlement documents themselves,

10   all of which are referred to in the plaintiffs'

11   complaint, is a complete bar to the claims that the

12   plaintiff asserts in this case and I would urge the

13   Court to grant the dismissal motion.

14          THE COURT:  Thank you.

15          MR. FAVATE:  Thank you, Judge.

16          THE COURT:  And we have some further response?

17          MS. MIDLIGE:  Your Honor, if I may, I would

18   just like to focus very briefly at the risk of being

19   redundant on one point that Mr. Favate just made, and

20   that is to really focus the Court on this notion and

21   the distinction between a policy buy back and the site

22   release that was given by the insurers in this case and

23   perhaps that also ties into why, in fact, the

24   settlement agreements were, in fact, attached to the

25   consent decree and actually incorporated via an

1   integration clause into the consent decree.  As Mr.

2   Favate indicated, the insurers were embroiled in very

3   hotly disputed coverage litigation with Garden State

4   Cleaners and with South -- South Jersey Cleaners (sic).

5   When they negotiated a settlement of those cases the

6   settlement agreements on their faces say there is no

7   admission of liability, there is no admission of any

8   obligation to defend or indemnify.  When an agreement

9   was made by the insurers to pay certain amounts of

10  money, those monies were actually paid to the New

11  Jersey DEP and the USEPA to reimburse those entities

12  for the clean-up at the site.  That is why the

13  settlement agreements were attached and integrated into

14  the consent decree.  Now what's important is that the

15  policies that our clients respectively issued remained

16  in full force and effect.  They were not canceled.

17  There was not a complete buy back of those policies.

18  They remained out there to pay other claims.  The only

19  thing that was released here were claims pertaining to

20  these particular contaminated sites and that is because

21  it was a negotiated resolution of the disputed coverage

22  action.  And I think that is -- that is very different

23  from the line of cases that Mr. Giansante has cited in

24  respect of canceling a policy when contamination

25  occurred there.

1          THE COURT:  Okay.  Anything else?  Any other

2    comments?

3          MR. ADAMS:  Your Honor, just a couple of

4    technical points to follow-up and -- and this is all

5    part of the record 'cause it's all contained within the

6    consent decree itself.  First, the insolvency that Mr.

7    Giansante eludes to, was a technical insolvency in --

8    in this -- in view of the fact that the liabilities

9    that the South Jersey Clothing Company/Garden State

10   Cleaners were facing to clean up the site, the -- the

11   amounts that would be required to do that, exceeded

12   the -- you know, the amount of assets they had

13   available.  So that was the insolvency -- and I'll put

14   that word in quotes -- that's referred to.  It wasn't

15   an insolvency in the sense that we -- you know,

16   speculation that we drove them insolvent, that they

17   weren't, you know, capable and thus, that's the reason

18   why this is a fraudulent conveyance.  And the second

19   thing is that the consent decree on its face makes

20   clear that Mr. Giansante's clients could have gone and

21   still -- and obviously did -- go after South Jersey

22   Clothing Company and Garden State Cleaners.  The only

23   parties who were released under the consent decree and

24   the settlement agreements were the insurance companies

25   who paid approximately 4.5 million dollars to remediate

1   the site.

2               THE COURT:  Okay.

3               MR. GIANSANTE:  A few follow-up, Your Honor.

4               THE COURT:  Sure.

5               MR. GIANSANTE:  That's actually the first time

6   in 23 years as a lawyer I've ever heard the word

7   technical insolvency spoken.  There is no such thing as

8   a technical insolvency.  The definition of an

9   insolvency under our fraudulent advanced statutes is

10  when your assets are -- are exceeded by your

11  liabilities and a consent decree.  By the way, the

12  parties that are bound by the consent decree are the

13  insurers and their insureds that actually signed the

14  consent decree and lodged it and all the facts

15  contained within this consent decree are admitted by

16  them.  So they have admitted that their insureds were

17  insolvent at the time they entered into this agreement

18  with them and whether you want to call it a buy back or

19  agreement or whether you want to call it a site release

20  or whatever you want to call it, the bottom line is

21  there's no insurance here to pay my client's claims

22  against their insureds because they entered into an

23  agreement that defeated my client's rights before we

24  had any notice.  There is nothing in this consent

25  decree --

1    THE COURT:  Didn't your clients have notice of

2  the proposed settlement?

3    MR. GIANSANTE:  No.  And that's where --

4  That's where I was about to go next.  This consent

5  decree says nothing about claims against us or our

6  potential third-party claims and it doesn't bind us.

7  It doesn't claim to bind us and if it --

8    THE COURT:  Does a publication of the proposed

9  settlement bind you?

10    MR. GIANSANTE:  If -- If this provision that

11  says parties bound had said any third parties with any

12  claims must bring them now and we had seen that in a

13  newspaper, I can tell you that my clients would have --

14  would have -- if they had known about the release,

15  would have gotten on the phone and called their

16  attorney and there would have been some -- There has to

17  be something in this document because we're not talking

18  about real notice here, Judge.  We're talking about

19  constructive notice.  We're talking about constructive

20  notice under a federal statute that's not intended to

21  defeat the rights of third parties who are injured by

22  pollution.  They're stretching the whole concept of

23  constructive notice so far as to be unrecognizable.

24  From the singe that -- that case that I learned in my

25  first day of civil procedure, if you're a judgment

1    creditor you have to have some individualized notice

2    and we have a -- a length of cases as long as my arm in

3    New Jersey, such as foreclosure cases, tax sale

4    foreclosures, a lot of other cases where your rights as

5    a -- as a judgment creditor cannot be defeated unless

6    there is something in a -- in a constructive notice

7    that gives you some idea that your rights are being

8    terminated.  There's nothing in this consent decree

9    that says that, except some generalized notion that

10   there's a deal between the parties and if we're not

11   talking about a -- a full buy back agreement, that

12   would be even less reason the parties would be

13   concerned that -- that their rights are being affected.

14   Again, there's nothing in this document.  Let me just

15   say one thing about whether Judge Simandle did

16   something proper, improper.  I never said that, but I

17   think that the provision of these documents in a

18   consent decree is unauthorized by statute.  He may have

19   done something ultra vires that he didn't have the

20   authority to do and I think that's one of the things

21   this Court should be reviewing as this case moves

22   forward.

23             THE COURT:  Well, let me -- let me ask the

24   question I was going to ask.  Why shouldn't this be

25   back in front of Judge Simandle?  What authority do I

1   have over the Federal Court?

2          MR. GIANSANTE:  It's not -- I'm enforcing a

3   State judgment, Your Honor, and I -- I think you have a

4   right sitting here in the Superior Court as I'm moving

5   to enforce my judgment, to determine whether or not (a)

6   this is binding on us -- I think you can interpret

7   federal law under the Reverse Erie Doctrine, and -- and

8   (b) I think that -- that we're really here talking

9   about State issues.  We're really talking about State

10  public policy because this -- if this is binding

11  under -- on me on federal law, I think our Appellate

12  Division can deal with that.  Our Supreme Court can

13  deal with that.  And we can take -- it can go from our

14  Supreme Court right to the US Supreme Court and I'm

15  sure they'll be happy to tell us whether we're

16  interpreting it properly or not.  I think we're in the

17  right forum.  I understand -- I -- I really do

18  understand how novel an issue this is.  It doesn't

19  arise very often.  It's a very complex case.

20          THE COURT:  First time I've ever hit it.

21          MR. GIANSANTE:  It's the first time -- I've

22  been practicing environmental law my -- my whole life

23  and I'll bet you the three counsel sitting at that

24  table haven't seen this case either.  It just -- It's

25  one of those cases.  It -- It's on the cutting edge and

1   I understand the Court's instinct may be to dismiss it

2   and let it go, but I think we should be entitled to

3   develop the facts as they're associated with this

4   consent decree and the transaction and, you know, they

5   say we paid 4.5 million dollars.  What were the limits,

6   30?  Is that sufficient?  Does a jury get to make that

7   determination?  I don't know until I get to see the

8   policies.  They -- They never -- They didn't attach

9   their policies to the consent decree.  They attached

10  some list of policies that doesn't tell me anything.

11  There's facts here that I still need to know.  There's

12  discovery that I should be entitled to and frankly, I

13  think no matter -- if this Court lets it go forward at

14  that level, I can assure you we'll be -- we will be

15  back here on a very large motion for summary judgment

16  as the defense will be filing and all -- now we'll have

17  facts before the Court and then we can then re-argue

18  these legal issues because I think that's -- it's the

19  legal issues that -- that -- that this case is really

20  going to turn on.  I think the Court has to make a

21  determination as to what our public policy is in -- in

22  New Jersey.  Thank you.

23         THE COURT:  Thank you.  Counsel, thank you for

24  coming in today.  I'm going to be on vacation for the

25  next week and 3 or 4 odd days or so.  So I wanted to

Page 27

1   get this done today and maybe get it out  within the

2   next 10 days or so.

3           MR. GIANSANTE:  Thank you, Judge.

4           THE COURT:  Thank you.  Have a good weekend.

5           MR. GIANSANTE:  With any luck, I'm --

6           MR. FAVATE:  Thank you very much, Judge.

7           MR. GIANSANTE:  -- I'm leaving for vacation --

8           MS. MIDLIGE:  Thank you.

9           MR. GIANSANTE:  -- Saturday as well, so enjoy

10  yours.

11          THE COURT:  Well, whether I get to it depends

12  how motivated I am on vacation.

13          MR. GIANSANTE:  Thank you, Judge.

14          MR. ADAMS:  Thank you, Your Honor.

15          MS. MIDLIGE:  Thank you.

16          *   *   *   *   *   *   *   *   *   *   *   *

17

18

19

20

21

22

23

24

25

Page 28

## C E R T I F I C A T I O N

      I, JOAN A. GIULIANTE, assigned transcriber, do
hereby certify that the foregoing transcript of
proceedings on compact disk dated August 18, 2011,
recorded 2:47:17-PM to 3:19:45-PM, is prepared in full
compliance with the current Transcript Format for
Judicial Proceedings and is a true and accurate
non-compressed transcript of the proceedings as
recorded.


_____          ___203___
JOAN A. GIULIANTE                        AOC Number
For:   NANCE M. BERNARD
       T/A P.S.C.S.                      November 23, 2011
                                              Date

# EXHIBIT I

EXHIBIT "I"



## SUPERIOR COURT OF NEW JERSEY
### COUNTIES OF
### ATLANTIC AND CAPE MAY

CIVIL DIVISION

Joseph E. Kane J.S.C.

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**

Court House
1201 Bacharach Blvd.
Atlantic City, N.J. 08401
(609) 594-3263
TDD 348-5551

### MEMORANDUM OF DECISION

*CASE:*  **Marolda Farms, Inc., et al, v. Maryland Casualty Insurance**

*DOCKET NO.:*  **ATL-L-861-11**

*DATE:*  **October 25, 2011**

*MOTION:*  **Defendants' Motion to Dismiss**

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

The present motions to dismiss arise out of an environmental contamination lawsuit involving various parties: Marolda Farms, Inc., Rigi Holdings, LLC, Sherry Marolda and Richard Marolda, Sr., collectively referred to as Plaintiffs; United States Environmental Protection Agency, the State of New Jersey Department of Environmental Protection, Garden State Cleaners, and South Jersey Clothing Company, Inc., and several insurance companies. Plaintiffs are farmers and owners of several properties, a stable and a horse farm that was owned and operated under the corporate name of Marolda. Plaintiffs own the farm as owners of Rigi Holdings, LLC, and in their individual capacity. Plaintiffs claimed to have suffered damages

resulting from groundwater contamination at various sites. Defendants in this matter are the insurers that issued a primary and/or umbrella liability insurance policy to South Jersey Clothing Company or Garden State Cleaners. Defendant Maryland Casualty Insurance Co. issued a primary insurance liability policy to South Jersey Cleaning Company. Defendant The Insurance Company of the State of Pennsylvania issued insurance policies to South Jersey Cleaning Company during its operating period. Defendant Zurich American Insurance Co. issued policies to South Jersey Cleaning Company during its operating period, including the period between 1970 -1974, and additional policies. Defendant North River Insurance Company issued both primary and umbrella policies to South Jersey Cleaning Company during its operating period. Defendant Continental Insurance Co. issued liability policies to Garden State Cleaners during its operating period.

Plaintiff's original complaint alleges that groundwater in the vicinity of Plaintiff's operations were contaminated by chlorinated solvents originating from the dry cleaning operations of South Jersey Clothing Company and Garden State Cleaners. A final judgment by default for approximately $9.17 million was entered against South Jersey Clothing Company and Garden State Cleaners, jointly and severally, in May 2008 for failure to answer or move in response to the complaint. On or about December 3, 2010, the Court signed an Order deeming Plaintiff's Writ of Execution Returned Unsatisfied, which purportedly allows Plaintiffs to pursue a direct action against the Defendant insurers as judgment creditors.

South Jersey Clothing Company ("SJCC") operated a manufacturing facility in Minotola, New Jersey, and Garden State Cleaners ("GSC") operated a separate site nearby. In 1988, the United States Environmental Protection Agency ("EPA") notified SJCC and GSC that they were potentially responsible for the release of hazardous substances in the area surrounding both

manufacturing sites. In September of 1991, EPA required remedial action for the SJCC and GSC

sites. SJCC filed suit in Superior Court in 1991 seeking a declaration that it was covered under

certain insurance policies for environmental contamination claims associated with the SJCC site.

In July 1996, the United States on behalf of EPA filed suit seeking reimbursement of past and

future response costs related to the release of hazardous substances at the SJCC site. In 2001, the

New Jersey Department of Environmental Protection ("NJDEP") also filed suit against SJCC and

GSC seeking reimbursement of past and future response costs related to the release of hazardous

substances. Consequently, all parties involved, including: SJCC, GSC, EPA, NJDEP and the

Defendant insurers engaged in mediation to resolve the EPA law suit, NJDEP law suit and

insurance coverage action.

Plaintiffs filed the present action on February 7, 2011 against: North River Insurance

Company ("North River"), Maryland Casualty Insurance Company ("Maryland"), Zurich

American Insurance Company ("Zurich"), Continental Insurance Company ("Continental") and

The Insurance Company of the State of Pennsylvania ("Pennsylvania"). Plaintiffs allege that the

underlying matter involves post judgment enforcement and garnishment proceedings directed

towards the assets of South Jersey Clothing Company's and Garden State Cleaners' insurance

carriers based upon the $9.17 million default obtained in May 2008.

*Plaintiffs' Complaint*

Plaintiffs assert five causes of action against Defendant insurers: 1) action in

garnishment; 2) equitable and legal fraud; 3) fraudulent conveyance of assets; 4) unjust

enrichment; 5) declaratory action.

Count one, action in garnishment, claims that Plaintiffs are judgment creditors of

SJCC and GSC by virtue of the default judgment that was obtained in May 2008, which was

deemed unsatisfied in December 2010, and that Defendants who issued policies to SJCC and GSC are responsible to satisfy the judgment.

Count two, equitable and legal fraud, alleges Defendants failed to defend SJCC and GSC and failed to negotiate in good faith with their insureds, by conditioning the release of the claims made by the EPA and NJDEP upon policy buy-backs. Plaintiffs allege that the settlement agreements were unconscionable and constituted legal and equitable fraud.

Count three, fraudulent conveyance, alleges that the settlement agreements with SJCC and GSC constituted fraudulent conveyance of SJCC's and GSC's assets, because the agreements were made at a time when SJCC and GSC were admittedly insolvent and their environmental liabilities far exceeded their assets. Plaintiffs claim that Defendants' policies are available to satisfy the default judgment.

Count four, unjust enrichment, alleges that as a direct result of the aforementioned actions, Defendant insurers have been unjustly enriched at the expense of the creditors of SJCC and GSC.

Count five, declaratory action, alleges that under the New Jersey Declaratory Judgment Act the settlement constitutes a buy-back agreement that is void against public policy.

*Settlement Agreement*

Each of the Defendant insurers, under their respective settlement agreements, was to pay an amount that collectively totals $4,317,067. This amount was to cover the costs associated with the environmental contamination cleanup. North River entered into a settlement agreement and release with SJCC on January 25, 2002. Under the agreement, North River agreed to pay on behalf of SJCC approximately $2.3 million to EPA and NJDEP as its contribution towards the settlement of SJCC's coverage action and the EPA and NJDEP law suits. In consideration for

payment, North River claims that SJCC agreed to release and forever discharge North River from present and future liabilities under the insurance policies for any known or unknown environmental claims related to the contamination at issue. The settlement agreement was incorporated into a consent decree approved by United States District Court on September 25, 2002 by the Hon. Jerome B. Simandle. Zurich entered into a similar settlement agreement with SJCC and agreed to pay approximately $1.17 million for cleanup of the SJCC site. Maryland agreed to pay approximately $141,000 towards cleanup of the SJCC site. Continental and GSC entered into a settlement agreement and release in which Continental would pay a total of $250,000. Pennsylvania entered into a settlement agreement with SJCC whereby Pennsylvania would pay $500,000 in exchange for a release regarding environmental claims arising from the SJCC site.

*Consent Decree*

A consent decree exists between the Defendants, SJCC, GSC, the United States and the State of New Jersey in the United States District Court of New Jersey, U.S.A. v. South Jersey Clothing Company, Civil Action No. 01-04379. The consent decree was signed by representatives of EPA; NJDEP; SJCC, individually and on behalf of the company; and GSC, individually and on behalf of the company. The consent decree identified settlement agreements entered into between SJCC, GSC and their respective insurers, resolving issues involved with the EPA's enforcement action, memorializing agreements between insurers and GSC and SJCC, and releasing the insurance carriers beyond the amounts paid to settle the federal enforcement action. In addition, four lawsuits involving the Defendants, SJCC, GSC, EPA, and NJ DEP were resolved by the consent decree: EPA's 1996 federal court Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") lawsuit against SJCC in which GSC

was a third-party defendant; NJDEP's 2001 federal court CERCLA and Spill Act lawsuit against SJCC and GSC; 1991 state court coverage litigation instituted by SJCC against its insurers; and 1997 state court coverage litigation instituted by GSC against its insurers. Plaintiff admits the settlements with SJCC and GSC insurance carriers were designed by the insurance companies to be a complete release of any future liability which may result from at the SJCC and GSC sites. The consent decree was held by the District Court for at least 30 days for public notice and comment. The $4.32 million of settlement money was paid to EPA and NJDEP as reimbursement of costs incurred by the agencies to remediate the SJCC and GSC sites, which included cleanup of soils at the sites and extraction and treatment of contaminated groundwater.

Plaintiffs claim that the settlement and release between SJCC, GSC and their insurance carriers amounted to a complete buy-back of the policies by the carriers. Plaintiffs also claim that the buy-backs were for far less than the coverage limits that had been purchased by SJCC and GSC at the time they were insuring against the same environmental risk which caused Plaintiff's present injury. Plaintiffs claim that the consent decree memorialized representations made by SJCC and GSC to EPA that clean-up liabilities greatly exceeded the assets of the companies and the individuals who owned the companies. Defendants counter claim several theories upon which Plaintiffs' complaint should be dismissed. For example, Defendants claim that: SJCC and GSC released Defendants from liability and Plaintiffs have not alleged any grounds on which to challenge the enforceability of the settlement agreements; Plaintiffs failed to plead fraud with specificity; the fraudulent conveyance claim is barred by the statute of limitations; and Plaintiffs failed to state a claim upon which relief can be granted, etc.

Given the procedural and factual history above, the Court must first decide if it has jurisdiction to hear Defendants' motions to dismiss. Only if the Court has jurisdiction, can there

be a determination as to whether there is merit to the motions to dismiss.

## DISCUSSION

It is undisputed that Defendant insurers, SJCC and GSC entered into a settlement agreement and release. The settlement agreement and release was incorporated into a consent decree which was approved by a District Court Judge and filed in the U.S. District Court. Plaintiffs' complaint seeks to garnish Defendants' assets to satisfy a default judgment against SJCC and GSC. Plaintiffs challenge Defendants' motions to dismiss based upon the premise that the settlement agreement and release is void against public policy. Plaintiffs are asking this Court to make a determination that the agreement violates public policy when this issue was already ruled upon by the District Court. The "doctrine of stare decisis -- the principle that a court is bound to adhere to settled precedent -- serves a number of important ends. The doctrine 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" Luchejko v. City of Hoboken, 207 N.J. 191, 208 (2011). Furthermore, the doctrine "carries such persuasive force that we have always required a departure from precedent to be supported by some special justification.'" Id. No special justifications are present here, and if Plaintiffs seek a reconsideration of the District Court's finding that the agreement does not violate public policy, the proper motion must be made to the appropriate court. Defendants' motions to dismiss and Plaintiffs' opposition are intertwined, and for these reasons, this matter is dismissed without prejudice, in its entirety, to be litigated in the proper forum.

## CONCLUSION

For the aforementioned reasons, all Defendants' motions to dismiss are Granted. A Form of Order is attached.

# EXHIBIT J

EXHIBIT "J"

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1299-11T2

MAROLDA FARMS, INC., RIGI
HOLDINGS, LLC, SHERRY MAROLDA
AND RICHARD MAROLDA, SR.,

    Plaintiffs-Appellants,

v.

MARYLAND CASUALTY INSURANCE CO.,
INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA, ZURICH
AMERICAN INSURANCE CO., NORTH
RIVER INSURANCE CO., CONTINENTAL
INSURANCE CO.,

    Defendants-Respondents.

---

Argued May 22, 2012 — Decided November 29, 2012

Before Judges Messano and Kennedy.

On appeal from Superior Court of New Jersey,
Law Division, Atlantic County, Docket No. L-
0861-11.

Louis Giansante argued the cause for
appellants (Giansante & Cobb, attorneys; Mr.
Giansante, of counsel and on the brief).

Suzanne C. Midlige argued the cause for
respondents Maryland Casualty Co., Zurich
American Insurance Co. and Continental
Insurance Co. (Coughlin Duffy LLP,
attorneys; Ms. Midlige, of counsel and on the
brief; Michael E. Hrinewski, on the brief).

Michael H. Cohen argued the cause for respondent Insurance Company of the State of Pennsylvania (Saiber LLC, attorneys; Mr. Cohen, of counsel and on the brief; Jason Pozner, on the brief).

John S. Favate argued the cause for respondent The North River Insurance Co. (Hardin, Kundla, McKeon & Poletto, P.A., attorneys; Mr. Favate, of counsel; Gary M. Sarno, on the brief).

PER CURIAM

Plaintiffs appeal from a Law Division order entered October 26, 2011, dismissing without prejudice their complaint against several insurance companies. Invoking the "doctrine of stare decisis," the motion judge determined that because the action required him to rule on the fairness and scope of a "consent decree" entered years earlier in the United States District Court, plaintiffs were required to litigate their claim in that forum.

We discern the facts from the record provided by the parties.

## I.

South Jersey Clothing Company (SJCC) is a New Jersey partnership that had been located for many years in Atlantic County. During the course of its operations, it allegedly released hazardous substances onto its property. Garden State Cleaners (GSC) is a New Jersey partnership that was situated

A-1299-11T2

adjacent to the SJCC property and it, too, allegedly released hazardous substances onto its property.[1]

In the early 1980s, the State of New Jersey, Department of Environmental Protection (DEP), began administrative proceedings against both SJCC and GSC arising from their release of the hazardous substances. In 1988, the United States Environmental Protection Agency (EPA) notified SJCC and GSC that they were potentially liable for the release of proscribed hazardous substances.

In 1991, SJCC filed a complaint in the Law Division against Continental Insurance Company and "others"[2] seeking a declaration that SJCC had insurance coverage for the environmental claims asserted against it. Thereafter, in 1996, the EPA filed a complaint against SJCC in the United States District Court for the District of New Jersey seeking reimbursement of its costs incurred and to be incurred in responding to the release of hazardous substances. SJCC filed a third party complaint against GSC and its owners for contribution and indemnity.

---

[1] The record does not reveal whether SJCC and GSC are still in existence or have any assets. We note, however, that plaintiffs issued a writ of execution against them on a judgment, but the writ was "returned unsatisfied."

[2] The record does not identify any of the other parties named in that litigation.

A-1299-11T2

In 1997, GSC and its owners filed a complaint in the Law Division against the "C.N.A. Insurance Companies" and others[3] for insurance coverage for the environmental claims. Then, in 2001, the DEP filed suit in the United States District Court for the District of New Jersey against SJCC and GSC to recover its past and future response costs.

It appears that SJCC and GSC subsequently obtained stays of the coverage suits so they could pursue mediation of the claims brought against them by the EPA and the DEP, as well as their claims against the insurance companies. These efforts were successful and on September 5, 2002, Jerome B. Simandle, U.S.D.J., executed a lengthy "Consent Decree" that had been signed by the EPA, the DEP, SJCC, GSC, Maryland Casualty Insurance Co. (Maryland), the Insurance Company of the State of Pennsylvania (ISOP), Zurich American Insurance Co. (as the successor to Zurich Insurance Co.) (Zurich), North River Insurance Co. (North River), and Continental Insurance Co. (Continental).

The insurance companies paid, in total, $4,150,440, with respect to the claims asserted by the EPA and the DEP. In turn, the insurance companies received covenants not to sue from both the United States and the State of New Jersey "with respect to

---

[3] The record does not identify the other parties.

known or unknown environmental claims, existing now or arising in the future, relating to the" properties. SJCC also released Maryland, ISOP, Zurich, and North River from "all obligations whatsoever arising under any and all [p]olicies with respect to Environmental Claims at or arising from the SJCC site, whether past, present or future, known or unknown, or asserted or unasserted[.]" The releases noted that the insurance companies disputed coverage and that the agreements represented "a compromise and settlement" achieved through "arms-length negotiations." Also, the release required SJCC to dismiss the coverage action with prejudice. GSC similarly released Continental. The various releases were expressly incorporated into the consent decree.

The consent decree signed by the Judge Simandle contained an explicit representation that the court "finds that this consent decree has been negotiated by the parties in good faith, and that this consent decree is fair, reasonable, and in the public interest." Further, the decree provided that the court "shall retain jurisdiction of this matter for the purpose of enforcing the terms of this consent decree." The decree was "lodged" with the court for thirty days for "public notice and comment."

A-1299-11T2

II.

Plaintiffs are owners of a farm, a stable and two homes in Atlantic County.  On May 12, 2006, plaintiffs filed a complaint in Atlantic County against SJCC, GSC, and the DEP.  The complaint alleged that SJCC and GSC had discharged pollutants onto their properties, and that these pollutants migrated to and damaged plaintiffs' properties.  Plaintiffs asserted various common law and statutory causes of action against SJCC and GSC, and asserted a claim against the DEP under 42 U.S.C.A. § 1983 for its denial of a well permit and its limitation of another well permit on their properties.

On May 9, 2008, the court entered final judgment by default against SJCC and GSC, jointly and severally, for $9,170,600. The record provided to us does not disclose the disposition of plaintiffs' claim against the DEP.

On February 7, 2011, plaintiffs filed an action in Atlantic County against Maryland, ISOP, Zurich, North River, Continental (hereinafter sometimes referred to as the "insurance company defendants"), and several "John Doe" defendants.  The complaint alleged that Continental had issued liability insurance policies to GSC during its relevant "operating period" and that the other insurance company defendants had issued such policies to SJCC during its relevant "operating period."

A-1299-11T2

The complaint adverted to the consent decree and claimed that the releases effected a "buy back" of the insurance policies constituting an "unearned windfall to the insurance carriers." In count one, plaintiffs alleged the insurance company defendants were responsible to satisfy plaintiffs' judgment; in count two, plaintiffs alleged the settlement agreements incorporated into the consent decree were "unconscionable" and constituted "legal and equitable fraud upon SJCC, GSC and the creditors" of both SJCC and GSC; count three asserted the settlement agreements constituted a "fraudulent conveyance" of assets; count four asserted a claim that by their agreements, the defendants were "unjustly enriched at the expense of the creditors of" both SJCC and GSC; and the fifth count sought a declaration that the agreements are "void as against public policy."

The insurance company defendants moved to dismiss the complaint under <u>Rule</u> 4:6-2, arguing that the averments in the complaint are unsupported by facts, and that plaintiffs cannot attack a consent decree of the United States District Court by filing a complaint in a state court that alleges agreements incorporated into the decree are unconscionable, fraudulent and violative of public policy.

A-1299-11T2

In a written opinion, the motion judge determined that "[p]laintiffs are asking this [c]ourt to make a determination that the agreement violates public policy when this issue was already ruled upon by the District Court." Relying on the doctrine of _stare decisis_, the motion judge explained that because plaintiffs are seeking "reconsideration of the District Court's finding that the agreement does not violate public policy," they must seek that relief in the "proper forum" and he thereupon dismissed the complaint without prejudice.

### III.

The motion court, as noted, dismissed plaintiffs' complaint pursuant to the doctrine of stare decisis, finding that the United States District Court "already ruled" that the settlement agreements incorporated into the consent decree do not violate public policy. While we agree with the result reached by the motion court, we determine that the analysis of the issue requires consideration of the principle of comity. Moreover, we review a motion court's determination to grant a comity stay or dismissal under an abuse of discretion standard. _Sensient Colors Inc. v. Allstate Ins. Co._, 193 _N.J._ 373, 390 (2008).

The power to bar a litigant from prosecuting a suit pertaining to a claim pending or adjudicated, in part, in

another jurisdiction is "a delicate one" that should be conscientiously exercised only when the "true interests of justice so require." Trustees of Princeton Univ. v. Trust Co. of N.J., 22 N.J. 587, 598 (1956). "New Jersey has long adhered to 'the general rule that the court which first acquires jurisdiction has precedence in the absence of special equities.'" Sensient Colors, supra, 193 N.J. at 386 (quoting Yancoskie v. Del. River Port Auth., 78 N.J. 321, 324 (1978)).

This first-filed rule counsels that our courts should "ordinarily . . . stay or dismiss a civil action in deference to an already pending, substantially similar lawsuit in another state, unless compelling reasons dictate that it retain jurisdiction." Sensient Colors, supra, 193 N.J. at 386; see also Continental Ins. Co. v. Honeywell Int'l, Inc., 406 N.J. Super. 156, 173-75 (App. Div. 2009). "The question is not whether a state court has the power to exercise jurisdiction over a case filed within its jurisdiction, but whether the court should restrain itself and not exercise that power." Sensient Colors, supra, at 386-87. As the Court explained:

> If we are to have harmonious relations with our sister states, absent extenuating circumstances sufficient to qualify as special equities, comity and common sense counsel that a New Jersey court should not interfere with a similar, earlier-filed case in another jurisdiction that is "capable of affording adequate relief and doing complete

A-1299-11T2

justice." The litigation of substantially similar lawsuits in multiple jurisdictions with opposing parties racing to acquire the first judgment is not only wasteful of judicial resources, but anathema in a federal system that contemplates cooperation among the states.

[Id. at 387 (citations and footnote omitted).]

In Thompson v. City of Atlantic City, 190 N.J. 359, 379 (2007), the Court explained that where a federal court has explicitly retained jurisdiction over the enforcement of a settlement agreement, any claimant seeking to invalidate the agreement must seek that relief in the federal court that has retained jurisdiction. However, "[w]hen a federal district court has not retained jurisdiction after entering an order dismissing a lawsuit, a state court has the power not only to enforce a settlement agreement, but also to invalidate an agreement that is contrary to public policy . . . ." Id. at 380.

The United States Supreme Court indicated in Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-81, 114 S. Ct. 1673, 1676-77, 128 L. Ed. 2d 391, 397 (1994), that it is appropriate for a federal court to validly exercise jurisdiction when there is a post-settlement controversy to "protect its proceedings and vindicate its authority" provided the order contains the terms of the parties' settlement or contains a

provision "retaining jurisdiction" over the settlement agreement. "[A]bsent" a clear retention of jurisdiction in this setting, "enforcement of the settlement agreement is for state courts." Id. at 382, 114 S. Ct. at 1677, 128 L. Ed. 2d at 398.

In Thompson, the Office of Government Integrity (OGI) commenced an action in state court to set aside a settlement reached in a federal action on the basis that the settlement was fraught with conflicts of interest involving the parties to the settlement agreement. Thompson, supra, 190 N.J. at 363. The trial court agreed that the settlement was rife with conflicts of interest but reasoned that to grant the relief OGI sought would be "'tantamount to the state court vacating a federal court order,'" and therefore held that "it did not have the power to 'invade the jurisdiction of the federal court by vacating a settlement which resulted in the dismissal of the federal litigation pursuant to an order entered by the United States District Court.'" Id. at 370.

On appeal, we agreed that there were "inherent and actual" conflicts that rendered the settlement agreement untenable. 386 N.J. Super. 359, 369 (App. Div. 2006), aff'd as modified, 190 N.J. 359 (2007). We disagreed, however, that the trial court was without a remedy. First, we found that setting aside a contract that violated state law did not impermissibly tread

A-1299-11T2

upon federal jurisdiction. Id. at 380. Next, we noted that the federal district court order expressed an intent to exercise continuing jurisdiction over the parties to the settlement, which did not include OGI. We therefore concluded that the trial court had jurisdiction to fashion an appropriate equitable remedy. Id. at 378.

The Supreme Court granted certification and first undertook to review "the precise language of the dismissal order." Thompson, supra, 190 N.J. at 381. The pertinent language provided:

> IT IS on this 31st day of January, 2002, ORDERED THAT:
>
> (1) This action is hereby DISMISSED without cost and without prejudice to the right, upon motion and good cause shown, within 60 days, to reopen this action if the settlement is not consummated; and
>
> (2) If any party shall move to set aside this Order of Dismissal as provided in the first decretal paragraph or pursuant to the provisions of Fed.R.Civ.P. 60(b), in deciding such motion the Court retains jurisdiction of the matter to the extent necessary to enforce the terms and conditions of any settlement entered into between the parties.
>
> [Ibid.]

The Court next acknowledged "that federal courts generally do not find ancillary jurisdiction over a settlement agreement

A-1299-11T2

unless the order expressly retains jurisdiction." <u>Ibid.</u> (citing

<u>In re Phar-Mor Secs. Litig.</u>, 172 <u>F.</u>3d 270, 275 (3d Cir. 1999)).

In reviewing the "precise language" of the order, the Court noted that the terms of the settlement were not incorporated into the order but that it allowed "'any party,' presumably limited to the lawsuit, to bring a motion before the federal district court 'to enforce the terms and conditions of [the] settlement.'" <u>Thompson</u>, <u>supra</u>, 190 <u>N.J.</u> at 381.   The Court held:

> We do not find that the federal district court intended to retain jurisdiction over a non-party to the original suit seeking to void the settlement agreement on public policy grounds. We conclude that the Superior Court had jurisdiction to decide the validity of the settlement agreement under state law.
>
> [<u>Id.</u> at 382].

Of significance to our discussion in the present matter, however, is the language of the Court that immediately followed:

> Nonetheless, we must acknowledge at least the possibility that Judge Irenas might have read his dismissal order differently. For that reason, out of an abundance of caution and as a matter of comity, the better course might have been for the Superior Court to decline to hear the matter until OGI first exhausted its potential federal remedies. Then, if the federal court concluded it had no jurisdiction, the Superior Court could have proceeded to render a decision on the

A-1299-11T2

validity of the settlement agreement.

[_Ibid._]

Here, the terms of the releases were incorporated into the consent decree. The consent decree, as noted, expressly provided that the United States District Court "shall retain jurisdiction of this matter for the purpose of enforcing the terms of this consent decree." It is therefore evident, not only by the court's language in the decree expressly reserving to itself continuing jurisdiction to enforce the terms of the decree, but also by the extent of the terms of the settlement incorporated in the decree, that the court intended to retain jurisdiction to enforce the decree.

While plaintiffs were not parties to the action, the issues they raised in their complaint in the Law Division explicitly challenged the lawfulness of the terms embodied in the consent decree. Consequently, even assuming the United States District Court decree was not intended to bind plaintiffs, we adopt the approach encouraged by our Court in _Thompson_ that, "out of an abundance of caution and as a matter of comity, the better course [was] for the Superior Court to decline to hear the matter until [plaintiffs] first exhausted [their] potential federal remedies." _Ibid._ "Comity is grounded in notions of accommodation and good-neighborliness, and is a necessary

A-1299-11T2

expedient to preserve the delicate balance of power and harmonious relations among the various sovereigns of our federalist system." _Ibid._ (citing _City of Philadelphia v. Austin_, 86 _N.J._ 55, 64 (1981)). The Law Division's dismissal of plaintiffs' complaint furthers this objective. In the event the United States District Court determines that it lacks jurisdiction or declines to exercise jurisdiction over plaintiffs' claims, plaintiffs are not foreclosed from reinstituting their cause of action in the Law Division.[4]

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] Plaintiffs' complaint asserts claims only against the insurance company defendants. The parties have neither briefed nor argued the issue of whether the failure of plaintiffs to name in their complaint, SJCC, GSC, the DEP, the EPA or other known creditors of SJCC or GSC, violates the Uniform Declaratory Judgments Act, _N.J.S.A._ 2A:16-50 to -62, which requires a plaintiff to name as parties all persons having or claiming any interest which would be affected by the declaration. _N.J.S.A._ 2A:16-56. Because the issue was neither briefed nor argued before us, and because the issue was not presented to the trial court, we will not consider the issue here. _Nieder v. Royal Indem. Ins. Co._, 62 _N.J._ 229, 234-35 (1973).

A-1299-11T2

# EXHIBIT K

EXHIBIT "K"

12BP,CLOSED,LEAD,RULE16

## U.S. District Court
### District of New Jersey [LIVE] (Camden)
### CIVIL DOCKET FOR CASE #: 1:96-cv-03166-JBS-AMD

UNITED STATES, et al v. S.J. CLOTHING CO., et al
Assigned to: Judge Jerome B. Simandle
Referred to: Magistrate Judge Ann Marie Donio
Demand: $0
Cause: 33:1365 Environmental Matters

Date Filed: 07/09/1996
Date Terminated: 07/30/2004
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**UNITED STATES OF AMERICA**     represented by **BRIAN G. DONOHUE**
UNITED STATES DEPARTMENT OF JUSTICE
P.O. BOX 7611
BEN FRANKLIN STATION
WASHINGTON, DC 20530
(202) 514-5413
Email: brian.donohue@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Consol Plaintiff**

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**     represented by **KENNETH WALLACE ELWELL**
OFFICE OF THE ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
P.O. BOX 093
TRENTON, NJ 08625-0093
(609) 984-6680
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**ADMINISTRATOR, NEW JERSEY SPILL COMPENSATION FUND**     represented by **KENNETH WALLACE ELWELL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**     represented by **KENNETH WALLACE ELWELL**
(See above for address)
*LEAD ATTORNEY*

WOODBURY, NJ 08096
(856) 845-8243
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. O'HARA**
DUANE MORRIS, LLP
100 AMERICAN METRO
BOULEVARD
SUITE 150
HAMILTON, NJ 08619-2304
(609) 631-2400
Email: mwohara@duanemorris.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**
**ALBERT TRASFERINI**                    represented by **KENNETH A. DIMUZIO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. O'HARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**
**JOHN TRASFERINI**                      represented by **KENNETH A. DIMUZIO**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MICHAEL W. O'HARA**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**
**JOHN DOE, INC. I**

**ThirdParty Defendant**
**JOHN DOE, INC. II**
*jointly, severally and in the alternative*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/09/1996 | 1 | COMPLAINT filed. Filing Fee waived. (et) (Entered: 07/09/1996) |
| | | |

| 07/09/1996 | | SUMMONS(ES) issued for S.J. CLOTHING CO. ( 20 Days) (Mailed to Counsel) (et) (Entered: 07/09/1996) |
|---|---|---|
| 07/09/1996 | 2 | NOTICE of Allocation and Assignment filed. Magistrate ROBERT B. KUGLER (et) Modified on 03/20/2003 (Entered: 07/09/1996) |
| 09/11/1996 | 3 | U.S.M. Service Process Receipt and RETURN OF SERVICE of Summons and Complaint, personally executed as to S.J. CLOTHING CO. 9/10/96 Answer due on 9/30/96 for S.J. CLOTHING CO. (lc) (Entered: 09/12/1996) |
| 12/26/1996 | 4 | ORDER extending time to answer for file an answer to the complaint, reset answer due for 1/7/97 for S.J. CLOTHING CO. (signed by Judge Jerome B. Simandle) (lc) (Entered: 12/31/1996) |
| 12/31/1996 | 5 | ORDER, set scheduling conference for 10:00 1/29/97 (signed by Mag. Judge Robert B. Kugler) (lc) (Entered: 12/31/1996) |
| 01/07/1997 | 6 | ANSWER to Complaint and THIRD-PTY CMP by S.J. CLOTHING CO. against GARDEN STATE CLEANERS, ALBERT TRASFERINI, JOHN TRASFERINI, JOHN DOE, INC. I, JOHN DOE, INC. II (lc) (Entered: 01/10/1997) |
| 01/21/1997 | 7 | LETTER By S.J. CLOTHING CO. for the issuance of summons to Third party defendants. (mb) (Entered: 01/21/1997) |
| 01/21/1997 | | SUMMONS(ES) issued for JOHN TRASFERINI, ALBERT TRASFERINI, GARDEN STATE CLEANER ( 20 Days) (Mailed to Counsel) (mb) (Entered: 01/21/1997) |
| 01/29/1997 | | Scheduling conference held before Mag. Judge Robert B. Kugler on 1.29.97. (lc) (Entered: 01/31/1997) |
| 01/31/1997 | 8 | RETURN OF SERVICE of Summons and Complaint, personally executed as to defendants, JOHN TRASFERINI, ALBERT TRASFERINI, GARDEN STATE CLEANER 1/22/97. Answer due on 2/11/97 for GARDEN STATE CLEANER, for ALBERT TRASFERINI, for JOHN TRASFERINI. (lc) (Entered: 02/03/1997) |
| 02/12/1997 | 9 | ORDER extending time to answer on behalf of Third party defendants, Garden State Cleaners, Albert Transferini, and John Transferini. (file and serve a responsive pleading to Third-Party Complaint on or before 3-1-97) (signed by Judge Jerome B. Simandle) (lc) (Entered: 02/14/1997) |
| 02/26/1997 | 10 | ANSWER by GARDEN STATE CLEANER, ALBERT TRASFERINI, JOHN TRASFERINI to [6-2] third-party complaint (jm1) (Entered: 02/27/1997) |
| 05/05/1997 | 11 | ORDER staying case for 60 days and all discovery obligations imposed by the Court shall be suspended for that period and The Court will hold a Status conference on 7-7-97 at 2:00 p.m. (signed by Mag. Judge Robert B. Kugler) (lc) (Entered: 05/06/1997) |
| 07/07/1997 | | Status conference held before Mag. Judge Robert B. Kugler on 7/7/97. (lc) (Entered: 07/16/1997) |
| 05/19/1998 | 12 | NOTICE of Call for Dismissal Pursuant to Rule 41.1(a) Motion hearing set for |

| | | 9:30 5/29/98 (femp) (Entered: 05/20/1998) |
|---|---|---|
| 05/28/1998 | 13 | Minute entry: Proceedings recorded by Ct-Reporter: None; Minutes of: 5.28.98; The following actions were taken, mooting [12-1] Notice of Call for Dismissal. Case administrative term. By Judge Jerome B. Simandle (lc) Modified on 05/29/1998 (Entered: 05/29/1998) |
| 05/28/1998 | 14 | ORDER for Administrative Termination. ( Signed by Judge Jerome B. Simandle ) (lc) Modified on 05/29/1998 (Entered: 05/29/1998) |
| 06/21/2002 | 15 | Notice of MOTION for Case Reopen in order to lodge Consent Decree by UNITED STATES, Motion set for 7/19/02 on [15-1] motion . (Brief/PO Subm) (db) (Entered: 06/24/2002) |
| 06/21/2002 | 16 | CERTIFICATE OF SERVICE by UNITED STATES Service Re: [15-1] motion for Case Reopen in order to lodge Consent Decree (db) (Entered: 06/24/2002) |
| 07/21/2002 | 17 | NOTICE of LODGING OF PROPOSED CONSENT DECREE by UNITED STATES (db) (Entered: 07/23/2002) |
| 07/22/2002 | 18 | ORDER granting [15-1] motion for Case Reopen in order to lodge Consent Decree. (signed by Judge Jerome B. Simandle) (NM) (db) (Entered: 07/23/2002) |
| 07/22/2002 | 19 | ORDER, consolidating cases 96cv3166 (JBS), 01cv4379 (JBS) (signed by Judge Jerome B. Simandle) (NM) (db) (Entered: 07/23/2002) |
| 07/23/2002 | | Deadline updated; terminating [15-2] hearing Motion set for 7/19/02 on [15-1] motion (db) (Entered: 07/23/2002) |
| 07/23/2002 | | Case reopened (db) (Entered: 07/23/2002) |
| 07/23/2002 | | Consolidated Lead Case (db) (Entered: 07/23/2002) |
| 08/13/2002 | 20 | LETTERA APPLICATION for approval of Consent Decree by UNITED STATES (db) (Entered: 08/13/2002) |
| 09/25/2002 | 21 | Consent Decree. (sb) (Entered: 09/26/2002) |
| 07/30/2004 | | ***Civil Case Terminated. (db, ) (Entered: 07/30/2004) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/10/2012 15:44:06 | | | |
| PACER Login: | lg0497 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:96-cv-03166-JBS-AMD Start date: 1/1/1970 End date: 12/10/2012 |
| Billable Pages: | 5 | Cost: | 0.50 |

# EXHIBIT L

EXHIBIT "L"

# U.S. District Court
## District of New Jersey [LIVE] (Camden)
## CIVIL DOCKET FOR CASE #: 1:01-cv-04379-JBS

NJ DEPT OF EPA, et al v. SJ CLOTHING COMPANY, et al

Assigned to: Judge Jerome B. Simandle

Demand: $0

Cause: 42:9607 Real Property Tort to Land

Date Filed: 09/17/2001

Date Terminated: 07/23/2002

Jury Demand: None

Nature of Suit: 240 Torts to Land

Jurisdiction: Federal Question

**Plaintiff**

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**

represented by **KENNETH WALLACE ELWELL**
OFFICE OF THE ATTORNEY GENERAL
R.J. HUGHES JUSTICE COMPLEX
P.O. BOX 093
TRENTON, NJ 08625-0093
(609) 984-6640
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ADMINISTRATOR, NEW JERSEY SPILL COMPENSATION FUND**

represented by **KENNETH WALLACE ELWELL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION**

*as Trustee for Natural Resources*

represented by **KENNETH WALLACE ELWELL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SOUTH JERSEY CLOTHING COMPANY, INC.**

**Defendant**

**ANGELO SPARAGNA**

**Defendant**

**FRANCIS SPARAGNA**

**Defendant**
**GARDEN STATE CLEANERS**

**Defendant**
**ALBERT TRASFERINI**

**Defendant**
**JOHN TRASFERINI**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/17/2001 | 1 | COMPLAINT filed; FILING FEE $ 150.00, RECEIPT #296058 (mfs) Modified on 09/25/2001 (Entered: 09/18/2001) |
| 09/18/2001 | 2 | NOTICE of Allocation and Assignment filed. Magistrate Judge Joel B. Rosen (mfs) (Entered: 09/18/2001) |
| 12/19/2001 | 3 | WAIVER OF SERVICE RETURNED EXECUTED as to GARDEN STATE CLEAN., ALBERT TRASFERINI, JOHN TRASFERINI 10/18/01 Answer deadline projected for 12/17/01 for JOHN TRASFERINI, for ALBERT TRASFERINI, for GARDEN STATE CLEAN. (sb) (Entered: 12/21/2001) |
| 12/19/2001 | 4 | WAIVER OF SERVICE RETURNED EXECUTED as to SJ CLOTHING COMPANY, ANGELO SPARAGNA, FRANCIS SPARAGNA 10/20/01 Answer deadline projected for 12/19/01 for FRANCIS SPARAGNA, for ANGELO SPARAGNA, for SJ CLOTHING COMPANY (sb) (Entered: 12/21/2001) |
| 03/05/2002 | | Letter of 2-27-02 sent to chambers by Kenneth Elwell AUSA, noting reason for inactivity of case and noting Court of Impending settlement . (dt) (Entered: 03/05/2002) |
| 07/01/2002 | 5 | Notice of MOTION to consolidate this action with 96-cv-3166 (JBS) by NJ DEPT OF EPA, ADMINISTRATOR, SPILL, COMMISSIONER, NJ EPA, Motion set for 8/2/02 on [5-1] motion . (PO Subm) (db) (Entered: 07/02/2002) |
| 07/01/2002 | 6 | DECLARATION of Kenneth W. Elwell on behalf of NJ DEPT OF EPA, ADMINISTRATOR, SPILL, COMMISSIONER, NJ EPA supporting [5-1] motion to consolidate this action with 96-cv-3166 (JBS) (db) (Entered: 07/02/2002) |
| 07/01/2002 | 7 | CERTIFICATE OF SERVICE by NJ DEPT OF EPA, ADMINISTRATOR, SPILL, COMMISSIONER, NJ EPA Service Re: [6-1] declaration, [5-1] motion to consolidate this action with 96-cv-3166 (JBS) (db) (Entered: 07/02/2002) |
| 07/22/2002 | 8 | ORDER granting [5-1] motion to consolidate this action with 96-cv-3166 (JBS) (signed by Judge Jerome B. Simandle) (NM) (db) (Entered: 07/23/2002) |
| 07/23/2002 | | Deadline updated; terminating [5-2] hearing Motion set for 8/2/02 on [5-1] motion (db) (Entered: 07/23/2002) |
| 07/23/2002 | | Case closed (db) (Entered: 07/23/2002) |

| 07/23/2002 | Consolidated Member Case . Lead Case Number: 1cv96-3166 (db) (Entered: 07/23/2002) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/29/2012 10:30:28 | | | |
| PACER Login: | lg0497 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:01-cv-04379-JBS Start date: 1/1/1970 End date: 11/29/2012 |
| Billable Pages: | 2 | Cost: | 0.20 |